503-99/EEL/LJK

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs
Maersk, Inc. and A.P. Moller-Maersk A/S,
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Eric E. Lenck (EL 4547)
Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

MAERSK, INC., and A.P. MOLLER-MAERSK A/S,

                                    Plaintiffs,

          -against-

NEEWRA, INC., REDNIHOM, INC., AREF
HASSAN ABUL INC., ARWEEN SINGH
SAHNI a/k/a ARWEEN SAHNI SINGH a/k/a
ARWEEN SAHNI a/k/a ARWEEN SINGH a/k/a
ABUL SABAH a/k/a AREF HASSAN ABUL,
MOHINDER SINGH SAHNI a/k/a MOHINDER
SAHNI SINGH a/k/a MOHINDER SAHNI a/k/a
MOHINDER SINGH, JOGINDER SINGH SAHNI
a/k/a JOGINGER SINGH SAHNI a/k/a JOGINDER
SAHNI SINGH a/k/a JOGINGER SAHNI SINGH
a/k/a JOGINDER SINGH a/k/a JOGINDER SAHNI
a/k/a JOGINGER SINGH a/k/a JOGINGER SAHNI,
SABHARWAL CHANDRA KUMAR a/k/a
SABHARWAL K. CHANDRA, HELP LINE
COLLECTION CO. W.L.L., PARKER DAWOOD
TAJUDDIN TAJUDIS ISMAIL PARKER, SARDAR
TRADERS EST., SARDAR INTERNATIONAL
TRADING CO., AL TAMASOK AL ARABI EST.,
JOHN DOE 1-100 (fictitious) and JOHN DOE INC.
1-100 (fictitious)
-------------------------------------------------------------------x

05 CIV _____ (     )

**VERIFIED COMPLAINT**

          Plaintiffs MAERSK, INC. and A.P. MOLLER-MAERSK A/S (collectively,

"MAERSK"), through their attorneys Freehill Hogan & Mahar, LLP, as and for their

Verified Complaint against Defendants NEEWRA, INC. ("NEEWRA"), REDNIHOM, INC. ("REDNIHOM"), AREF HASSAN ABUL, INC. ("AREF"), ARWEEN SIGNH SAHNI a/k/a ARWEEN SAHNI SINGH a/k/a ARWEEN SAHNI a/k/a ARWEEN SINGH a/k/a ABUL SABAH a/k/a AREF HASSAN ABUL ("ASS"), MOHINDER SINGH SAHNI a/k/a MOHINDER SAHNI SINGH a/k/a MOHINDER SAHNI a/k/a MOHINDER SINGH ("MSS"), JOGINDER SINGH SAHNI a/k/a JOGINGER SINGH SAHNI a/k/a JOGINDER SAHNI SINGH a/k/a JOGINGER SAHNI SINGH a/k/a JOGINDER SINGH a/k/a JOGINDER SAHNI a/k/a JOGINGER SINGH a/k/a JOGINGER SAHNI ("JSS"), SABHARWAL CHANDRA KUMAR a/k/a SABHARWAL K. CHANDRA ("SCK"), HELP LINE COLLECTION CO. W.L.L. ("HLC"), PARKER DAWOOD TAJUDDIN TAJUDIS ISMAIL PARKER ("PARKER"), SARDAR TRADERS EST. ("SARDAR"), SARDAR INTERNATIONAL TRADING CO. ("SITC"), AL TAMASOK AL ARABI EST. ("AL TAMASOK"), JOHN DOE 1-100 (fictitious), and JOHN DOE INC. 1-100 (fictitious) allege upon information and belief as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      This is an admiralty and maritime matter within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims related to the transportation of goods by sea in connection with ocean bills of lading.  The case also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper under 18 U.S.C. §1961 and is therefore within the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

2.      Venue is proper pursuant to Rule 82 of the Federal Rules of Civil Procedure and because MAERSK's ocean bills of lading include a forum selection clause that specifies jurisdiction before this Court.  Because MAERSK's ocean bills of lading provide for jurisdiction before this Court, this Court is an appropriate venue pursuant to 18 U.S.C. §§1964(c) and 1965.

## THE PARTIES

3.      At all material times, Plaintiff MAERSK, INC. was and still is a corporation incorporated in one of the States of the United States with a registered office at Giralda Farms, Madison, New Jersey.

