UNITED STATES DISTRICT COURT                                    ECF
SOUTHERN DISTRICT OF NEW YORK _____

|  |  |
|---|---|
| MAERSK, INC. and A.P. MOLLER-MAERSK A/S, )<br><br>Plaintiffs, )<br><br>- against - )<br><br>NEEWRA, INC.; REDNIHOM, INC.; AREF HASSAN )<br>ABUL, INC.; ARWEEN SINGH SAHNI a/k/a )<br>ARWEEN SAHNI SINGH a/k/a ARWEEN SAHNI )<br>a/k/a ARWEEN SINGH a/k/a ABUL SABAH a/k/a )<br>AREF HASSAN ABUL; MOHINDER SINGH SAHNI )<br>a/k/a MOHINDER SAHNI SINGH a/k/a MOHINDER )<br>SAHNI a/k/a MOHINDER SINGH; JOGINDER )<br>SINGH SAHNI a/k/a JOGINGER SINGH SAHNI )<br>a/k/a JOGINDER SINGH a/k/a JOGINDER SAHNI; )<br>SABHARWAL CHANDRA KUMAR a/k/a )<br>SABHARWAL K. CHANDRA; HELP LINE )<br>COLLECTION CO. W.L.L.; PARKER )<br>DAWOOD TAJUDDIN TAJUDIS ISMAIL PARKER; )<br>SARDAR TRADERS EST.; SARDAR )<br>INTERNATIONAL TRADING CO.; AL TAMASOK )<br>AL ARABI EST.; JOHN DOES 1-100 (fictitious) and )<br>JOHN DOES INC. 1-100 (fictitious), )<br><br>Defendants. )<br>_____ _____ _____ . _)  | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: _8/1/06_<br><br>05 Civ. 4356 (RCC)<br><br>MEMORANDUM &<br>ORDER |

**RICHARD CONWAY CASEY, United States District Judge:**

Mohinder Singh Sahani ("Movant Sahani"), by order to show cause, moves to vacate

Plaintiffs' maritime attachment against him or, in the alternative, to reduce the amount attached to

$2,500. The instant motion turns on Movant Sahani's contention that his surname and identity are

distinct from those of named defendant Mohinder Singh Sahni ("Defendant Sahni").[1]  Plaintiffs

contend that Movant Sahani is Defendant Sahni and/or other individuals identified in the verified

_____

[1] "Defendant Sahni" encompasses defendant Mohinder Singh Sahni's alleged aliases as
well—Mohinder Sahni Singh, Mohinder Sahni, and Mohinder Singh.

complaint ("Complaint"). Although the Court does not take a final position with respect to Movant

Sahani's real name or his true identity, the Court refers to Movant Sahani by the name that he alleges

is real for purposes of this opinion. For the reasons outlined below, Movant Sahani's application

to vacate Plaintiffs' maritime attachment against him or lower the amount attached is **DENIED**.

## I.    BACKGROUND

On May 5, 2005, pursuant to the Complaint, Maersk, Inc. and A.P. Moller-Maersk A/S

("Plaintiffs")—together one of the world's largest shipping companies—obtained a Supplemental

Rule B Process of Maritime Attachment and Garnishment ("Process of Attachment") against the

named defendants to this action.[2] In the Complaint, Plaintiffs allege that Defendant Sahni, along

with members of his family and other associates, engaged in an international scheme to defraud

Plaintiffs and other overseas carriers. Movant Sahani, whose funds have been restrained pursuant

to Plaintiffs' Process of Attachment, asserts that he is neither Defendant Sahni nor any other

defendant named in the Complaint.

---

[2] The parties have filed six briefs and several affidavits with respect to the pending
motion. They include the following: Memorandum of Law in Support of Garnishee's Order to
Show Cause (hereinafter "Garn. Order Mem."); Plaintiffs' Memorandum of Law in Opposition
to Order to Show Cause ("Pls.' Opp'n Mem."); Reply Memorandum of Law in Further Support
of Garnishee's Order to Show Cause ("Garn. Reply Mem."); Plaintiffs' Memorandum of Law in
Support of Motion for Reconsideration ("Pls.' Recons. Mem.); Plaintiffs' Memorandum of Law
in Opposition to Motion to Vacate ("Pls.' 2d Opp'n Mem."); Garnishee's Reply to Plaintiffs'
Additional Response to the Motion to Vacate ("Garn. 2d Reply Mem."); Affidavit of Donald J.
Kennedy ("Kennedy Order Aff."); Reply Affidavit of Donald J. Kennedy ("Kennedy Reply
Aff."); Affidavit of Lawrence J. Kahn in Opposition to Motion to Vacate Attachment ("Kahn
Opp'n Aff."); Second Affidavit of Lawrence J. Kahn in Opposition to Motion to Vacate
Attachment ("Kahn 2d Opp'n Aff."); Affidavit of Joan Sorrentino in Opposition to Motion to
Vacate Attachment ("Sorrentino Opp'n Aff."); Affidavit of Wachovia National Association
("Wachovia Aff."); Supplemental Affidavit of Wachovia National Association ("Wachovia
Supp. Aff.").

