503-99/EEL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs
Maersk, Inc. and A.P. Moller-Maersk A/S,
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Peter J. Gutowski (PG 2200)
Eric E. Lenck (EL 4547)
Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------x

MAERSK, INC., and A.P. MOLLER-MAERSK A/S,

                              Plaintiffs,

         -against-

NEEWRA, INC., REDNIHOM, INC., AREF HASSAN ABUL
INC., ARWEEN SINGH SAHNI a/k/a ARWEEN SAHNI
SINGH a/k/a ARWEEN SAHNI a/k/a ARWEEN SINGH a/k/a
ABUL SABAH a/k/a AREF HASSAN ABUL, MOHINDER
SINGH SAHNI a/k/a MOHINDER SAHNI SINGH a/k/a
MOHINDER SAHNI a/k/a MOHINDER SINGH a/k/a
MOHINDER SINGH SAHANI a/k/a MOHINDER SAHANI
a/k/a MOHINDER SAHANI SINGH a/k/a JOGINDER SINGH
SAHNI, JOGINDER SINGH SAHNI a/k/a JOGINGER SINGH
SAHNI a/k/a JOGINDER SAHNI SINGH a/k/a JOGINGER
SAHNI SINGH a/k/a JOGINDER SINGH a/k/a JOGINDER
SAHNI a/k/a JOGINGER SINGH a/k/a JOGINGER SAHNI,
SABHARWAL CHANDRA KUMAR a/k/a SABHARWAL K.
CHANDRA, MANDEEP SINGH SAHNI a/k/a MOHINDER
SINGH a/k/a MOHINDER SAHNI a/k/a MOHINDER SINGH
SAHNI a/k/a MOHINDER SAHANI a/k/a MOHINDER SINGH
SAHANI, HELP LINE COLLECTION CO. W.L.L., PARKER
DAWOOD TAJUDDIN TAJUDIS ISMAIL PARKER,
SARDAR TRADERS EST., SARDAR INTERNATIONAL
TRADING CO., AL TAMASOK AL ARABI EST., JOHN DOE
1-100 (fictitious) and JOHN DOE INC. 1-100 (fictitious),

                              Defendants.
----------------------------------------------------------------------------x

**05 CIV 4356 (RCC)**

**AMENDED
VERIFIED
COMPLAINT**

Plaintiffs MAERSK, INC. and A.P. MOLLER-MAERSK A/S (collectively, "MAERSK"), through their attorneys Freehill Hogan & Mahar, LLP, as and for their Amended Verified Complaint against Defendants NEEWRA, INC. ("NEEWRA"), REDNIHOM, INC. ("REDNIHOM"), AREF HASSAN ABUL, INC. ("AREF"), ARWEEN SIGNH SAHNI a/k/a ARWEEN SAHNI SINGH a/k/a ARWEEN SAHNI a/k/a ARWEEN SINGH a/k/a ABUL SABAH a/k/a AREF HASSAN ABUL ("ASS"), MOHINDER SINGH SAHNI a/k/a MOHINDER SAHNI SINGH a/k/a MOHINDER SAHNI a/k/a MOHINDER SINGH a/k/a MOHINDER SINGH SAHANI a/k/a MOHINDER SAHANI a/k/a MOHINDER SAHANI SINGH a/k/a JOGINDER SINGH SAHNI ("MSS"), JOGINDER SINGH SAHNI a/k/a JOGINGER SINGH SAHNI a/k/a JOGINDER SAHNI SINGH a/k/a JOGINGER SAHNI SINGH a/k/a JOGINDER SINGH a/k/a JOGINDER SAHNI a/k/a JOGINGER SINGH a/k/a JOGINGER SAHNI ("JSS"), SABHARWAL CHANDRA KUMAR a/k/a SABHARWAL K. CHANDRA ("SCK"), MANDEEP SINGH SAHNI a/k/a MOHINDER SINGH a/k/a MOHINDER SAHNI a/k/a MOHINDER SINGH SAHNI a/k/a MOHINDER SAHANI a/k/a MOHINDER SINGH SAHANI ("MANDEEP"), HELP LINE COLLECTION CO. W.L.L. ("HLC"), PARKER DAWOOD TAJUDDIN TAJUDIS ISMAIL PARKER ("PARKER"), SARDAR TRADERS EST. ("SARDAR"), SARDAR INTERNATIONAL TRADING CO. ("SITC"), AL TAMASOK AL ARABI EST. ("AL TAMASOK"), JOHN DOE 1-100 (fictitious), and JOHN DOE INC. 1-100 (fictitious) allege upon information and belief as follows:

## JURISDICTION AND VENUE

1.      This is an admiralty and maritime matter within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves claims related to the transportation of goods by sea in connection with ocean bills of lading. The case also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper under 18 U.S.C. §1961 and is therefore within the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

2.      Venue is proper pursuant to Rule 82 of the Federal Rules of Civil Procedure and because MAERSK's ocean bills of lading include a forum selection clause that specifies jurisdiction before this Court. Because MAERSK's ocean bills of lading provide for jurisdiction before this Court, this Court is an appropriate venue pursuant to 18 U.S.C. §§1964(c) and 1965.

## THE PARTIES

3.      At all material times, Plaintiff MAERSK, INC. was and still is a corporation incorporated in one of the States of the United States with a registered office at Giralda Farms, Madison, New Jersey.

4.      At all material times, Plaintiff A.P. MOLLER-MAERSK A/S was and still is a corporation or other business entity organized and existing pursuant to the laws of a foreign country, with a registered office at Esplanaden 50, 1098 Copenhagen K, Denmark. A.P. MOLLER-MAERSK A/S was established in June of 2003 as the result of the merger between Dampskibsselskabet af 1912 Aktieselskab, and Aktieselskabet Dampskibsselskabet Svendborg. The two merged companies were at all times the actual carriers under the relevant bills of lading in this matter.

5.      Plaintiffs sue on their own behalf and as agent and trustee on behalf of all other parties with an interest in the claims or who may ultimately be entitled to enforce the claims which are the subject of this action.

6.      At all material times, NEEWRA INC. was a corporation or other business entity organized and existing pursuant to the laws of the State of New York with an office at 86-10 Roosevelt Ave., Store #9, Jackson Heights, New York 11372 and with another or former office c/o MSS at 80-50 Baxter Ave., Suite 189, Elmhurst, New York 11373. NEEWRA's telephone and fax numbers were the same as those for REDNIHOM (see below).

7.      NEEWRA was dissolved by proclamation of the State of New York for failure to pay taxes, and another entity currently occupies the space where NEEWRA's offices were formerly located, but NEEWRA has nonetheless been actively pursuing fraudulent claims against MAERSK in Kuwait.

8.      NEEWRA, during the pendency of this litigation, became an active New York corporation again by paying some or all of the past due taxes.  When NEEWRA was activated, it provided the New York Secretary of State with an address for service of process at 75-18-A Broadway, Ste 522, Elmhurst, NY 11373.  This address, however, is fictitious.  The tenant at the address given for NEEWRA is in the business of renting mailboxes, and none of the mailboxes at that location are registered to NEEWRA, to ASS, to MANDEEP or to MSS.