4.      At all material times, Plaintiff A.P. MOLLER-MAERSK A/S was and still is a corporation or other business entity organized and existing pursuant to the laws of a foreign country, with a registered office at Esplanaden 50, 1098 Copenhagen K, Denmark.  A.P. MOLLER-MAERSK A/S was established in June of 2003 as the result of the merger between Dampskibsselskabet af 1912 Aktieselskab, and Aktieselskabet Dampskibsselskabet Svendborg.  The two merged companies were at all times the actual carriers under the relevant bills of lading in this matter.

5.      Plaintiffs sue on their own behalf and as agent and trustee on behalf of all other parties with an interest in the claims or who may ultimately be entitled to enforce the claims which are the subject of this action.

6.      At all material times, NEEWRA INC. was a corporation or other business entity organized and existing pursuant to the laws of the State of New York with an office at 86-10 Roosevelt Ave., Store #9, Jackson Heights, New York 11372 and with another or former office c/o MSS at 80-50 Baxter Ave., Suite 189, Elmhurst, New York 11373.

NEEWRA's telephone and fax numbers were the same as those for REDNIHOM (see below). NEEWRA was dissolved by proclamation of the State of New York for failure to pay taxes, and another entity currently occupies the space where NEEWRA's offices were formerly located, but NEEWRA has nonetheless been actively pursuing fraudulent claims against MAERSK in Kuwait.

7.   At all material times, REDNIHOM INC. was a corporation or other business entity organized and existing pursuant to the laws of the State of New York with an office at 80-50 Baxter Avenue, Office #189, Elmhurst, New York 11373. REDNIHOM's telephone and fax numbers were the same as those for NEEWRA (see above). REDNIHOM was dissolved by proclamation of the State of New York for failure to pay taxes, and another entity currently occupies the space where REDNIHOM's offices were formerly located.

8.   At all material times, AREF was a corporation or other business entity organized and existing pursuant to the laws of the State of New York with an office at 50-08 Ithaca Street, Elmhurst, New York 11373 and with another or former office at 80-50 Baxter Avenue, Suite 189, Elmhurst, New York 11373. AREF was dissolved by proclamation of the State of New York for failure to pay taxes, and another entity occupies the space where AREF's offices were formerly located.

9.   At all material times, ARWEEN SINGH SAHNI, also known as ARWEEN SAHNI SINGH, also known as ARWEEN SAHNI, also known as ARWEEN SINGH, also known as ABUL SABAH and also known as AREF HASSAN ABUL ("ASS") is a natural person of foreign nationality whose current address is presently not known. ASS holds an Indian passport, no. B0250994. ASS's last known address was

40-18 Hampton Street, Office #1J, Elmhurst, New York 11373, but another individual currently occupies that apartment. ASS is or was the individual who operated both NEEWRA (which is "Arween" spelled backwards) and AREF HASSAN ABUL, INC. ASS is the brother or other close family relation of MSS and is the son of JSS.

10. At all material times, MOHINDER SINGH SAHNI, also known as MOHINDER SAHNI SINGH, also known as MOHINDER SAHNI and also known as MOHNINDER SINGH ("MSS") is a natural person believed to be of foreign nationality whose current address is presently not known. MSS is or was the chairman or CEO of NEEWRA and is or was the President of REDNIHOM (which is "Mohinder" spelled backwards). MSS is the brother or other close family relation of ASS and is the son of JSS.

11. NEEWRA, REDNIHOM, AREF, ASS and MSS all operated out of the 80-50 Baxter Avenue, Suite 189, Elmhurst, New York 11373 address during the period 1998-2000, sometimes concurrently during this period.

12. At all material times, JOGINDER SINGH SAHNI, also known as JOGINGER SINGH SAHNI, also known as JOGINDER SAHNI SINGH, also known as JOGINGER SAHNI SINGH, also known as JOGINDER SAHNI, also known as JOGINDER SINGH, also known as JOGINGER SAHNI and also known as JOGINGER SINGH ("JSS") is a natural person of foreign nationality residing in Kuwait whose current address in Kuwait is presently not known. JSS is the owner or operator of HLC. JSS is the owner or operator of SARDAR. JSS is the owner or operator of SITC. JSS is the owner or operator of Blue Bird Water Treatment Company (a Kuwait company).