## A.     The Parties

In documents filed with the State of New York, Defendant Sahni is listed as the chairman or CEO of defendant Neewra, Inc. ("Neewra") and the president of defendant Rednihom, Inc. ("Rednihom").[3] Neewra and Rednihom operated out of offices in New York State between 1998 and 2001. According to the Complaint, both companies defrauded Plaintiffs during that time period. Plaintiffs allege that Neewra and Rednihom committed fraudulent acts at the direction of, or with the assistance of, Defendant Sahni. By late 2003, Neewra and Rednihom had been dissolved by proclamation of the State of New York for failure to pay taxes.

Plaintiffs allege that defendant Arween Singh Sahni ("Arween"), Movant Sahani's nephew, operated Neewra and a third New York corporation, Aref Hassan Abul, Inc.[4] ("AHA"); that defendant Joginder Singh Sahni ("Joginder"), Arween's father and Movant Sahani's brother, owns or operates defendant Help Line Collection Co. W.L.L. ("Help Line"), a foreign corporation with an office in Kuwait; that defendant Sabharwal Chandra Kumar ("Sahbarwal") owns or operates defendant Al Tamasok Al Arabi Est. ("Al Tamasok"), a foreign corporation with an office in Kuwait; and that each of these defendants, along with Defendant Sahni and others, conspired to defraud Plaintiffs on several occasions.

Movant Sahani is a 68-year-old Indian national and permanent resident of Kuwait who claims to own a business dealing exclusively in automobile windshields. He claims to have an eighth-grade education and limited ability to read and write English. According to his passport, he

---

[3] "Rednihom" is "Mohinder" spelled backward. "Neewra" is "Arween" in reverse. "Arween Singh Sahni" is a defendant.

[4] Arween allegedly uses Aref Hassan Abul as a personal alias as well.

3

has made only two visits to the United States—in April 2005 and in July 2004. In contrast, the Defendant Sahni who acted on behalf of Neewra and Rednihom in New York during the relevant time period was born in the 1960s, had a social security number, a New York State Driver's License, engaged in correspondence from an address in New York, and maintained a New York telephone number. (See Garn. Order Mem. at 4.)

In light of this information, Plaintiffs have suggested that the individual acting as Defendant Sahni in the United States was Arween, Movant Sahani's nephew, though Plaintiffs contend that Arween did so with Movant Sahani's permission. Plaintiffs assert that Movant Sahani acted from Kuwait in conspiracy with others, including Arween, to further the fraudulent schemes alleged in the Complaint.

## B.    The Tire Shipment Scheme

According to the Complaint, one of the named defendants' schemes involved the shipment of used tires from the United States to India ("Tire Shipment"). Plaintiffs allege that in late April 2001, Arween, on behalf of AHA, requested a price quote on the shipment of 720 container loads of used auto and truck tires to India.[5] On or about May 2, 2001, Plaintiffs and AHA agreed to a service contract whereby AHA would deliver approximately 720 containers of tires to Plaintiffs over time and Plaintiffs would ship the containers to India in groups over time. The consignee of record

---

[5] Plaintiffs allege that AHA obtained the used tires by contacting numerous facilities in New York, New Jersey, and elsewhere, and offering to dispose of their stockpiles by shipping the tires to interested buyers in India. (Complaint ¶ 42.) Plaintiffs also note that used tires are solid and possibly hazardous "waste product" subject to the Solid Waste Disposal Act. (Id. ¶ 41.) Plaintiffs further note that the shipment of "solid and/or hazardous waste to a foreign country without a permit from the receiving country" is a federal crime. (Id. ¶ 43.)

in India, Golden Traders, would then pay Plaintiffs on a freight collect basis (i.e., pay the cost of the ocean freight before receiving the cargo).

Plaintiffs allege that they received approximately 260 containers from AHA for the Tire Shipment. On or about May 16, 2001, however, after approximately 200 of the containers arrived in India, Plaintiffs learned that Golden Traders did not exist or lacked interest in the shipment. After notifying AHA of the problem, Plaintiffs allege that Arween, on behalf of AHA, provided Plaintiffs with a replacement consignee, Poonanam Ent. ("Poonanam"). Plaintiffs allege that on or about May 18, 2001, Poonanam informed them it was not interested in the tires, but that on or about May 21, 2001, Arween, on behalf of AHA, again told Plaintiffs that Poonaman would offer $1,000 per container for the tires. Plaintiffs allege that they accepted the offer from Poonaman, but that the offer did not exist and Arween and AHA knew as much. On or about June 15, 2001, after Plaintiffs learned that Poonaman would not take any of the containers of tires, India Customs impounded the containers and Plaintiffs abandoned them.[6]

## C.    The Electronics Shipment Scheme

Another of named defendants' alleged schemes involved the shipment of goods from the United States to Kuwait ("Electronics Shipment"). On or about March 5, 1999, Arween, on behalf of Neewra, contracted with Plaintiffs to ship a container "said by the shipper to contain crates of electrical spare parts" for delivery to Kuwaiti consignee Al Tamasok. (Complaint ¶ 50.) According to the Complaint, Sahbarwal, on behalf of Al Tamasok, took delivery of the Electronics Shipment on May 5, 1999 without the original bill of lading. Plaintiffs allege that Arween authorized

---

[6] During this time, Plaintiffs continued to hold the 60 additional containers of tires at Newark, New Jersey.