9.      At all material times, REDNIHOM INC. was a corporation or other business entity organized and existing pursuant to the laws of the State of New York with an office at 80-50 Baxter Avenue, Office #189, Elmhurst, New York 11373.

REDNIHOM's telephone and fax numbers were the same as those for NEEWRA (see above). REDNIHOM was dissolved by proclamation of the State of New York for failure to pay taxes, and another entity currently occupies the space where REDNIHOM's offices were formerly located.

10.   At all material times, AREF was a corporation or other business entity organized and existing pursuant to the laws of the State of New York with an office at 50-08 Ithaca Street, Elmhurst, New York 11373 and with another or former office at 80-50 Baxter Avenue, Suite 189, Elmhurst, New York 11373. AREF was dissolved by proclamation of the State of New York for failure to pay taxes, and another entity occupies the space where AREF's offices were formerly located.

11.   At all material times, ARWEEN SINGH SAHNI, also known as ARWEEN SAHNI SINGH, also known as ARWEEN SAHNI, also known as ARWEEN SINGH, also known as ABUL SABAH and also known as AREF HASSAN ABUL ("ASS") is a natural person of Indian nationality whose current address is presently not known. ASS holds an Indian passport, no. B0250994. ASS's last known address was 40-18 Hampton Street, Office #1J, Elmhurst, New York 11373, but another individual currently occupies that apartment. ASS is or was the individual who operated both NEEWRA (which is "Arween" spelled backwards) and AREF HASSAN ABUL, INC. ASS is the son of JSS and is the nephew of MSS. ASS (with MANDEEP) has used MSS's name(s) with MSS's permission and has used MSS's name with MSS's permission in order to perpetrate frauds on MAERSK.

12.   At all material times, MOHINDER SINGH SAHNI, also known as MOHINDER SAHNI SINGH, also known as MOHINDER SAHNI and also known as

MOHNINDER SINGH also known as MOHINDER SINGH SAHANI also known as MOHINDER SAHANI SINGH also known as MOHINDER SAHANI also known as JOGINDER SINGH SAHNI ("MSS") is a natural person of Indian nationality whose current address is c/o Al-Musanna Trading Co. W.L.L., PO Box 42366 Shuwaikh, Canada Dry Street, Opposite Boodai Next to The American Home, 70654 Kuwait. MSS is or was an owner, officer, director, employee and/or agent of any or all of the following: Al-Musanna Trading Co. W.L.L., HLC, SARDAR, SITC, and/or AL TAMASOK. MSS authorized ASS and/or MANDEEP to utilize his name and/or identity in order to create and/or operate NEEWRA, INC., REDNIHOM (which is "Mohinder" spelled backwards), INC., and AREF HASSAN ABUL INC. MSS, in giving such authority to ASS and/or MANDEEP, was aware of, and consented to, the frauds that these companies furthered. MSS is the brother of JSS, the father of MANDEEP and the uncle of ASS.

13.    NEEWRA, REDNIHOM and AREF were all operated, sometimes concurrently, out of the 80-50 Baxter Avenue, Suite 189, Elmhurst, New York 11373 address by ASS, MSS, JSS and MANDEEP, whether or not any or all of them were personally present at that location, during the period 1998-2000.

14.    At all material times, JOGINDER SINGH SAHNI, also known as JOGINGER SINGH SAHNI, also known as JOGINDER SAHNI SINGH, also known as JOGINGER SAHNI SINGH, also known as JOGINDER SAHNI, also known as JOGINDER SINGH, also known as JOGINGER SAHNI and also known as JOGINGER SINGH ("JSS") is a natural person of Indian nationality residing at Al-Shouyoukh, Canada Dry Street, Across from Al-Malim, Sardar Commercial Corporation, Kuwait. JSS is the owner or operator of HLC. JSS is or was an owner, officer, director, employee

and/or agent of any or all of the following:  SARDAR, SITC, AL TAMASOK, and Blue Bird Water Treatment Company.

15.    SABHARWAL CHANDRA KUMAR, also known as SABHARWAL K. CHANDRA ("SCK") is a natural person of Indian nationality formerly residing in Kuwait whose current address is presently not known.  SCK is an employee of MSS and/or JSS.

16.    MANDEEP SINGH SAHNI also known as MOHINDER SINGH also known as MOHINDER SAHNI also known as MOHINDER SINGH SAHNI also known as MOHINDER SAHANI also known as MOHINDER SINGH SAHANI ("MANDEEP") is a natural person of Indian nationality whose current address is c/o Al-Musanna Trading Co. W.L.L., PO Box 42366 Shuwaikh, Canada Dry Street, Opposite Boodai Next to The American Home, 70654 Kuwait.  MANDEEP is or was an owner, officer, director, employee and/or agent of Al-Musanna Trading Co.  MANDEEP, with the permission of MSS, cooperated with ASS in creating NEEWRA, REDNIHOM and AREF and in operating these companies, including but not limited to opening bank accounts for these companies.  In so doing MANDEEP would pose, with MSS's authorization, as MSS and would present and sign documents as MSS and would have telephone conversations in which he represented himself as MSS.

17.    HELP LINE COLLECTION CO. W.L.L. ("HLC") is a corporation or other business entity organized and existing under the laws of a foreign country with an office or place of business located at Sharq-Opp. Fire Brigade, Honda Cars Showroom Bldg., 1st Floor, Flat No. 1, PO Box 25300 Safat, Code 13114, Kuwait.  HLC is owned or

operated by JSS and/or MSS. HLC employed PARKER and pursued NEEWRA's and REDNIHOM's fraudulent claims in Kuwait against MAERSK.

18.    PARKER DAWOOD TAJUDDIN TAJUDIS ISMAIL PARKER ("PARKER") is a natural person of Indian nationality residing in Kuwait. PARKER is employed by HLC (which is owned or operated by JSS and/or MSS) and his sponsor in Kuwait is Blue Bird Water Treatment Company (which is owned or operated by JSS and/or MSS). PARKER pursued NEEWRA's fraudulent claim against MAERSK in Kuwait.

19.    SARDAR TRADERS EST. ("SARDAR") is a corporation or other business entity organized and existing under the laws of a foreign country with an office or place of business located at Al-Shuwaika Canada Dry St., Opp. Al-Mailem Co., PO Box 3216, Safat 13033, Kuwait. SARDAR is a tire and auto parts company owned or operated by JSS and/or MSS.

20.    SARDAR INTERNATIONAL TRADING CO. ("SITC") is a corporation or other business entity organized and existing under the laws of a foreign country with an office or place of business located at PO Box 2533, Safat 13110, Kuwait. SITC is owned or operated by JSS and/or MSS. SITC and Blue Bird Water Treatment Company share the same telephone number in Kuwait.