13. SABHARWAL CHANDRA KUMAR, also known as SABHARWAL K. CHANDRA ("SCK") is a natural person of foreign nationality residing in Kuwait whose current address in Kuwait is presently not known. SCK is the owner or operator of AL TAMASOK.

14. HELP LINE COLLECTION CO. W.L.L. ("HLC") is a corporation or other business entity organized and existing under the laws of a foreign country with an office or place of business located at Sharq-Opp. Fire Brigade, Honda Cars Showroom Bldg., 1st Floor, Flat No. 1, PO Box 25300 Safat, Code 13114, Kuwait. HLC is owned or operated by JSS.

15. PARKER DAWOOD TAJUDDIN TAJUDIS ISMAIL PARKER ("PARKER") is a natural person of foreign nationality residing in Kuwait whose current address in Kuwait is presently not known. PARKER is employed by HLC (which is owned by JSS) and his sponsor in Kuwait is Blue Bird Water Treatment Company (which is owned by JSS).

16. SARDAR TRADERS EST. ("SARDAR") is a corporation or other business entity organized and existing under the laws of a foreign country with an office or place of business located at Al-Shuwaika Canada Dry St., Opp. Al-Mailem Co., PO Box 3216, Safat 13033, Kuwait. SARDAR is a tire and auto parts company owned or operated by JSS.

17. SARDAR INTERNATIONAL TRADING CO. ("SITC") is a corporation or other business entity organized and existing under the laws of a foreign country with an office or place of business located at PO Box 2533, Safat 13110, Kuwait. SITC is

owned or operated by JSS. SITC and Blue Bird Water Treatment Company share the same telephone number in Kuwait.

18.     AL TAMASOK AL ARABI EST. ("AL TAMASOK") is a corporation or other business entity organized and existing pursuant to the laws of a foreign country with an office or place of business located at Office 8, Third Floor, 9th Commercial Division 0009, Building 13, Kuwait City, Kuwait.

19.     ASS has other aliases. The individual defendant sued herein as "ASS" is also sued herein as "JOHN DOE" to account for this individual's other aliases and actual identity, once discovered.

20.     MSS has other aliases. The individual defendant sued herein as "MSS" is also sued herein as "JOHN DOE" to account for this individual's other aliases and true identity, once discovered.

21.     JSS has other aliases. The individual defendant sued herein as "JSS" is also sued herein as "JOHN DOE" to account for this individual's other aliases and true identity, once discovered.

22.     Suit is also brought against JOHN DOE INC. 1-100, the fictitious name of other business entities, the names of which are not presently known, whether or not actually incorporated, the addresses of which are not presently known, which are or were owned, operated and/or controlled by the other defendants herein.

## FIRST CAUSE OF ACTION

23.     MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 22 inclusive with the same force and effect as if herein set forth at length.

24.    On or about April 22, 2001, MAERSK received an inquiry via telephone and/or facsimile and/or mail and/or telex and/or email from AREF through ASS, requesting a price quote on the shipment of 720 container loads of used auto and truck tires to India.  AREF and ASS knew that the consignee for the shipment was nonexistent and/or had no interest in the tires, but hid this fact from MAERSK.  AREF and ASS knew that there was no contract with the named consignee to deliver any tires to it and knew that there would never be any such contract with the named consignee, but hid these facts from MAERSK.

25.    On or about April 24, 2001, MAERSK responded to AREF with a freight quote on a "freight collect" (*i.e.*, the consignee must pay for ocean freight before it can receive the cargo) basis.

26.    On or about May 2, 2001, MAERSK and AREF entered into a service contract (No. 7792), filed with the U.S. Federal Maritime Commission that incorporated the terms and conditions of MAERSK's bills of lading.   The service contract contemplated that AREF would deliver to MAERSK approximately 720 containers over a period of time and that MAERSK would ship the containers to India in groups over time, with freight coming due upon MAERSK's receipt of the containers.  Over time, MAERSK received approximately 260 containers from AREF and fully performed its obligations by shipping all but the last 60 received (as further discussed below) to India.

27.    On or about May 16, 2001, after approximately 200 containers had reached India, MAERSK learned that the consignee of record in India for the shipment of the tires, "Golden Traders", was fictitious or had no interest in the shipment of tires, and advised AREF.