Plaintiffs to release the cargo to Sahbarwal and Al Tamasok in return for a $30,000 bank check as security. Five days later, on May 10, 1999, Neewra forwarded the "shipping documents" to its bank, Banco Popular, with a request for payment in the amount of $1.86 million from Al Tamasok. (Id. ¶ 64.)

Plaintiffs allege that Joginder, on behalf of Al Tamasok, "corrupted" one of Plaintiffs' employees and thereby obtained blank form bills of lading. (Id. ¶ 65.) Plaintiffs allege that Sahbarwal, also on behalf of Al Tamasok, then used one of these blank bills of lading to create a fictitious bill for the Electronics Shipment. The fictitious bill of lading, according to Plaintiffs, was then provided to Plaintiffs in return for Al Tamasok's original $30,000 security deposit. After Plaintiffs delivered the container to Al Tamasok, Neewra claimed that it never received payment for the shipment. Neewra filed an insurance claim with its insurer, Continental Insurance Company ("Continental"), which Continental rejected after investigation.

Neewra then brought suit against Plaintiffs in New York alleging misdelivery and conversion of the shipped goods ("New York Lawsuit"). Plaintiffs allege that Neewra brought the New York Lawsuit in an attempt to defraud them. In the suit, Neewra claimed that the shipping container it had stuffed, sealed, and delivered to Plaintiffs' agent contained 2000 units of new computer hard drives, which Neewra had purchased from Seagate Technology ("Seagate") through Micro-Spy Inc. ("Micro-Spy") for $1.6 million. Neewra alleged that it received an ocean bill of lading from Plaintiffs' agent upon delivery of the container, and thereafter negotiated the bill of lading to its bank. Neewra's bank was to hold the bill of lading—the document entitling Al Tamasok to claim the cargo from Plaintiffs in Kuwait—until Al Tamasok paid the full purchase price to Neewra.

Neewra claimed that misdelivery and conversion occurred when Al Tamasok obtained a fraudulent bill of lading and thereby obtained the cargo in Kuwait without paying the purchase price.

In the Complaint, however, Plaintiffs allege that Seagate never sold hard drives to Micro-Spy or to Neewra, and that Neewra's invoice for a $1.6 million purchase of hard drives from Micro-Spy was false and fraudulent. Plaintiffs also allege that Neewra retained no "stuffing records" for the container, and that the container was stuffed and sealed in a suspicious manner—at a "small auto parts supply shop . . . in a mainly residential neighborhood in Garfield, New Jersey." (Complaint ¶ 54.) Additionally, Plaintiffs allege that when Al Tamasok received the Electronics Shipment in Kuwait, it executed a Kuwaiti Customs declaration based on an invoice from Arween and/or Neerwa indicating that the cargo of "spare parts (brake pads and wires)" was worth approximately $10,000. (Ghirardani Decl. ¶ 45(a).) Neewra eventually withdrew its claim in the New York Lawsuit and in a subsequently filed lawsuit in New Jersey.

In 2004, Neewra brought an action against Plaintiffs in Kuwaiti court, claiming misdelivery of the Electronics Shipment and seeking to recover $1.86 million. At the time of suit, however, Neewra no longer existed under New York law, and Plaintiffs allege that Neewra enlisted Help Line and others to pursue its claim via an invalid power of attorney. In connection with the lawsuit, Neewra caused Plaintiffs' ship, the M/V Alva Maersk, to be arrested in Kuwait on or about April 4, 2004. Plaintiffs posted cash security in the disputed amount with the Kuwaiti court and obtained release of the ship.

Later that month, Paolo Ghirardani, Plaintiffs' London attorney tasked with investigating the possibility of fraud in connection with the Electronics Shipment, arranged a meeting in Kuwait with Neerwa's "decision maker" ("April 2004 Meeting"). (Ghirardani Decl. ¶¶ 119, 123.) Plaintiffs

7

allege that at the April 2004 Meeting, Mr. Ghirardani met an individual introduced as "Mr. Joginder." According to Plaintiffs, "Mr. Joginder" did not say much, and the meeting ended short of 30 minutes after an unfruitful discussion regarding settlement of the pending litigation. At the close of the meeting, "Mr. Joginder" handed Mr. Ghirardani his business card for Help Line. In the litigation that followed, Neewra lost its claim in the Kuwaiti trial court but succeeded on appeal. Pursuant to the appellate court's decision, Plaintiffs' $1.86 million bond was transferred to Neewra.