21.    AL TAMASOK AL ARABI EST. ("AL TAMASOK") is a corporation or other business entity organized and existing pursuant to the laws of a foreign country with an office or place of business located at Office 8, Third Floor, 9th Commercial Division 0009, Building 13, Kuwait City, Kuwait. AL TAMASOK at all relevant times was owned by a Kuwaiti named Dr. Adel Baroun and has or had a Kuwaiti import-export

8

license. Dr. Baroun (together with a rental car) has disappeared and cannot now be located. Prior to his disappearance, however, he advised MAERSK that SCK had approached him to be able to use AL TAMASOK's import-export license on behalf of MSS and JSS, and Dr. Baroun agreed. In this way and with respect to the events giving rise to this matter, AL TAMASOK was ultimately controlled, run and/or operated by ASS, MSS, JSS and/or MANDEEP. AL TAMASOK was the named receiver on the bill of lading of NEEWRA's cargo. AL TAMASOK, through the assistance of ASS, MSS, JSS, MANDEEP and/or SCK, prepared and presented a fraudulent bill of lading in order to take possession of the NEEWRA cargo. Dr. Baroun had no role in presenting the fraudulent bill of lading to MAERSK.

22. ASS has other aliases. The individual defendant sued herein as "ASS" is also sued herein as "JOHN DOE" to account for this individual's other aliases and actual identity, once discovered.

23. MSS has other aliases. The individual defendant sued herein as "MSS" is also sued herein as "JOHN DOE" to account for this individual's other aliases and true identity, once discovered.

24. JSS has other aliases. The individual defendant sued herein as "JSS" is also sued herein as "JOHN DOE" to account for this individual's other aliases and true identity, once discovered.

25. MANDEEP has other aliases. The individual defendant sued herein as "MANDEEP" is also sued herein as "JOHN DOE" to account for this individual's other aliases and true identity, once discovered.

26.    Suit is also brought against JOHN DOE INC. 1-100, the fictitious name of other business entities, the names of which are not presently known, whether or not actually incorporated, the addresses of which are not presently known, which are or were owned, operated and/or controlled by the other defendants herein and were used as vehicles for perpetrating frauds on MAERSK.

## FIRST CAUSE OF ACTION

27.    MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 26 inclusive with the same force and effect as if herein set forth at length.

28.    On or about April 22, 2001, MAERSK received an inquiry via telephone and/or facsimile and/or mail and/or telex and/or email from AREF through ASS, requesting a price quote on the shipment of 720 container loads of used auto and truck tires to India.  ASS represented to MAERSK that AREF had a buyer in India for the used tires, and that the buyer intended to recycle the used tires by turning them into conveyor belts.  ASS also represented to MAERSK that a sale contract was already in place between AREF and the buyer, which provided for shipment on a "freight collect" (*i.e.*, the consignee must pay for ocean freight before it can receive the cargo) basis.

29.    ASS knew that AREF had no contract to sell used tires to anyone in India – or anywhere else – and knew that there was no prospect of finding a buyer for such a quantity of used tires in India.  ASS hid these facts from MAERSK, intending MAERSK to rely on false information in providing a price quote for the shipment as described by ASS.

30.     At or about the same time, ASS and/or MANDEEP, posing as MSS with MSS's permission, requested similar price quotes on behalf of REDNIHOM from other shipping lines, based on the same or similar misrepresentations.

31.     On or about May 2, 2001, MAERSK and AREF entered into a service contract (No. 7792), filed with the U.S. Federal Maritime Commission, that incorporated the terms and conditions of MAERSK's bills of lading.   The service contract contemplated that AREF would deliver to MAERSK approximately 720 containers over a period of time and that MAERSK would ship the containers to India in groups over time, with freight coming due upon MAERSK's receipt of the containers.

32.     Used tires are a waste product in the United States and are stored at waste tire facilities in New York and in New Jersey.

33.     AREF and REDNIHOM entered into contracts with waste tire storage facilities in New York and New Jersey whereby the facilities agreed to pay AREF and REDNIHOM to take tires from their facilities and transport the tires abroad.   The facilities agreed to stuff the used tires into containers.

34.     ASS and "MSS" (actually ASS and/or MANDEEP posing as MSS with MSS's authorization) made the same representations to the used tire storage facilities as had been made to the shipping lines, including MAERSK, that there was a buyer in India who wished to convert the tires into conveyor belts.   These representations were made in order to induce the facilities to pay AREF and REDNIHOM to take the tires away.

35.     ASS and "MSS" (actually ASS and/or MANDEEP posing as MSS with MSS's authorization) directed MAERSK to send empty containers to the various tire

storage facilities, and MAERSK complied in reliance on the terms and conditions of the service contract.

36.     The tire storage facilities loaded the empty containers with used tires and the containers were sent to MAERSK and held at Port Newark, New Jersey while awaiting transportation to India.

37.     Over time, MAERSK received approximately 260 containers filled with used tires pursuant to the service contract. MAERSK fully performed its obligations by shipping all but the last 60 received (as further discussed below) to India as required by the service contract.

38.     On or about May 16, 2001, after approximately 200 containers had reached India, MAERSK learned that the consignee of record in India for the shipment of the tires, "Golden Traders", was either fictitious or had no interest in the shipment of tires, and so advised AREF.

39.     On or about May 17, 2001, AREF through ASS advised MAERSK via telephone and/or facsimile and/or mail and/or telex and/or email of the details of a replacement consignee, "Poonanam Ent."

40.     AREF and ASS knew that Poonanam had no interest in the tires, but hid this fact from MAERSK. AREF and ASS knew that there was no contract with Poonanam to deliver any tires to it and knew that there would never be any such contract with Poonanam, but hid these facts from MAERSK. AREF and ASS hid these facts from MAERSK in an effort to induce MAERSK into believing that there was in fact a buyer for the tires in India and that MAERSK would be paid for the transportation services it had provided.

41.     On or about May 18, 2001, Poonanam advised that it was not interested in the tires.

42.     On or about May 21, 2001, AREF through ASS advised MAERSK via telephone and/or facsimile and/or mail and/or telex and/or email that Poonanam was offering to pay $1,000 per container for the tires, knowing the same to be false but hiding the falsity of the statement from MAERSK in an effort to induce MAERSK into accepting less than the full amount due for the transportation.  MAERSK accepted the offer in a communication to AREF and ASS.

43.     At or about the same time, some 60 containers from AREF and ASS were at Newark, New Jersey awaiting transport to India.  Due to the difficulties in releasing the containers of used tires at India, and because it was unclear to MAERSK whether Poonanam would accept (and pay for) the 60 additional containers of tires, the containers were held at Newark with the knowledge and consent of AREF and ASS.

44.     On or about June 15, 2001, MAERSK learned that Poonanam would not take any of the containers of tires and India Customs refused to permit the cargo to enter into India and impounded the containers.  Poonanam never paid any monies to MAERSK and the containers of tires were abandoned where they sat in India.