28.     On or about May 17, 2001, AREF through ASS advised MAERSK via telephone and/or facsimile and/or mail and/or telex and/or email of the details of a replacement consignee, "Poonanam Ent." AREF and ASS knew that Poonanam had no interest in the tires, but hid this fact from MAERSK. AREF and ASS knew that there was no contract with Poonanam to deliver any tires to it and knew that there would never be any such contract with Poonanam, but hid these facts from MAERSK.

29.     On or about May 18, 2001, Poonanam advised that it was not interested in the tires.

30.     On or about May 21, 2001, AREF through ASS advised MAERSK via telephone and/or facsimile and/or mail and/or telex and/or email that Poonanam was offering to pay $1,000 per container for the tires, knowing the same to be false but hiding the falsity of the statement from MAERSK, and MAERSK accepted the offer in a communication to AREF and ASS.

31.     At or about the same time, some 60 containers from AREF and ASS were at Newark, New Jersey awaiting transport to India. Due to the difficulties in releasing the containers of used tires at India, and because it was unclear to MAERSK whether Poonanam would accept (and pay for) the 60 additional containers of tires, the containers were held at Newark with the knowledge and consent of AREF and ASS.

32.     On or about June 15, 2001, MAERSK learned that Poonanam would not take any of the containers of tires and India Customs refused to permit the cargo to enter into India and impounded the containers. Poonanam never paid any monies to MAERSK and the containers of tires were abandoned where they sat in India.

33. At or about the same time, REDNIHOM through MSS was involved in a similar fraud and scam, also involving approximately 700 ocean shipping containers filled with used auto and truck tires, but involving other ocean carriers, and MAERSK learned that other ocean carriers were caught by a nearly identical fraud and scam perpetrated by REDNIHOM and MSS with the cooperation of ASS and AREF.

34. MAERSK's freight for the shipment of the containers that were transported to India and for those that were held at Newark, $339,166.00, was never paid, nor was MAERSK's claim for deadfreight for the approximately 450 containers that were contracted for at a discounted rate but were never shipped, in the amount of approximately $1,125,000.

35. MAERSK also incurred significant charges for demurrage, storage and similar charges for maintaining the containers at India and Newark and has never been reimbursed for such charges. From the date of arrival of the cargo at India, and following seven "free days", the cargo incurred demurrage, storage and similar charges at a rate of $65 per container per day, for a total on September 5, 2001 of $1,360,021.00 and at Newark at the same rate for a total on September 5, 2001 of $437,580.00. Total charges for all the containers (at Newark and at India) of approximately $17,290 were incurred each day thereafter until the containers were released.

36. Because of the difficulties involved in releasing the containers of tires, MAERSK was denied use of more than 250 shipping containers for an extended period of time beyond the "free time" permitted by MAERSK and MAERSK is entitled to loss of use of these containers at its ordinary rental rate for containers for the period of time from

the end of free time until the containers were returned to service. MAERSK is entitled to loss of use damages for its containers in the total approximate amount of $1,175,000.

37.     MAERSK also incurred significant expenses in disposing of the used tires once it became clear that the tires had been abandoned. Indian Customs would not allow the used tires to enter the country and MAERSK had to pay a fee to secure the release of its containers and had to pay for the return transportation of the approximately 200 containers filled with tires to the United States. MAERSK incurred $104,200 to dispose of the used tires.

38.     MAERSK retained counsel to attempt to recoup the amounts due for the aforementioned freight, demurrage, and similar items of expense as indicated above. MAERSK incurred $5,858.94 in reasonable attorney fees and disbursements in attempting to collect these sums. The efforts to collect the sums due were ultimately unsuccessful and discontinued in or about November 2001, without waiver of the claim, because AREF and ASS (who had initially retained counsel to represent them) terminated their counsel's services, ceased doing business, failed to respond to communications, and/or could not thereafter be found.

39.     MAERSK's bill of lading provides in part as follows:

> The Shipper, consignee, holder hereof, and owner of the goods, *and their principals*, shall be jointly and severally liable to Carrier for the payment of all freight, demurrage, General Average and other charges due hereunder, without discount, together with any Court costs, expenses and reasonable attorney fees incurred in collecting any sums due Carrier....Merchant to remain liable for all charges hereunder notwithstanding any extension of credit...by Carrier.