## D.    The PC Parts Shipment

The third scheme described in the Complaint began in a manner similar to the Electronics Shipment. Plaintiffs allege that, on July 20, 1999, Defendant Sahni, on behalf of Rednihom, contracted with Plaintiffs for the shipment of a container to Kuwait which Defendant Sahni and Rednihom claimed contained 4,000 pieces of "PC Parts" ("PC Parts Shipment"). The PC Parts Shipment occurred 4 months after the Electronics Shipment. By the time the PC Parts Shipment was discharged at Shuaiba Containter Terminal in Kuwait on August 20, 1999, Plaintiffs were already aware of problems with the Electronics Shipment. After noticing that the freight forwarder was identical for both shipments, and that Rednihom's address was the same as Neewra's (Ghirardani Decl. ¶ 76), Plaintiffs, along with the Kuwaiti Port Authority and Customs authorities, unsealed the container and found mostly used automotive parts. Plaintiffs allege that the cargo did not include any of the computer parts described in the bill of lading.

The PC Parts Shipment was abandoned by the named consignees for nearly three months, and Plaintiffs later discovered that the consignees did not exist. Plaintiffs allege that Help Line, through Joginder and/or one of Help Line's employees, thereafter contacted Plaintiffs and requested (1) that they be permitted a survey of the container, and (2) that Plaintiffs send the container to a

new consignee in Dubai. Plaintiffs allege that Defendant Sahni contacted them and urged that Help Line was acting on behalf of Rednihom. Plaintiffs allege that Help Line, Joginder and/or one of Help Line's employees, and Defendant Sahni were attempting to find an alternative way to present a false claim with regard to the PC Parts Shipment.

## E. Order of Attachment

Plaintiffs thereafter sought and received an ex parte order of attachment against the named defendants from the Court. On May 13, 2005, Plaintiffs served the Process of Attachment on Wachovia Bank National Association ("Wachovia") for the first time. Plaintiffs continued to serve the Process of Attachment on Wachovia—via e-mail—every day for the next several months, up to and including Friday, November 11, 2005. By serving Wachovia in this manner, Plaintiffs sought the attachment of any of the named defendants' property which came into Wachovia's possession as an electronic funds transfer ("EFT").

On October 11, 2005, Movant Sahani instructed Syndicate Bank in New Delhi, India to wire transfer $467,938 from his account at Syndicate Bank to an account in the name of his son, Mandeep Singh Sahni ("Mandeep"), at Commercial Bank in Kuwait. Movant Sahani obtained these funds from the United Nations as war reparations for the destruction of his business during the Iraqi invasion of Kuwait in the early 1990s. Movant Sahani's application for these reparations, which included documents notarized by the Indian Consul in Kuwait, spelled his name "Sahni" several times. That appellation matches the surname of Defendant Sahni and others named in the caption of the Complaint.

On Monday, November 14, 2005, Syndicate Bank sent wire instructions to their correspondent, Union Bank of California International, New York ("Union Bank"), to effectuate

9

Movant Sahani's requested transfer. On the same day, Union Bank sent Movant Sahani's funds to Wachovia for remittance to Commercial Bank in Kuwait. The wire instructions for the EFT included the name "Mohinder Singh Sahani" and the name "Mohinder Singh Sahni."

On Monday, November 14, 2005, Wachovia's wire transfer interdiction system identified the name "Sahni" in the EFT from Union Bank and immediately "interdicted and restrained" Movant Sahani's funds.[7] (Pls.' Opp'n Mem. at 11; Wachovia Aff. ¶ 10.) Plaintiffs did not serve process on Wachovia on the morning of Friday, November 14, 2005 nor on any day thereafter preceding March 30, 2006. Thus, the day that Movant Sahani's funds come into Wachovia's possession, Plaintiffs failed to effectuate service of process.

On November 15, 2005 or shortly thereafter, Wachovia, pursuant to its "usual procedures," notified Plaintiffs' counsel via telephone that Movant Sahani's funds had been restrained. (Wachovia Aff. ¶ 11.) At that time, Wachovia also inquired whether the case remained active and, if so, whether Wachovia should seize and continue to restrain the funds. Plaintiffs' counsel answered both questions in the affirmative. Although Plaintiffs' counsel does not recall this conversation with Wachovia, they do not dispute that it occurred and that they were so notified of the attachment.

On November 22, 2005, Movant Sahani received notification in writing from Syndicate Bank that Wachovia had restrained his wire transfer. On the same day, Plaintiffs received a phone call from an individual identifying himself as "Mohinder Singh Sahani." During the conversation and several subsequent ones, this individual protested Plaintiffs' interference with the transferred funds.

---

[7] The amount of funds that arrived at Wachovia was $459,975, approximately $8,000 less than Movant Sahani initially transferred from Syndicate Bank. This discrepancy was due to bank commissions and charges.