45.     At or about the same time, REDNIHOM (through ASS and/or MANDEEP posing as MSS with MSS's authorization) was involved in a similar fraud and scam, also involving approximately 700 ocean shipping containers filled with used auto and truck tires, but involving other ocean carriers.  MSS acted in this tire fraud directly and/or indirectly through REDNIHOM and AREF and/or authorized ASS and/or MANDEEP to act on his behalf in so doing.

NYDOCS1/267909.1                        13

46.     MAERSK's freight for the shipment of the containers that were transported to India and for those that were held at Newark, $339,166.00, was never paid, nor was MAERSK's claim for deadfreight for the approximately 450 containers that were contracted for at a discounted rate but were never shipped, in the amount of approximately $1,125,000.

47.     MAERSK also incurred significant expense for demurrage, storage and similar charges for maintaining the containers at India and Newark and has never been reimbursed for such charges.  From the date of arrival of the cargo at India, and following seven "free days", the cargo incurred demurrage, storage and similar charges at a rate of $65 per container per day, for a total on September 5, 2001 of $1,360,021.00 and at Newark at the same rate for a total on September 5, 2001 of $437,580.00.  Total charges for all the containers (at Newark and at India) of approximately $17,290 were incurred each day thereafter until the containers were released.

48.     Because of the difficulties involved in releasing the containers of tires, MAERSK was denied use of more than 250 shipping containers for an extended period of time beyond the "free time" permitted by MAERSK and MAERSK is entitled to loss of use of these containers at its ordinary rental rate for containers for the period of time from the end of free time until the containers were returned to service.  MAERSK is entitled to loss of use damages for its containers in the total approximate amount of $1,175,000.

49.     MAERSK also incurred significant expenses in disposing of the used tires once it became clear that the tires had been abandoned.  Indian Customs would not allow the used tires to enter the country and MAERSK had to pay a fee to secure the release of its containers and had to pay for the return transportation of the approximately 200

containers filled with tires to the United States. MAERSK incurred $104,200 to dispose of the used tires.

50.    MAERSK retained counsel to attempt to recoup the amounts due for the aforementioned freight, demurrage, and similar items of expense as indicated above. MAERSK incurred $5,858.94 in reasonable attorney fees and disbursements in attempting to collect these sums. The efforts to collect the sums due were ultimately unsuccessful and discontinued in or about November 2001, without waiver of the claim, because AREF and ASS (who had initially retained counsel to represent them) terminated their counsel's services, ceased doing business, failed to respond to communications, and/or could not thereafter be found.

51.    MAERSK's bill of lading provides in part as follows:

> The Shipper, consignee, holder hereof, and owner of the goods, *and their principals*, shall be jointly and severally liable to Carrier for the payment of all freight, demurrage, General Average and other charges due hereunder, without discount, together with any Court costs, expenses and reasonable attorney fees incurred in collecting any sums due Carrier....Merchant to remain liable for all charges hereunder notwithstanding any extension of credit...by Carrier.

(emphasis supplied). Accordingly, due to their breach of contract, AREF, ASS, MSS and/or MANDEEP are jointly and severally responsible to MAERSK for the approximate sum of $5,246,825 for unpaid freight, demurrage, storage, and other charges, together with the cost of collection of the same.

## SECOND CAUSE OF ACTION

52.    MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 51 inclusive with the same force and effect as if herein set forth at length.

53.    Used tires are a solid (and depending on their synthetic composition, hazardous) waste subject to regulation under the Solid Waste Disposal Act and it is costly to dispose of used tires.

54.    AREF through ASS contacted via telephone and/or facsimile and/or mail and/or telex and/or email numerous facilities throughout New York and New Jersey and elsewhere and offered to dispose of their stockpiles of used tires by shipping them to India where AREF through ASS represented there was a buyer of the used tires, knowing the same to be false.

55.    Causing the shipment of solid waste and/or hazardous waste to a foreign country without a permit from the receiving country is a crime under U.S. law.

56.    AREF and ASS, through one or more communications via telephone and/or facsimile and/or mail and/or telex and/or email, contracted with MAERSK to ship 720 container loads of used tires and represented to MAERSK that all necessary permits for the import into India of the used tires had been obtained or would be obtained, knowing the same to be false, for the purpose of defrauding MAERSK.

57.    REDNIHOM and "MSS" (actually ASS and/or MANDEEP posing as MSS with MSS's permission), through one or more communications via telephone and/or facsimile and/or mail and/or telex and/or email contracted with other ocean carriers to ship approximately 700 additional container loads of used tires to India, representing to those other carriers that all necessary permits for the import into India of the used tires

had been obtained or would be obtained, knowing the same to be false, thereby participating in a larger conspiracy to defraud ocean carriers, including MAERSK.

58.    AREF through ASS, through one or more communications via telephone and/or facsimile and/or mail and/or telex and/or email, entered into contract with MAERSK for the shipment of used tires and caused MAERSK to issue bills of lading containing false statements for such shipments with the intent of defrauding MAERSK, which is a crime under the Bills of Lading Act.

59.    REDNIHOM through "MSS" (actually ASS and/or MANDEEP posing as MSS with MSS's permission), through one or more communications via telephone and/or facsimile and/or mail and/or telex and/or email, entered into contract with ocean carriers for the shipment of used tires and caused those ocean carriers to issue bills of lading containing false statements for such shipments with the intent of defrauding those ocean carriers, which is a crime under the Bills of Lading Act.

60.    Shipment of the used tires to India under these conditions also constitutes under Indian law the crime of smuggling.

61.    AREF through ASS, and/or REDNIHOM through MSS, ASS and/or MANDEEP, using telephonic and/or facsimile and/or mail and/or telex and/or email communications, defrauded the original owners of the used tires, defrauded MAERSK, and defrauded other ocean carriers through this scheme to transport used tires from the United States to India.

62.    As a result of this fraudulent scheme, AREF, ASS, MSS, and/or MANDEEP are jointly and severally liable to MAERSK for its damages of $104,200

together with attorneys fees, costs and expenses of $5,858.94 for a total of approximately $110,058.94.

**THIRD CAUSE OF ACTION**

63.    MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 62 inclusive with the same force and effect as if herein set forth at length.

64.    In November 1998, ASS established a New York corporation called "Neewra Incorporated" ("NEEWRA"). In the incorporation papers, the president described himself as "Arween Sahni". Neewra is Arween spelled backwards, and the president of NEEWRA is Defendant ASS herein.

65.    The incorporation papers give addresses of both ASS and NEEWRA as 40-18 Hampton Street, Office #1J, Elmhurst, NY 11373. ASS's contemporaneous business card and NEEWRA's contemporaneous stationery both show a different address – Office 189, 80-50 Baxter Ave., Elmhurst, NY 11373. The telephone and fax numbers shown on both ASS's business card and NEEWRA's stationery are (718) 803-2725 and (718) 803-2801 respectively. A third address was reported by ASS to Dunn & Bradstreet ("D&B") as 110 West 40th Street, New York, NY 10018, with a different telephone number, (646) 366-0176.