(emphasis supplied). Accordingly, due to their breach of contract, AREF and ASS are jointly and severally responsible to MAERSK for the approximate sum of $5,246,825 for unpaid freight, demurrage, storage, and other charges, together with the cost of collection of the same.

## SECOND CAUSE OF ACTION

40.     MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 39 inclusive with the same force and effect as if herein set forth at length.

41.     Used tires are a solid (and depending on their synthetic composition, hazardous) waste subject to regulation under the Solid Waste Disposal Act and it is costly to dispose of used tires.

42.     AREF through ASS contacted via telephone and/or facsimile and/or mail and/or telex and/or email numerous facilities throughout New York and New Jersey and elsewhere and offered to dispose of their stockpiles of used tires by shipping them to India where AREF through ASS represented there was a buyer of the used tires, knowing the same to be false.

43.     Causing the shipment of solid waste and/or hazardous waste to a foreign country without a permit from the receiving country is a crime under U.S. law.

44.     AREF and ASS, through one or more communications via telephone and/or facsimile and/or mail and/or telex and/or email, contracted with MAERSK to ship 720 container loads of used tires and represented to MAERSK that all necessary permits for the import into India of the used tires had been obtained or would be obtained, knowing the same to be false, for the purpose of defrauding MAERSK.

45.     AREF through ASS, through one or more communications via telephone and/or facsimile and/or mail and/or telex and/or email, entered into contract with MAERSK for the shipment of used tires and caused MAERSK to issue bills of lading containing false statements for such shipments with the intent of defrauding MAERSK, which is a crime under the Bills of Lading Act.

46.     Shipment of the used tires to India under these conditions also constitutes under Indian law the crime of smuggling.

47.     AREF through ASS, and/or REDNIHOM through MSS and ASS, using telephonic and/or facsimile and/or mail and/or telex and/or email communications, defrauded the original owners of the used tires, defrauded MAERSK, and defrauded other ocean carriers through this scheme to transport used tires from the United States to India.

48.     As a result of this fraudulent scheme, AREF and ASS are jointly and severally liable to MAERSK for its damages of $104,200 together with attorneys fees, costs and expenses of $5,858.94 for a total of approximately $110,058.94.

### THIRD CAUSE OF ACTION

49.     MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 48 inclusive with the same force and effect as if herein set forth at length.

50.     On or about March 5, 1999, NEEWRA through ASS (using an alias different from the one used in the used tires scheme), using one or more telephonic and/or facsimile and/or mail and/or telex and/or email communications, contracted with MAERSK to ship a container from Newark, New Jersey said by the shipper to contain crates of electrical spare parts for delivery to consignee AL TAMASOK in Kuwait.

NEEWRA had previously shipped a container with MAERSK from the same location to the same destination and the same consignee, containing the same number of crates, but describing the contents as automotive parts, as a test run for a scam.

51.     NEEWRA through ASS brought suit in New York alleging misdelivery and conversion of the electrical spare parts. NEEWRA claimed that the container had been stuffed with 2000 units of new computer hard drives purchased by it from Seagate Technology, a well-known U.S. manufacturer. NEEWRA claimed that the container had been stuffed and sealed by it and had been delivered to MAERSK's agent in exchange for an ocean bill of lading which was in turn negotiated to its bank. The bank was to hold the bill of lading (which would act as a receipt, entitling AL TAMASOK, as buyer, to claim the cargo upon arrival at Kuwait) until the full purchase price had been paid by AL TAMASOK. In its New York complaint, NEEWRA claimed that AL TAMASOK had obtained a fraudulent bill of lading and obtained the cargo at Kuwait without paying the purchase price. NEEWRA's claim against MAERSK sought $1.86 million for misdelivery and conversion, but knew that the claim was fraudulent.

52.     NEEWRA's invoice for the computer hard drives, allegedly issued by a company called "Micro-Spy Inc." in the amount of $1.6 million, was false and fraudulent. Micro-Spy was not paid this amount by NEEWRA or ASS or anyone else. Similarly, there was no contract for sale of hard drives from Micro-Spy to NEEWRA or ASS.