10

Plaintiffs allege that this individual was not Movant Sahani but rather his son, Mandeep. Mandeep told Plaintiffs that the likely target of the attachment order was another "Mohinder Singh Sahni who lives in Kuwait and has a questionable reputation." (Mandeep Decl. ¶ 5; see also Kennedy Order Aff. Ex. 16.) This other "Mohinder Singh Sahni" allegedly is a prominent tire dealer in and has a brother named "Abul Sabah," another defendant named in the caption of the Complaint. (Id. ¶ 6.)

In December 2005, Movant Sahani submitted to a deposition in Kuwait without the benefit of counsel. At that time, he provided Plaintiffs with his business card, which presented his surname as "Sahni" (not "Sahani"). Mr. Ghirardani attended the deposition and recognized Movant Sahani as the same individual whom he met at the April 2004 Meeting regarding the Electronics Shipment. The individual at that meeting had identified himself as "Joginder," not "Mohinder." Plaintiffs' senior employee in Kuwait, Bimal Kanal, accompanied Mr. Ghirardani to the April 2004 Meeting and later identified Movant Sahani as the same individual who attended that meeting. Movant Sahani has denied being present at the meeting, and his brother, Joginder, has submitted an affidavit stating that he, not Movant Sahani, was there.

On January 13, 2006, Plaintiffs informed Movant Sahani that his funds would not be released. Movant Sahani then retained his present counsel. On March 30, 2006, Movant Sahani's counsel contacted Plaintiffs and requested proof of service of the Process of Attachment on Wachovia. On the same day, Plaintiffs served a new Process of Attachment on Wachovia, the first since November 11, 2005. Plaintiffs have continued service of process on Wachovia every day since.

11

**F.     Part I Hearing to Vacate the Order of Attachment**

On May 8, 2006, Movant Sahani filed an order to show cause why Plaintiffs' attachment of his funds should not be vacated. After an initial hearing on the motion, Judge Chin, as Part I Judge, ordered the parties to submit briefing only on the issues of service of process and the adequacy of Plaintiffs' prima facie allegations. At the first hearing, in their subsequent briefs, and at the second hearing before Judge Chin, both parties informed Judge Chin that Plaintiffs had ceased service of process on October 31, 2005. Judge Chin vacated the attachment after the second hearing, concluding that Plaintiffs had not served a valid Process of Attachment on Wachovia.

In their motion for reconsideration, however, Plaintiffs submitted new documentation showing that service of process continued through the morning of November 11, 2005. In addition, Plaintiffs alleged the existence of an agreement with Wachovia by which the latter, upon receipt of service of process in the morning of any given business day, would deem itself served throughout that business day and into or through the following business day. Plaintiffs' description of this agreement with Wachovia differs from a previous one they provided to the Court. In Plaintiffs' earlier description, Wachovia, after receiving service of process on a particular business day, would "deem[] itself continuously served for the remainder of the day. . . ."[8] (Kennedy Reply Aff. Ex. 1 at 4.)

Judge Chin determined that Plaintiffs' new allegations "could affect the outcome" of the motion. (Order, May 26, 2006.) He therefore vacated his previous order and concluded that, "[u]nder all the circumstances . . . it would be best if this matter were returned to Judge Casey for

---

[8] Wachovia's description of the agreement—that "such service would be valid throughout each day that it was served"—coincides with Plaintiffs' earlier description. (Wachovia Supp. Aff. ¶ 2.)

12

determination." (Id.) This Court ordered an additional round of briefing and another hearing on the matter.

## II.    DISCUSSION

### A.    Standard of Review

A plaintiff who seeks an ex parte order of attachment pursuant to Supplemental Rule B must make a prima facie showing that a maritime claim appears to exist against the defendant and that the defendant is not present in the district. Supp. R. Fed. R. Civ. P. B; Seaplus Line Co. v. Bulkhandling Handymax, 409 F. Supp. 2d 316, 319-20 (S.D.N.Y. 2005). "[T]he case with which a prima facie case for attachment can be made," however, "creates a real risk of abusive use of the maritime remedy." Aqua Stoli Shipping Ltd. v. Gardner Smith PTY Ltd., 384 F. Supp. 2d 726, 729 (S.D.N.Y. 2005) (citation and internal quotations omitted). Supplemental Rule E(4)(f) addresses that risk, providing any person claiming an interest in the attached property with "a prompt hearing at which the plaintiff shall be required to show why the . . . attachment should not be vacated or other relief granted consistent with these rules." Supp. R. Fed. R. Civ. P. E(4)(f).