66.    In or about 2004, ASS reported to D&B that NEEWRA was a telecommunications company occupying 5,000 square feet and employing 36 people. These representations made to D&B were made by ASS with the knowledge that they were untrue. ASS made these representations for the purpose of luring creditors with

false information as to the company's size and general business activities so as to be able to defraud creditors.

67.     D&B determined, though, that ASS's statements were untrue. D&B found the address discrepancy, learned that the 646 telephone number was not in service, discovered that the sole listed officer for the corporation was "Mohinder Singh" (actually MSS or ASS or MANDEEP posing as MSS with MSS's authorization) and determined that the company's charter had been rendered void by proclamation effective June 26, 2002 for failure to pay taxes.

68.     Contemporaneous local directory assistance showed NEEWRA only at the 80-50 Baxter Avenue address with the (718) 803-2725 telephone number, and the 86-10 Roosevelt Avenue address with the (718) 396-0801 telephone number. The Baxter Avenue address is merely a mail drop location and neighbors at the Roosevelt Avenue address could not confirm that NEEWRA operated out of that address. Neither telephone number was in service at any relevant time.

69.     ASS also provided D&B with favorable credit references for REDNIHOM and AREF (as well as another company called Laxmi Impex), all classified by D&B as higher risk businesses and all of which were linked by D&B to Mohinder Singh (MSS or ASS and/or MANDEEP posing as MSS with his permission). These favorable credit references were given by ASS in order to bolster the perceived creditworthiness of these companies so as to be able to induce and defraud creditors into giving credit to these companies.

70.     On February 26, 1999, NEEWRA, through ASS, shipped a container to Kuwait with MAERSK. The goods were described as "20 crates automotive spare parts

and accessories", and the buyer/consignee was AL TAMASOK. The shipment passed without incident. The original bill of lading was presented to MAERSK in Kuwait, which indicates that either AL TAMASOK paid for the goods, or the presenter of the bill of lading was cooperating with NEEWRA and was given the document. This shipment was a "test run" to learn the practices involved in shipping with MAERSK and to become familiar with MAERSK's documents and business practices.

71.     On March 5, 1999, NEEWRA through ASS (utilizing an alias different from the one used in the used tires scheme), making one or more telephonic and/or facsimile and/or mail and/or telex and/or email communications, contracted with MAERSK to ship a container from Newark, New Jersey said by NEEWRA (as shipper) to contain "20 crates of electrical spare parts" for delivery to consignee AL TAMASOK in Kuwait. The bill of lading issued by MAERSK showed the same description provided by NEEWRA and showed the container no. BENU232656-0 was loaded aboard the M/V DRAGOER MAERSK on March 6, 1999. The "20 crates of electrical spare parts" language was also used by NEEWRA to describe the goods in the export declaration submitted to the U.S. government.

72.     Prior to arrival of the NEEWRA shipment, SCK on behalf of AL TAMASOK contacted MAERSK to determine whether the container could be released without presentation of the original bill of lading if a personal guarantee was posted. The request was passed along to NEEWRA, who declined, insisting that the original bill of lading be surrendered.

73.     NEEWRA's shipment was carried to Kuwait without incident, and MAERSK satisfied all of its obligations to NEEWRA under the contract of carriage.

74.   When NEEWRA's shipment arrived in Kuwait on or about April 10, 1999, notice of the arrival of the cargo was timely given as required by the contract of carriage, but no representative of the consignee appeared to collect the container for several weeks.   Ultimately, individuals representing AL TAMASOK appeared at MAERSK's offices in Kuwait and requested that the container be released to them without presenting the original bill of lading.

75.   Ordinarily, consignees are required to present the original bill of lading, which acts under the circumstances as a receipt, in order to collect the cargo.   It is not uncommon, however, for there to be a delay in receipt by the consignee of the original bill of lading.

76.   MAERSK contacted NEEWRA to ask whether AL TAMASOK could collect the container without presentation of the original bill and ASS declined such permission on the basis that NEEWRA had not been paid by AL TAMASOK.

77.   ASS represented on April 15, 1999 that NEEWRA had sent the original bill of lading.   Unbeknownst to MAERSK, ASS had not forwarded the original bill of lading.

78.   Representatives of AL TAMASOK, including SCK, made multiple visits to MAERSK's offices in Kuwait in an attempt to secure the quick release of the container without presentation of an original bill of lading, citing commercial pressure to deliver the contents to customers.

79.   On May 4, 1999, ASS eventually gave MAERSK authorization to allow delivery to AL TAMASOK against a bank check as security for the original bill of lading.   ASS provided AL TAMASOK with an invoice showing that the goods inside the

container had a value of less than $10,000. Based on ASS's representation that the goods were worth no more than $10,000, MAERSK advised AL TAMASOK that in order to secure the release of the container, the company needed to provide a check that was three times the value to the cargo, or approximately $30,000. MAERSK also independently verified with Kuwaiti Customs that the declared customs value of the cargo was $10,000.

80.    AL TAMASOK provided MAERSK with a $30,000 check which acted as security against delivery of the original bill of lading together with the invoice sent by fax by NEEWRA/ASS showing that the cargo had a value of approximately $10,000. Upon the delivery of these items to MAERSK, the container was released to AL TAMASOK, who removed it from the port after clearing Kuwaiti customs on the basis of a customs declaration that the goods were "electrical spare parts" worth less than $10,000 – all as represented by NEEWRA and ASS.

81.    At or about the same time, JSS and/or MSS sent intermediaries to at least two MAERSK employees in Kuwait in an attempt to obtain an original blank form bill of lading. As a matter of well-known MAERSK policy (a policy which is common to the shipping industry), blank original bills of lading are never distributed because of the possibility that such blank bills might be used to defraud ocean transporters and/or purchasers of cargo.

82.    These intermediaries acting on JSS's and/or MSS's behalf succeeded in convincing one MAERSK employee to provide a blank form bill of lading.

83.    The blank form bill of lading improperly obtained from MAERSK by JSS and/or MSS, together with information from the original bill of lading obtained from NEEWRA/ASS was given to a website designer in Kuwait named Mr. Fernandez. Mr.

Fernandez was asked by intermediaries acting on JSS's and/or MSS's instructions to produce a fake original bill of lading that would appear to be the original bill of lading for the NEEWRA shipment.

84.     Mr. Fernandez did not have an appreciation for the significance of the document and prepared a fraudulent draft original bill of lading. A friend of Mr. Fernandez's, who worked for a shipping company, saw what Mr. Fernandez was working on, explained the significance of the document, and suggested that Mr. Fernandez stop work on the project. Mr. Fernandez stopped work on the project and returned all the materials to JSS and/or MSS through the intermediaries.

85.     SCK then presented the fraudulent bill of lading to MAERSK, alleging that it was the original bill of lading. At first glance, the document appeared to be authentic. AL TAMASOK's check and supporting documentation were released by MAERSK in exchange for the bill of lading that had been presented as an original.