53.     Seagate Technology did not sell hard drives to either Micro-Spy or to NEEWRA or ASS. Seagate Technology did not receive any funds from Micro-Spy or from NEEWRA or ASS, and there was no contract for sale of hard drives from Seagate

Technology to Micro-Spy or NEEWRA or ASS. Seagate Technology confirmed that the manner in which 2000 hard drives would have been packed for shipment would have been different from the manner described by ASS as the way the supposed hard drives were allegedly packed.

54.     There were no stuffing records for the container, and the container was stuffed and sealed at a small auto parts supply shop called "Engines Plus Corporation" in a mainly residential neighborhood in Garfield, New Jersey.

55.     With this and other evidence of the falsity of NEEWRA's claim against MAERSK, NEEWRA's attorneys withdrew the claim.

56.     NEEWRA and ASS thereafter retained counsel in New Jersey who brought a nearly identical action in New Jersey, but when NEEWRA's New Jersey counsel were shown the evidence presented to NEEWRA's prior New York counsel, NEEWRA's New Jersey attorneys withdrew the claim.

57.     NEEWRA and ASS also asserted a claim against their cargo underwriter, Continental Insurance Company, for the alleged loss of the same cargo. Continental declined the claim after investigation as fraudulent and sought and obtained a declaratory judgment of nonliability against NEEWRA.

58.     Making a false claim against an insurance company is a crime under U.S. law.

59.     NEEWRA and ASS communicated the aforesaid false information to their New York and New Jersey attorneys via telephone and/or facsimile and/or mail and/or telex and/or email for the purpose of bringing fraudulent claims in litigation.

60.    NEEWRA's and ASS's fraudulent litigation in New York and New Jersey cost MAERSK in excess of $15,674 in legal fees, costs and disbursements which should be reimbursed to MAERSK jointly and severally by NEEWRA and ASS.

## FOURTH CAUSE OF ACTION

61.    MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 60 inclusive with the same force and effect as if herein set forth at length.

62.    The container that was the subject of the March 5, 1999 bill of lading from NEEWRA to AL TAMASOK actually held comparatively low-value auto parts, and the Kuwaiti Customs declaration executed by SCK on behalf of AL TAMASOK indicated that the cargo was worth approximately $9,980.  The basis for the Kuwaiti Customs declaration was an invoice from ASS and/or NEEWRA indicating that the cargo was in fact spare auto parts worth less than $10,000, and not Seagate Technology computer hard drives as claimed by NEEWRA in litigation in the United States.

63.    When AL TAMASOK's SCK attempted to take delivery of the container, he had no original bill of lading to present.  ASS permitted SCK of AL TAMASOK to take delivery against a bank check in the amount of $30,000, however, on May 5, 1999.

64.    It was not until five days after AL TAMASOK had already obtained the cargo that NEEWRA forwarded the shipping documents to its bank, Banco Popular, on May 10, 1999.  NEEWRA signed a payment instruction and demanded payment in the amount of $1.86 million to AL TAMASOK, and forwarded such payment instructions via telephone and/or facsimile and/or mail and/or telex and/or email, with the knowledge that AL TAMASOK already had possession of the cargo and with the knowledge that the

cargo was not valued anywhere near $1.86 million, for the purpose of defrauding MAERSK and Banco Popular.

65.    JSS, on behalf of AL TAMASOK, attempted to corrupt one MAERSK employee to provide blank original bills of lading and later actually corrupted a second MAERSK employee who provided blank form bills of lading to JSS.

66.    SCK, on behalf of AL TAMASOK and with the assistance of JSS, used one of the fraudulently obtained blank form bills of lading to create a fictitious original bill of lading which was presented to the receiver in Kuwait in exchange for the return of the $30,000 AL TAMASOK had initially posted to secure release of the cargo (the cargo had by that time already been released to AL TAMASOK).

67.    NEEWRA through ASS then brought a claim against MAERSK in Kuwaiti court, claiming misdelivery of the cargo of computer parts and seeking a recovery of $1.86 million, knowing that the claim was false. At the time NEEWRA brought its claim in Kuwait, NEEWRA had already been dissolved by proclamation of the New York Department of State for failure to pay taxes.  NEEWRA nonetheless utilized telephonic and/or facsimile and/or mail and/or telex and/or email communications to obtain the assistance of PARKER and/or HLC to press NEEWRA's false claim in the Kuwaiti courts by granting PARKER and/or HLC an invalid power of attorney for this purpose.