At a Rule E(4)(f) hearing, a defendant may attack "'the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings.'" Aqua Stoli, 384 F. Supp. 2d at 728 (quoting Supp. R. Fed. R. Civ. P. E advisory committee's notes). And as the text of the Rule makes clear, it is the plaintiff's burden to show that the attachment should not be vacated. The plaintiff must demonstrate that "reasonable grounds" exist for the attachment, and that all technical requirements for effective attachment have been met. Ullises Shipping Corp. v. Fal Shipping Co. Ltd., 415 F. Supp. 2d 318, 322-23 (S.D.N.Y. 2006). When determining whether such reasonable grounds exist, "Supplemental Rule E does not restrict review to the adequacy of the allegations in

the complaint." Linea Naviera De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A., 169 F. Supp. 2d 1341, 1358 (M.D. Fla. 2001). A court also may consider any allegations or evidence offered in the parties' papers or at the post-attachment hearing. See id. at 1357-58.

Finally, this Court has inherent authority to vacate an attachment "upon a showing of 'any improper practice' or a 'manifest want of equity on the part of plaintiff.'" Blake Mar., Inc. v. Petrom S.A., No. 05 Civ. 8033 (PAC), 2005 WL 2875335, at *2 (S.D.N.Y. Oct. 31, 2005) (quoting Southern District of New York Former Local Civil Rule 12 (1986)). The Second Circuit has held that "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge." Greenwich Marine, Inc. v. S.S. Alexandria, 339 F.2d 901, 905 (2d Cir. 1965).

**B.     Service of Process**

Movant Sahani argues that the Court should vacate Plaintiffs' attachment of his funds because Plaintiffs failed to effectuate valid service of process on Wachovia. In Reibor International, Ltd. v. Cargo Carriers (KACZ-CO.) Ltd., 759 F.2d 262 (2d Cir. 1985), the Second Circuit held that process of maritime attachment is absolutely void unless, at the time of service, the process recipient possesses res susceptible to attachment. See also ContiChem LPG v. Parsons Shipping Co., Ltd., 229 F.3d 426, 433 (2d Cir. 2000) (noting "the well-established prohibition against maritime attachments of after-acquired property"). This rule "honors the quasi-in-rem characteristic of maritime attachment, which requires the presence of some item of property of the defendant in the hands of the garnishee as a basis for jurisdiction over the defendant's interest in that property." Ythan Ltd. v. Americas Bulk Transp. Ltd., 336 F. Supp. 2d 305, 307 (S.D.N.Y. 2004).

Accordingly, a plaintiff attempting to attach an EFT is required to anticipate the bank's receipt of the defendant's funds by serving the bank with Processes of Attachment on a continuous basis. See ContiChem, 229 F.3d at 434-35. A plaintiff and bank may sidestep this "absurdity" if the bank agrees that service of process is effective "for a short and reasonable amount of time." Ullises Shipping, 415 F. Supp. 2d at 328; see also Ythan, 336 F. Supp. 2d at 307-08 (refusing to vacate an attachment where the bank agreed that process served in the morning by fax would remain effective throughout the remainder of that particular business day).

In Winter Storm Shipping Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002), however, the Second Circuit refused to vacate the attachment of an EFT where service of process occurred before the bank had possession of the defendant's funds and despite the fact that the plaintiff and the bank had no agreement regarding an extended effective period for service. The court explained that the bank, which received service of process the previous business day, restrained the defendant's funds on its own authority rather than pursuant to the earlier Process of Attachment. Id. at 274 n.7. When the plaintiff again served the bank some hours later, service of process was sufficient to attach the EFT. Id.

In reaching this result, the Second Circuit distinguished its previous decision in ContiChem, 229 F.3d 426. The plaintiff in ContiChem first obtained a temporary restraining order preventing the bank from transferring target funds; upon deposit of those funds, the restraining order suspended automatic transfer and the plaintiff attached the funds by subsequent service of process. The Second Circuit upheld the district court's decision to vacate the attachment because the plaintiff had employed "a tactical course of conduct . . . which the court regarded as improper." In Winter Storm,

15

by contrast, the plaintiff's counsel "did no more than careful practitioners would do" and "was entirely blameless" for the bank's suspension of the EFT. Winter Storm, 310 F.3d at 274 n.7.

Winter Storm controls this case. The only notable difference between the attachment in Winter Storm and the attachment here involves the length of time between the arrival of funds at the respective banks and subsequent service of process. In Winter Storm, subsequent service happened within hours; here, it occurred more than four months after restraint of Movant Sahani's funds. But the temporal distinction is immaterial. To validly attach an EFT, "process and a res must coexist in the hands of the garnishee at a single moment in time." Ythan, 336 F. Supp. 2d at 307. Little else is required. Here, as in Winter Storm, the Plaintiffs served the Process of Attachment when Movant Sahani's funds were in the bank's possession.[9]

The question at issue in ContiChem— "whether ContiChem could accomplish indirectly, by means of an order restraining to-be-attached property, that which it could not do directly in light of the well-established prohibition against maritime attachments of after-acquired property," 229 F.3d at 433—has no relevance here. Plaintiffs effectuated direct service of process on Wachovia at a time when the bank maintained possession of Movant Sahani's funds absent any legal obligation to do so. Movant Sahani argues that Plaintiffs, like the ContiChem plaintiff, did something questionable—perhaps even blameworthy—by telling Wachovia to continue its restraint of his funds in the absence of effective process. But ContiChem does not apply to every instance where "questionable" acts occur in connection with a maritime attachment. Plaintiffs in this case, unlike the ContiChem plaintiff, did nothing to force Wachovia's restraint of Movant Sahani's funds.