86.     Once AL TAMASOK had both the container and the money, JSS and/or MSS advised ASS by telephone or fax or email.

87.     Upon learning that AL TAMASOK had both the container and the money, NEEWRA (through ASS) then forwarded by mail or courier the original bill of lading to his bank, Banco Popular, with instructions that it was not to release the original bill of lading to AL TAMASOK's bank until AL TAMASOK had paid the purchase price of $1.86 million.

88.     Banco Popular then contacted AL TAMASOK's bank and requested payment in exchange for the original bill of lading. AL TAMASOK had no intention of paying any amount for the cargo, and NEEWRA and ASS were well aware of this fact.

89.  MAERSK, in reviewing the bill of lading presented by SCK/AL TAMASOK, learned that the bill was fraudulent.

90.  MAERSK tried to contact AL TAMASOK, but the phone went unanswered and their premises were abandoned.

91.  MAERSK presented the information it had, including original documents, and forwarded same to the Kuwaiti police, requesting an investigation.

92.  MAERSK also contacted NEEWRA/ASS to advise that the container had been released against a fraudulent bill of lading.  ASS responded that the container held new Seagate computer hard drives worth approximately $1.86 million and that NEEWRA was holding MAERSK responsible for these damages.  ASS knew that the container did not in fact hold anything of value.

93.  NEEWRA claimed that the container had been stuffed with 2000 units of new computer hard drives purchased by it from Seagate Technology, a well-known U.S. manufacturer.  NEEWRA claimed that the container had been stuffed and sealed by it and had been delivered to MAERSK's agent in exchange for an ocean bill of lading which was in turn negotiated to its bank.

94.  NEEWRA's invoice for the computer hard drives, allegedly issued by a company called "Micro-Spy Inc." in the amount of $1.6 million, was false and fraudulent.  Micro-Spy was not paid this amount by NEEWRA or ASS or anyone else. Similarly, there was no contract for sale of hard drives from Micro-Spy to NEEWRA or ASS.

95.  Seagate Technology did not sell hard drives to Micro-Spy or to NEEWRA or to ASS.  Seagate Technology did not receive any funds from Micro-Spy or from

NEEWRA or ASS, and there was no contract for sale of hard drives from Seagate Technology to Micro-Spy or NEEWRA or ASS. Seagate Technology confirmed that the manner in which 2000 hard drives would have been packed for shipment would have been different from the manner described by ASS as the way the supposed hard drives had allegedly been packed by Seagate.

96. There were no stuffing records for the container, and the container was stuffed and sealed at a small auto parts supply shop called "Engines Plus Corporation" in a mainly residential neighborhood in Garfield, New Jersey.

97. Engines Plus Corporation was not in the regular business of stuffing ocean shipping containers and its location in a lower-income residential neighborhood does not lend itself to the stuffing of an ocean shipping container of cargo worth nearly $2 million.

98. Engines Plus Corp. is or was owned or operated at all relevant times by an individual named Lowei Najjar, who is a registered sex offender who is required to register his current address with the police. Despite the legal requirement to register his address, Mr. Najjar closed down Engines Plus Corp. and moved without registering his new address.

99. NEEWRA retained counsel and brought suit against its cargo underwriter, CNA, claiming a loss of $1.86 million for the stolen computer hard drives, knowing that the claim was false. CNA retained a private investigator who collected evidence that demonstrated that NEEWRA's claim was fraudulent and that NEEWRA's shipment did not contain computer hard drives. CNA ultimately was successful in dismissing the action brought by NEEWRA. Making a false claim against an insurance company is a crime under U.S. law.

100.   Shortly thereafter, NEEWRA instructed its attorneys to pursue the same claim against MAERSK in New York. Undersigned counsel presented NEEWRA's New York attorneys with the evidence of NEEWRA's fraudulent claim and NEEWRA's New York counsel thereafter withdrew the claim and did not pursue a lawsuit against MAERSK.

101.   NEEWRA next instructed attorneys in New Jersey to pursue the same claim against MAERSK. Undersigned counsel presented to NEEWRA's New Jersey attorneys the evidence of the fraud and NEEWRA's New Jersey attorneys also withdrew the claim and did not pursue a lawsuit against MAERSK.

102.   By 2002, NEEWRA's charter had been voided by the New York Secretary of State for failure to pay taxes.

103.   Nonetheless, in or about March or April 2004, NEEWRA – knowing its claim was false – brought suit against MAERSK on the same claim in Kuwait, which resulted in the wrongful arrest of one of Maersk's large container ships on liner service, the M/V ALVA MAERSK.

104.   NEEWRA was represented in the Kuwaiti Court by HLC and PARKER, with the knowledge of and authorization from JSS and/or MSS.

105.   After several days' negotiations, the M/V ALVA MAERSK was released only against the posting of approximately $1.86 million in cash with the Kuwaiti Court's Execution Department to act as substitute security for the vessel.

106.   Soon after the cash was posted and the vessel released, however, PARKER, HLC, JSS and/or MSS sought to have the vessel restrained again, but these efforts were unsuccessful and the vessel left port.

107.    In April 2004, MAERSK directed English solicitor Paolo Ghirardani of the law firm of Stephenson Harwood to go to Kuwait to investigate the fraudulent claim and to give legal advice regarding the handling of the claim.

108.    When Mr. Ghirardani arrived at Kuwait, he asked MAERSK to set up a meeting with the "decision maker" for NEEWRA. MAERSK had no direct contact with those representing NEEWRA, and so MAERSK instead set up a meeting with MAERSK's local business partner, Mr. Behbehani. Mr. Behbehani in turn introduced Mr. Ghirardani to an employee of Mr. Behbehani's, Vijay Kapoor. Mr. Kapoor was connected to the Singh Sahni family of which ASS, MANDEEP, MSS and JSS are all members. Mr. Kapoor advised that the decision maker was JSS, but that it would be difficult to meet with JSS because a large family wedding was then occurring. Mr. Ghirardani encouraged Mr. Kapoor to set up the meeting anyway, hinting that settlement of the matter might be possible.

109.    A meeting was then scheduled and held at a coffee shop in the lobby of the JW Marriott Hotel in Kuwait. Mr. Kapoor arrived with an individual he introduced as JSS. The individual identified as JSS never claimed to be someone other than JSS. Attending the meeting on behalf of MAERSK was Mr. Ghirardani and Mr. Bimal Kanal, MAERSK's country manager for Kuwait. The meeting lasted approximately 20-30 minutes.

110.    In discussing settlement, Mr. Ghirardani encouraged the person he believed at the time was JSS to drop the lawsuit on the basis of the strong evidence that the claim was fraudulent. The person identified as JSS at that meeting in turn offered to

resolve the case if MAERSK would pay the principal amount - $1.86 million, and offered to waive interest "as a commercial gesture".

111.     The parties did not come to any agreements regarding settlement or the further conduct of the case at that time.  At the close of the meeting, the person identified as JSS gave to Mr. Ghirardani a business card for HLC which was almost entirely in Arabic.  Mr. Ghirardani asked for and noted the individual's mobile (cell) phone number on the reverse of the business card.