68.    PARKER's and/or HLC's assistance was obtained through JSS, ASS's father, and/or one or more of ASS's companies, including HLC, SARDAR, SITC, and/or Blue Bird Water Treatment Company for the purpose of knowingly advancing the false claim with an invalid power of attorney.

69.     Although NEEWRA's claim before the trial court in Kuwait was defeated by MAERSK, PARKER obtained by fraud a reversal on appeal in favor of NEEWRA and caused MAERSK's ship, the M/V ALVA MAERSK, to be arrested at Kuwait on or about April 4, 2004.

70.     The M/V ALVA MAERSK was delayed due to the arrest by several days, incurring demurrage and other damages in the amount of approximately $446,700 until PARKER agreed to accept a bank guarantee for the fictitious $1.86 million claim. MAERSK incurred a further $74,000 in posting and maintaining the bank guarantee and in excess of $410,000 in legal fees and disbursements with regard to the Kuwaiti legal proceedings.

71.     Although Kuwaiti appellate proceedings are currently ongoing and MAERSK is taking further actions in Kuwait against NEEWRA and/or PARKER, under Kuwaiti law, PARKER and/or NEEWRA may now liquidate and collect against the bank guarantee and has in fact initiated proceedings to collect these funds. If these funds are successfully collected in Kuwait, MAERSK will have lost a further $1.86 million to NEEWRA, ASS, and their conspirators, including but not limited to JSS, HLC and/or PARKER.

72.     MAERSK has not been paid freight for its carriage of the NEEWRA shipment to Kuwait and is owed approximately $2,500, which was eventually acquired by SARDAR and/or SITC for the benefit of JSS. Accordingly, according to the terms and conditions of the bill of lading contract of carriage, MAERSK is entitled to collect jointly and severally from NEEWRA, ASS, SCK, AL TAMASOK, JSS, SARDAR,

and/or SITC for its unpaid freight as well as the cost of collection (including but not limited to reasonable attorneys fees and court costs).

73.   NEEWRA's, ASS's and PARKER's fraudulent litigation in Kuwait has cost MAERSK in excess of $447,954.74 in legal fees, costs and disbursements and other expenses, which MAERSK is entitled to collect jointly and severally from NEEWRA, ASS, SCK, AL TAMASOK, JSS, SARDAR, and/or SITC.

### FIFTH CAUSE OF ACTION

74.   MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 73 inclusive with the same force and effect as if herein set forth at length.

75.   On or about July 20, 1999, REDNIHOM, through MSS, used telephonic and/or facsimile and/or mail and/or telex and/or email communications to contract with MAERSK pursuant to an ocean bill of lading for the shipment of a container said by REDNIHOM and MSS to contain 4,000 pieces of "PC parts" to Kuwait, knowing that the container actually held no such "PC parts", but hiding this fact from MAERSK.

76.   Sharing many of the same hallmarks of the then-recent shipment by NEEWRA, and suspecting that this shipment was also fraudulent, MAERSK caused the seal placed on the container by REDNIHOM to be broken and discovered that the container held a number of low-value goods, but no "PC parts" whatsoever.

77.   The REDNIHOM shipment initially was abandoned by the named consignees for nearly three months, during which time the container incurred demurrage, storage and similar charges at Kuwait.

78.    The consignees of the REDNIHOM shipment were thereafter discovered by MAERSK to be fictitious, with no real presence in Kuwait.

79.    HLC, through PARKER and/or JSS attempted to find an alternative way to present a false claim with regard to the shipment. HLC tried to have the container surveyed in the knowledge that it did not contain high-value PC parts. HLC then tried to divert the shipment to another consignee in another country, all for the purpose of defrauding MAERSK.

80.    REDNIHOM tried to disguise the fact that its shipment was connected to the NEEWRA shipment. Although REDNIHOM and NEEWRA had different names and addresses, they shared the same fax and telephone numbers. Moreover, MSS, the president of REDNIHOM, is publicly listed as a principal of NEEWRA.

81.    MAERSK was not paid its freight of approximately $2,500 for carrying the container to Kuwait or for the charges incurred for demurrage and storage in the amount of approximately $29,500 for which REDNIHOM and MSS are jointly and severally liable pursuant to the terms and conditions of the bill of lading, and REDNIHOM and MSS are further liable for the costs of collection (including reasonable attorneys fees and court costs) pursuant to the terms and conditions of the bill of lading.