_____

[9] For the same reason, the parties' dispute over the length of the extended effective period for service agreed upon between Plaintiffs and Wachovia is immaterial.

Indeed, Wachovia was neither required nor entitled to continue suspension of the EFT simply because Plaintiffs' told it to do so. Thus, although Movant Sahani "may feel aggrieved" by Wachovia's decision to suspend his funds for several months absent a valid Process of Attachment, Winter Storm indicates that it is Plaintiffs' actions, not the bank's, which are relevant to the validity of an attachment in such circumstances. See 310 F.3d at 274 n.7. Accordingly, the Court holds that Plaintiffs validly attached Movant Sahani's funds pursuant to service of the Process of Attachment on March 30, 2006.

## C.     The Order of Attachment

Movant Sahani next argues that the Court should vacate Plaintiffs' attachment of his funds for two additional reasons: first, because Plaintiffs have failed to state a prima facie maritime claim against him insofar as he is not a named defendant; and second, because even assuming Movant Sahani is a named defendant, the Complaint does not assert any claims, much less maritime claims, against him.

### 1.     Movant Sahani's Surname Slight-of-Hand

Movant Sahani asks that the attachment against him be vacated because he is not a named defendant in the Complaint. Movant Sahani offers two distinct grounds for his argument. First, Movant Sahani claims that he is not among those listed in the caption of the Complaint. Pointing to his Indian passport and U.S. visa (see Kennedy Order Aff. Ex. 12), he claims that his surname is "Sahani," not "Sahni," and that neither the Complaint nor the Court's Order of Attachment list "Mohinder Singh Sahani" among the named defendants.

This aspect of Movant Sahani's identity argument strains credulity. Movant Sahani's brother and nephew, both of whom are named defendants, spell their surname "Sahni." Movant Sahani's

17

son, Mandeep, also spells his surname "Sahni," not "Sahani." Movant Sahani's application for U.N. war reparations spells his surname "Sahni." (Pl.'s 2d Opp. Mem. at 19.) And Movant Sahani, during his deposition in December 2005, provided Plaintiffs with a business card that spells his surname "Sahni" rather than "Sahani." (Id. at 18.) Movant Sahani has provided no explanation for these discrepancies, which do more than merely discredit his assertion that he is not named in the Complaint; his dissembling has colored the Court's overall perception of his credibility.

Yet the Court's diminished view of Movant Sahani's credibility is not the result of his surname slight-of-hand alone. In addition, Movant Sahani has made largely unsubstantiated assertions that his brother and nephew cooperated with a different "Mohinder Singh Sahni," a Kuwaiti businessman of ill-repute who deals in tires; he allowed his son, Mandeep, to speak not only for him but as him during several telephone conversations with Plaintiffs; and he dubiously obtained a last minute affidavit from his brother, Joginder, after having requested a protective order from the Court for fear that Joginder would commit violence against him in connection with the instant litigation. Movant Sahani has not adequately addressed any of these issues. Thus, the Court finds reasonable grounds to believe that Movant Sahani has used the name "Mohinder Singh Sahni" and is named in the caption of the Complaint.

For similar reasons, the second aspect of Movant Sahani's identity argument—that he is not the Defendant Sahni described in specific allegations in the Complaint—also is insufficient to warrant the requested relief. Movant Sahani points out, and Plaintiffs acknowledge, that data on the age and location of Defendant Sahni limits, if not eliminates, the possibility that Movant Sahani is the Defendant Sahni named in the Complaint with respect to events in the United States between 1998 and 2001. Instead, Plaintiffs allege that the individual described as Defendant Sahni likely was

18

Arween acting with Movant Sahani's permission. Movant Sahani now seizes upon this ambiguity, arguing that because the Defendant Sahni in the Complaint is not him, he is not a defendant to this action.

The current motion to vacate, however, is not a motion to dismiss; it is a specialized maritime proceeding with the singular purpose of determining the ongoing propriety of a maritime attachment. See Supp. R. Fed. R. Civ. P. E(4)(f). Accordingly, the Court's review of whether reasonable grounds exist for the attachment is not limited to allegations in the Complaint. See Linea Naviera, 169 F. Supp. 2d at 1358.