112.     The person who attended the meeting was not JSS but instead was MSS.

113.     NEEWRA and those responsible for its actions pursued their claim through the Kuwaiti court system, based on fraudulent evidence.  During the pendency of MAERSK's appeal of an unfavorable ruling, the $1.86 million, plus interest, was released to PARKER, MSS and/or JSS without the consent of MAERSK.

114.     As a result of the NEEWRA fraud, MAERSK has suffered damages, as best as may presently be estimated, in excess of $2,250,000, for which NEEWRA, ASS, MSS, JSS, SCK, PARKER and AL TAMASOK are directly and jointly and severally liable.

## FOURTH CAUSE OF ACTION

115.     MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 114 inclusive with the same force and effect as if herein set forth at length.

116.     MAERSK has not been paid freight for its carriage of the NEEWRA shipment to Kuwait and is owed approximately $2,500, which was eventually acquired by SARDAR and/or SITC for the benefit of JSS.  Accordingly, according to the terms

and conditions of the bill of lading contract of carriage, MAERSK is entitled to collect jointly and severally from NEEWRA, ASS, SCK, AL TAMASOK, JSS, SARDAR, and/or SITC for its unpaid freight as well as the cost of collection (including but not limited to reasonable attorneys fees and court costs).

117.   NEEWRA's, ASS's, SCK's, JSS's, MSS's and PARKER's fraudulent litigation in Kuwait has cost MAERSK in excess of $447,954.74 in legal fees, costs and disbursements and other expenses, which MAERSK is entitled to collect jointly and severally from NEEWRA, ASS, SCK, AL TAMASOK, JSS, MSS, SARDAR, and/or SITC.

## FIFTH CAUSE OF ACTION

118.   MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 117 inclusive with the same force and effect as if herein set forth at length.

119.   On or about July 20, 1999, MSS and REDNIHOM, through MSS (or ASS and/or MANDEEP posing as MSS with MSS's permission), used telephonic and/or facsimile and/or mail and/or telex and/or email communications to contract with MAERSK pursuant to an ocean bill of lading for the shipment of a container said by REDNIHOM to contain 4,000 pieces of "PC parts" to Kuwait, knowing that the container actually held no such "PC parts", but hiding this fact from MAERSK.

120.   Sharing many of the same hallmarks of the then-recent shipment by NEEWRA, and suspecting that this shipment was also fraudulent, MAERSK caused the seal placed on the container by REDNIHOM to be broken and discovered that the

container held a number of low-value goods, mainly used auto parts, but no "PC parts" whatsoever.

121.   The REDNIHOM shipment initially was abandoned by the named consignees for nearly three months, during which time the container incurred demurrage, storage and similar charges at Kuwait.

122.   The consignees of the REDNIHOM shipment were thereafter discovered by MAERSK to be fictitious, with no real presence in Kuwait.

123.   MSS and/or JSS themselves and/or through HLC and/or PARKER attempted to find an alternative way to present a false claim with regard to the shipment. HLC tried to have the container surveyed in the knowledge that it did not contain high-value PC parts. HLC then tried to divert the shipment to another consignee in another country, all for the purpose of defrauding MAERSK. These efforts by HLC were unsuccessful.

124.   REDNIHOM tried to disguise the fact that its shipment was connected to the NEEWRA shipment. Although REDNIHOM and NEEWRA had different names and addresses, they shared the same fax and telephone numbers. Moreover, MSS, the president of REDNIHOM, is publicly listed as a principal of NEEWRA.

125.   MAERSK was not paid its freight of approximately $2,500 for carrying the container to Kuwait or for the charges incurred for demurrage and storage in the amount of approximately $29,500 for which REDNIHOM and MSS are jointly and severally liable pursuant to the terms and conditions of the bill of lading, and REDNIHOM and MSS are further liable for the costs of collection (including reasonable attorneys fees and court costs) pursuant to the terms and conditions of the bill of lading.

126.   REDNIHOM's, MSS's, and JSS's fraudulent shipment to Kuwait has cost MAERSK approximately $32,000 for which MSS, ASS, JSS, MANDEEP, HLC, SCK and REDNIHOM are directly and jointly and severally liable.

## SIXTH CAUSE OF ACTION

127.   MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 126 inclusive with the same force and effect as if herein set forth at length.

128.   NEEWRA, REDNIHOM, AREF, ASS, MSS, JSS, MANDEEP, SCK, HLC, PARKER, SARDAR, SITC, AL TAMASOK, JOHN DOE 1-100, and JOHN DOE INC. 1-100 all conspired to defraud MAERSK and others and actually participated in multiple separate events of mail fraud and/or wire fraud as defined in 18 U.S.C. §§1341 and 1343 in so doing.

129.   Defendants MSS and JSS have actively engaged in a course of conduct whose aim has been to intimidate witnesses for MAERSK with respect to this litigation. One of the persons chiefly responsible for investigating the NEEWRA and REDNIHOM frauds was an Indian national employed by MAERSK in Kuwait named Elvis Pinto. Mr. Pinto prepared a statement outlining the fraudulent activities, the facts learned by him in the course of his investigation and the conclusions that he drew therefrom. Mr. Pinto's wife was recently attacked, however, and Mr. Pinto has taken that attack as a clear signal that he should cease participating in this matter. Other potential witnesses have been willing to provide information but have been unwilling to testify against the Singh Sahni family, due to safety concerns. Still other witnesses, such as Dr. Adel Baron (owner of AL TAMASOK), and SCK have simply disappeared without a trace.

130.   Three of the Singh Sahni Defendants (ASS, MSS and MANDEEP) have each engaged in multiple acts of wire fraud and/or mail fraud for the purpose of furthering the criminal enterprise established to defraud MAERSK and others.

131.   ASS's wire fraud and/or mail fraud activities include but are not limited to the following:

a)  the use of wire and/or mail communications on or about November 18, 1998 to create NEEWRA as a vehicle for conducting fraudulent activities and afterwards in providing fictitious address and telephone information to the New York Secretary of State;

b)  the use of wire and/or mail communications on or about April 22, 2001 to induce MAERSK to provide a price quote on the shipment of 720 container loads of used tires to India, and to enter into a service contract for the shipment of such containers on a freight collect basis;

c)   the use of wire and/or mail communications to provide fictitious information in bills of lading in violation of the Bills of Lading Act, 49 U.S.C. §80101 *et seq.*;

d)  the use of wire and/or mail communications on or about May 17, 2001 to provide MAERSK with a  false replacement consignee in India for the used tires;

e)  the use of wire and/or mail communications on or about May 21, 2001 to provide MAERSK with a fictitious settlement offer regarding the purchase of the tires.

f) the use of wire and/or mail communications on or about April 2004 in order to provide Dunn & Bradstreet with fictitious information regarding the creditworthiness of NEEWRA, REDNIHOM, AREF and others, which in turn was used to induce potential creditors to give credit to those corporate defendants.