82.    REDNIHOM's, MSS's, and JSS's fraudulent shipment to Kuwait has cost MAERSK approximately $32,000 for which MSS and REDNIHOM are jointly and severally liable.

## SIXTH CAUSE OF ACTION

83.    MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 82 inclusive with the same force and effect as if herein set forth at length.

84.    NEEWRA, REDNIHOM, AREF, ASS, MSS, JSS, SCK, HLC, PARKER, SARDAR, SITC, AL TAMASOK, JOHN DOE 1-100, and JOHN DOE INC. 1-100 all conspired to defraud MAERSK and others and actually participated in multiple separate events of mail fraud and/or wire fraud as defined in 18 U.S.C. §§1341 and 1343 in so doing. As such, the Defendants' actions constitute an enterprise to conduct "racketeering activity" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.* ("RICO") and MAERSK hereby seeks civil relief pursuant to 18 U.S.C. §1964, including but not limited to treble damages, the cost of the suit, and reasonable attorneys fees, all as provided in 18 U.S.C. §1964(c), all in an amount to be determined at trial, but not less than $24,707,136.

## MARITIME ATTACHMENT

85.    MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 84 inclusive with the same force and effect as if herein set forth at length.

86.    Upon information and belief, and after investigation, Defendants NEEWRA, REDNIHOM, AREF, ASS, MSS, JSS, SCK, HLC, PARKER, SARDAR, SITC, AL TAMASOK, JOHN DOE 1-100, and JOHN DOE INC. 1-100 all cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have,

or will shortly have, assets within this District comprising of, *inter alia*, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (hereinafter, "ASSETS"), including but not limited to ASSETS at, being transferred through, or being transferred and/or wired to or from Citibank and Banco Popular or other financial institutions.

87.  The total amount sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by MAERSK against the defendants is **$24,950,000**, which represents, pursuant to the sixth cause of action, three times the damages suffered by MAERSK as described in the first through fifth causes of action described above, together with estimated attorneys fees, costs and disbursements in the amount of approximately $243,000, collectible from the defendants as described above in the sixth cause of action.

WHEREFORE, plaintiffs MAERSK pray:

a.  That process in due form of law according to the practice of this Court may issue against the defendants, citing them to appear and answer the foregoing, failing which a default will be taken against them for the principal amount of the claim of $8,235,712 plus interest, costs and attorneys fees;

b.  That plaintiff be awarded treble damages pursuant to RICO of $24,707,136 plus attorneys fees, costs and interest;

c.  That if the defendants, or any of them, cannot be found within this District pursuant to Supplemental Rule B that all assets of the defendants, or those

outside this District, up to and including the claim of **$24,950,000** be restrained and attached, including, but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or any other assets of, belonging to, due or for the benefit of the defendants held by Citibank and/or Banco Popular and/or any other garnishees upon whom a copy of the Process of Maritime Attachment and Garnishment issued herein may be served;

d.     That plaintiffs have such other, further and different relief as this Court deems just and proper in the premises.

Dated: New York, New York
          May 3, 2005

                                        FREEHILL HOGAN & MAHAR, LLP
                                        Attorneys for Plaintiffs
                                        Maersk, Inc. and A.P. Moller-Maersk A/S

                    By:     _____
                                        Eric E. Lenck (EL 4547)
                                        Lawrence J. Kahn (LK 5215)
                                        80 Pine Street
                                        New York, NY 10005
                                        (212) 425-1900
                                        (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

ERIC E. LENCK, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for plaintiffs herein, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications from our clients and documents provided by our clients regarding the claims.

3.      The reason this verification is made by an attorney and not by the plaintiffs themselves is because the plaintiff A.P. Moller-Maersk A/S is a foreign entity, none of whose officers are presently within this Judicial District, and although Plaintiff Maersk Inc. is a U.S. entity, none of its officers are presently within this Judicial District.

_____
                    Eric E. Lenck

Sworn to before me this
3  day of May, 2005

_____
Notary Public
                CLARE MAZZA
        Notary Public, State of New York
               No. 01MA4831498
             Qualified in Kings County
           Certified in New York County
        Commission Expires October 31, 2005