The totality of Plaintiffs' allegations, including those offered in their opposition briefs, their affidavits, and at the hearing, provide reasonable grounds to believe that Movant Sahani was intricately involved in events alleged in the Complaint, whether as Defendant Sahni or other individuals identified therein. The most significant of Plaintiffs' allegations beyond the Complaint involves Mr. Ghirardani's and Mr. Kamal's separate identifications of Movant Sahani as the same individual who attended the April 2004 Meeting– the same individual then identified as "Mr. Joginder," the "decision-maker" behind the Electronics Shipment. Taken together, the Complaint and Plaintiffs' extrinsic allegations describe an international web of suspect corporations and individual actors who employ tacit alliances and shifting identities as the primary tools of their malfeasance. In a case such as this, the Court will not permit Movant Sahani to employ those same tools to escape the attachment presently in dispute.

## 2. Adequacy of the Allegations

Movant Sahani also argues that the Complaint does not sufficiently allege any claim against him, much less a maritime claim. He contends that the Complaint fails to allege any claim because

19

it does not plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. Most of Plaintiffs' claims are based on civil RICO violations for mail and wire fraud, which must be pled with particularity to survive a motion to dismiss. McLaughlin v. Anderson, 962 F.2d 187 (2d Cir. 1992). But Movant Sahani has not filed a motion to dismiss. He has filed a motion to vacate an ex parte attachment order, and the Court will not consider such an argument lest Rule 12(b)(6) be completely subsumed by Supplemental Rule E(4)(f).

Movant Sahani's more specific request that the Court vacate the attachment because Plaintiffs have failed to state any maritime claim against him fails to find adequate support in the caselaw. Movant Sahani argues that Plaintiffs have failed to state a maritime contract claim against him because the bills of lading at issue were contracts between Plaintiffs and Neewra, Rednihom, or AHA. Movant Sahani argues that Plaintiffs cannot pierce the corporate veil to hold him liable because Plaintiffs have not alleged that he was the alter ego of those corporations.

Movant Sahani is wrong. Each bill of lading at issue contains Clause 14(4), which includes the following language:

> The Shipper, consignee, holder hereof, and owner of the goods, and their principals, shall be jointly and severally liable to Carrier for the payment of all freight, demurrage, General Average and other charges due hereunder, without discount, together with any Court costs, expenses and reasonable attorney fees incurred in collecting any sums due Carrier.

(See Kahn Opp'n Aff. Ex. F. (emphasis added).) Courts of this District have repeatedly upheld Clause 14(4). See Maersk Inc. v. Atcom Indus., 73 F. Supp. 2d 387 (S.D.N.Y. 1999); Maersk Inc. v. Am. Midwest Commodities Export Cos., Inc., No. 97 Civ. 0475 (NRB), 1998 WL 473945 (S.D.N.Y. Aug. 10, 1998); Maersk Inc. v. Alan Mktg., Inc., No. 97 Civ. 3495 (HB), 1998 WL 167323 (S.D.N.Y. Apr. 10, 1998).

Movant Sahani argues, however, that because Plaintiffs have acknowledged he is not the Defendant Sahni who, according to the Complaint, was listed as a principal of Neewra, Rednihom, and AHA, Clause 14(4) does not apply to him. The Court will not abide this argument for reasons previously noted. Questions surrounding Movant Sahani's veracity substantially diminish the weight of his contentions while simultaneously reinforcing Plaintiffs' claims. Together with the Complaint, Plaintiffs' extrinsic allegations and evidence provide reasonable grounds to believe that Movant Sahani was a principal of Neewra, Rednihom, and AHA. Accordingly, reasonable grounds also exist to believe that Clause 14(4) applies to Movant Sahani.

Because the Court decides that Plaintiffs have stated a maritime contract claim against Movant Sahani, the Court will not decide whether Plaintiffs have adequately stated a maritime tort claim. The former is sufficient to sustain this Court's maritime jurisdiction as well as the ongoing validity of Plaintiffs' attachment of the funds at issue.

**D.     Reduction of the Amount Attached**

Finally, Movant Sahani argues that Plaintiffs attached an excessive amount of his funds, and that the amount should be reduced to $2,500 to more accurately reflect Plaintiffs' claims against him. Although the Court "has the power, pursuant to Supplemental Admiralty Rule E(6) to reduce the amount of the attachment when good cause is shown," Sea Transp. Contractors, Ltd. v. Indus. Chemiques du Senegal, 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006), Movant Sahani has not made a showing of good cause to warrant such a reduction. Movant Sahani's argument for good cause amounts to little more than a restatement of his argument to vacate the attachment in its entirety. Because the Court has already addressed each aspect of that argument, it will not do so again here. For the reasons stated above, Movant Sahani's request to reduce the amount attached is denied.

21

## III.   CONCLUSION

For the foregoing reasons, Movant Sahani's motion to vacate the Rule B attachment at issue or reduce the amount attached to $2,500 is **DENIED**.  Plaintiffs are hereby granted leave to file an amended complaint.  Plaintiffs' must serve their amended complaint within thirty (30) days from the entering of this Order.


**So Ordered**:   New York, New York
            August 1, 2006

**Richard Conway Casey, U.S.D.J.**

22