132.    MSS's wire fraud and/or mail fraud activities include but are not limited to the following:

a)    the use of multiple wire and/or mail communications between approximately November 1998 and December 2005 authorizing ASS and/or MANDEEP to pose as MSS in communications with third parties; and/or

b)  authorizing ASS to pursue false claims in both New York and New Jersey with respect to the NEEWRA shipment; and/or

c)  agreeing to allow ASS and/or MANDEEP to commit multiple acts of wire and/or mail fraud by posing as MSS and using his name; and/or

d)  communications with ASS and/or MANDEEP planning the fraudulent actions taken against MAERSK, discussing the status of the fraudulent actions, resolving issues that arose concerning the frauds, helping each other execute the frauds, coordinating the fraudulent claims brought in the United States and Kuwait, and discussing the manufacture of fraudulent documents and evidence.

133.    MANDEEP's wire fraud and/or mail fraud activities include but are not limited to the following:

a) the use of multiple wire and/or mail communications in MSS's name with respect to establishing and operating REDNIHOM;

b) the use of multiple wire and/or mail communications in MSS's name with respect to an attempt to cause MAERSK to voluntarily release MSS's funds held under attachment;

134.    Each defendant, by words or actions, manifested an agreement to commit at least two predicate acts in furtherance of the common purpose of their criminal enterprise.

135.    The Defendants' actions, together with their actions in other matters not directly affecting MAERSK, through the commission of two or more predicate acts, constitute a pattern of racketeering activity that constitutes an enterprise in which each Defendant directly invested in or maintained an interest in or participated in, the activities of which affected both interstate and foreign commerce.   The same constitutes "racketeering activity" within the meaning of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq.* ("RICO") and MAERSK hereby seeks civil relief pursuant to 18 U.S.C. §1964, including but not limited to treble damages, the cost of the suit, and reasonable attorneys fees, all as provided in 18 U.S.C. §1964(c), all in an amount to be determined at trial, but not less than $24,707,136.

## SEVENTH CAUSE OF ACTION

136.    MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 135 inclusive with the same force and effect as if herein set forth at length.

137.    ASS, MANDEEP, MSS and JSS are all related.   MSS and JSS are brothers; MANDEEP is MSS's son and ASS is JSS's son (making ASS and MANDEEP first cousins).

138. ASS, MANDEEP, MSS and JSS, together with others make up the "Singh Sahni family", which is very powerful and influential in Kuwait.

139. The Singh Sahni family ostensibly deals in auto parts in Kuwait and elsewhere. The Singh Sahni family also has numerous other businesses incorporated in Kuwait, the United States and elsewhere. The Singh Sahni family works cooperatively for its own enrichment.

140. The members of the Singh Sahni family liberally allow each other to use each others' identities, names and aliases. The purpose of each member taking on multiple names and aliases and also in posing as each other is to create confusion to creditors and to enable them to commit frauds and throw their victims off track.

141. ASS, MSS, JSS and/or MANDEEP, and/or other family members, used certain companies (most of which, but not all, were owned by them) – NEEWRA, REDNIHOM, AREF, HLC, SARDAR, SITC, AL TAMASOK and perhaps others, and employed intermediaries, such as SCK and others to commit frauds in which MAERSK was a victim. ASS, MSS, JSS, MANDEEP, NEEWRA, REDNIHOM, AREF, HLC, SARDAR, SITC, and AL TAMASOK conspired together to commit the frauds and each had a role to play in executing the frauds committed upon MAERSK.

142. Accordingly, ASS, MSS, JSS, MANDEEP, NEEWRA, REDNIHOM, AREF, HLC, SARDAR, SITC and AL TAMASOK are each directly and jointly and severally liable for any and all damages caused to MAERSK through their conspiracy to commit frauds against MAERSK and for their execution of those frauds against MAERSK.

## MARITIME ATTACHMENT

143.   MAERSK repeats and realleges each and every allegation set forth in paragraphs 1 through 142 inclusive with the same force and effect as if herein set forth at length.

144.   Upon information and belief, and after investigation, Defendants NEEWRA, REDNIHOM, AREF, ASS, MSS, JSS, MANDEEP, SCK, HLC, PARKER, SARDAR, SITC, AL TAMASOK, JOHN DOE 1-100, and JOHN DOE INC. 1-100 all cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising of, *inter alia*, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants (hereinafter, "ASSETS"), including but not limited to ASSETS at, being transferred through, or being transferred and/or wired to or from Citibank and Banco Popular or other financial institutions.

145.   The total amount sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by MAERSK against the defendants is **$24,950,000**, which represents, pursuant to the sixth cause of action, three times the damages suffered by MAERSK as described in the first through fifth causes of action described above, together with estimated attorneys fees, costs and disbursements in the amount of approximately $243,000, collectible from the defendants as described above in the sixth cause of action.

WHEREFORE, plaintiffs MAERSK pray:

a.    That process in due form of law according to the practice of this Court may issue against the defendants, citing them to appear and answer the foregoing, failing which a default will be taken against them for the principal amount of the claim of $8,235,712 plus interest, costs and attorneys fees;

b.    That plaintiff be awarded treble damages pursuant to RICO of $24,707,136 plus attorneys fees, costs and interest;

c.    That if the defendants, or any of them, cannot be found within this District pursuant to Supplemental Rule B that all assets of the defendants, or those outside this District, up to and including the claim of **$24,950,000** be restrained and attached, including, but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or any other assets of, belonging to, due or for the benefit of the defendants held by Citibank and/or Banco Popular and/or any other garnishees upon whom a copy of the Process of Maritime Attachment and Garnishment issued herein may be served;

    d.      That plaintiffs have such other, further and different relief as this Court

deems just and proper in the premises.

Dated: New York, New York
       August 31, 2006

                                    FREEHILL HOGAN & MAHAR, LLP
                                    Attorneys for Plaintiffs
                                    Maersk, Inc. and A.P. Moller-Maersk A/S

          By:       _____
                                      Peter J. Gutowski (PG 2200)
                                      Eric E. Lenck (EL 4547)
                                      Lawrence J. Kahn (LK 5215)
                                      80 Pine Street
                                      New York, NY  10005
                                      (212) 425-1900
                                      (212) 425-1901 fax

**ATTORNEY VERIFICATION**

State of New York      )
                       ) ss.:
County of New York  )

      ERIC E. LENCK, being duly sworn, deposes and says as follows:

      1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for plaintiffs herein, I have read the foregoing Amended Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

      2.     The sources of my information and the grounds for my belief are communications from our clients, documents provided by our clients regarding the claims, investigations and pretrial discovery to date.

      3.     The reason this verification is made by an attorney and not by the plaintiffs themselves is because the plaintiff A.P. Moller-Maersk A/S is a foreign entity, none of whose officers are presently within this Judicial District, and although Plaintiff Maersk Inc. is a U.S. entity, none of its officers are presently within this Judicial District.

                                                Eric E. Lenck

Sworn to before me this
31st day of August, 2006

Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009

NYDOCS1/267909.1

39