MOAC
June 5, 2000
Report 99560
Page 18

According to information supplied by the building superintendent, Carlos Santiago, both offices are primarily used for storage purposes with no visits from customers or clients, and Santiago believes Arween Sahni to be the owner of both companies.

### 6.2    Micro-Spy, Inc.

We visited the premises of Micro-Spy Inc., located at 2221 Avenue U, Brooklyn, NY 11229, on January 5, 2000.

The section of Avenue U between 22nd and 23rd Street is occupied on either side by numerous small shops, of which Micro-Spy Inc. occupies one. Access to the store is gained through a glass door entrance. The rear of the building can only be accessed on foot through a private driveway.

The store occupies an area of about 15 ft in width and about 50 – 60 ft in length. Shopwindows are located on either side of the double entrance door, and the shop window display consisted mostly of computer monitors.

The store gave generally a disorganized impression. To the right, small computer accessories were displayed on wall-mounted hooks, in front of which were piled up boxes and cartons containing either new or second-hand computer equipment, in part unpacked. Some cartons were stacked all the way to the ceiling.

To the left –hand side, shelving was installed, of which three rows were occupied by monitors. On the floor, placed in front of the shelves, was a collection of boxes and cartons as well as partly unpacked computer equipment – similar in appearance to that on the other side of the narrow passageway left.

About two-thirds into the store, a small desktop area is installed, accommodating the store-used computer with keyboard. A floor-to-ceiling partition is located behind the desk area. On the desk, we noticed a small clear plastic display box with business and magnetized cards (see Exhibit J).

On our arrival, we were met by a person engaged in re-arranging the window display. He led us to the manager who introduced himself as "Peter". We later established that the person was Peter Cohen, the owner of the company. We asked whether Michael Reich (identified as the salesperson on the Micro-Spy Inc. invoice provided to us by Arween Sahni - at Exhibit F), was available, and Peter Cohen initially informed us that he did not know anyone by that name. Upon further reflection, he said that we were probably looking for Michael Roich (he was not sure of the spelling of the last name, but seemed confident that it was not "Reich"). In any event, Michael Reich aka Roich was not available. We asked when he could be reached, and Peter Cohen replied that he did not know

MOAC
June 5, 2000
Report 99560
Page 19

for certain, Mr. Cohen explained that Michael "Reich" was not an employee of the company, and just helped out with "things" now and then, wandering in and out as he pleased. Peter Cohen claimed that he did not have a telephone number for Michael, or an address.

We showed Peter Cohen a copy of the Micro-Spy Inc. invoice No. 271 dated February 25, 1999 (at Exhibit F), which had been previously submitted by Arween Sahni. Peter Cohen was adamant that this was not an invoice generated by him or Micro-Spy Inc. Further, he advised us that he could not recall having heard the name of Neewra Inc. before, let alone of having been involved in a sale of 2,000 Seagate SCSI HDDs for US$ 1,600,000.00.

When we asked Mr. Cohen why he was certain that this invoice had not been issued by Micro-Spy Inc., he opened a drawer of the sales counter, showing us a pack of invoice copies (the layout of which was said to be identical to the original), and printed off a blank invoice from his computer system in our presence, a photocopy of which appears at Exhibit J. Mr. Cohen explained that the invoice layout, based on the accounting software used, had been the same ever since the company started, and bore no resemblance at all to the document submitted by Neewra Inc.

Peter Cohen claimed to be upset that Michael "Reich" had "imitated" and/or "used" the name of Micro-Spy Inc. for the transaction represented by the invoice shown to him, and said that he certainly would like to talk to him about this. He confirmed several times that he knew nothing of the transaction in question, and that it had not been a sale going through his books.

Micro-Spy Inc. maintains a website (at http://store.yahoo.com/microspy/), current particulars of which appear at Exhibit J.

## 6.3    Michael "Reich" aka Michael Rokeach

We met with Michael "Reich" on two separate occasions. He explained that his real name is Michael Rokeach, and he produced a US passport, showing his date of birth as June 15, 1973, and the place of birth as New York. The only immigration stamp in the passport originated from Ben Gurion Airport in Israel in 1993. The name "Reich" had been adopted by him purely for business purposes, so as to gain protection from potential lawsuits. Rokeach advised us that Arween Sahni only knew him as Michael "Reich".

Rokeach alleged that he was a part owner of Micro-Spy Inc., together with Peter Cohen, but was unable to explain why his name did not appear in any of the official company documents or public records. Whilst Cohen ran the retail shop, dealing with computer sales and repairs, Rokeach was engaged in the wholesale side of the business, but not limited to computers and peripherals. Rokeach

MOAC
June 5, 2000
Report 99560
Page 20

added that "Cohen" was also an alias, but he did not want to disclose Peter Cohen's real name.

Michael Rokeach stated that he had known Arween Sahni for about 5 years. During this period of time, Rokeach claimed to have engaged on average in 3 – 4 transactions with Sahni per year, initially for smaller sums, but gradually rising to about US 1 million or more. In 1999, his sales to Sahni had exceeded US$ 4 million. These transactions were conducted with Sahni personally, Neewra Inc. as well as Rednihom Inc. (the latter being controlled or owned by Sahni).

Rokeach was not prepared to disclose from where or whom he had obtained the HDDs that he allegedly sold to Neewra Inc. in February 1999. He explained that he knew certain people, perhaps even connected with Seagate, who could supply him with HDD at a very good price, and if he disclosed their identities, they might not wish to sell any further merchandise to him. Instead, he offered to take us to the warehouse of one of his customers, to whom he referred as the "Jewish guy". This customer stocked a variety of merchandise in the warehouse, including computers and computer parts, and could confirm that Rokeach had been supplying him in the past. Rokeach stated on several occasions that the "Jewish guy" would confirm that the HDDs sold to Neewra Inc. had been supplied by him to Rokeach, and loaded at his warehouse, provided that we felt that this would help Neewra Inc. to obtain payment from the insurance company.

When asked how he paid for his supplies, Rokeach advised us that he had a line of credit with his contacts. Obviously, he did not have unlimited credit, and therefore, he was interested in getting paid by Neewra Inc.

After he had sold the HDD to Neewra Inc., they had been collected from his warehouse. He refused to disclose the address of the warehouse, but explained that he had about 25,000 square feet available, and was conducting most of his business from there. Initially, Rokeach stated that Arween Sahni had sent two employees of his with a truck to collect the HDD, and the loading operations had been undertaken in Rokeach's presence. No delivery receipt had been issued at the time. Later, he corrected himself, saying that he himself, together with an employee of his, had loaded the truck. He could not remember the date on which the HDD had been loaded, nor whether it was a rental truck or one owned by Arween Sahni. Subsequently, he corrected this statement as well, saying that the truck was owned by a friend of his, who had not charged him for the service.

When we asked Rokeach about the packing of the HDD, he stated that each HDD was in an anti-static pouch, and then individually boxed. 20 of these boxes were packed in a carton, and 50 cartons had been placed into each of the 20 wooden crates. Rokeach was adamant that each individual HDD was separately boxed.

MOAC
June 5, 2000
Report 99560
Page 21

Although we requested Rokeach to provide serial numbers for the HDD supplied by him, he was unable to provide them. He offered to supply us with serial numbers from other shipments instead if we felt that this might help settle the insurance claim submitted by Neewra Inc.

In respect of the invoice issued to Neewra Inc., Rokeach confirmed that he had issued it. He expected to be paid by Arween Sahni at some stage, and such payment should be in cash rather than by check. He claimed that he had not engaged in any further business deals with Arween Sahni or any of his companies since February 1999.

During the meetings as well as various telephone conversations, Rokeach offered us various inducements for the express purpose of "producing a report helping Arween Sahni to get his insurance claim paid". First, Rokeach offered to supply us with stock market tips. He claimed to be friendly with executives of various listed companies, and they would frequently pass insider information to him.

Next, he offered to us as a present a pair of designer sunglasses, stating that they were worth about US$ 400.00 at retail price.

Finally, Rokeach offered to sell to us for US$ 2,500.00 a Louis XVI dining room suite (dining table, 4 chairs, 2 carvers, 1 buffet), which had allegedly been valued at over US$ 8,000.00. Following discussions with your office and with your permission, we pretended to be interested in the furniture items, and requested Rokeach to supply us with photographs so that we could discuss a possible sale to a fictitious buyer in Albany. Under cover of a certified letter dated March 23, 2000, Rokeach made copies of some photographs available (at Exhibit Z). He followed this up with several telephone calls, in the course of which Rokeach offered to obtain for us storage space in a lock-up for us (having declined to buy the furniture on the pretext that we had no storage space available).

In less explicit terms, Rokeach offered on several occasions "to see us right" if we helped Arween Sahni to get his money from the insurers of the consignment, so as to allow Sahni to pay him (Rokeach).

6.4     Inquiries with Seagate Technology

We were informed by Scott Dedic, Corporate Investigator of Seagate Technology, that neither Seagate nor any of its authorized dealers had any record of the theft or unexplained disappearance of about 2,000 SCSI HDD of the type allegedly purchased by Neewra Inc. during the period of 1998 to about March 1999. There had been three major incidents of theft reported in 1998 (all of HDD of a different type), and one in March 1999 (also a different HDD type).

MOAC
June 5, 2000
Report 99560
Page 22

Scott Dedic advised us that Seagate kept a record of the serial number of each HDD produced (mainly for warranty purposes), and would therefore be able to identify the purchaser of a HDD if the serial number was available.

Mr. Dedic researched the sales prices charged by Seagate for the 18.2 GB SCSI Barracuda drives allegedly sold to Neewra Inc. on our request, and ascertained that in February 1999, the Seagate sales prices varied between US$ 650.00 and US$ 680.00.

We learned from Seagate that if customers purchase larger quantities of HDD, the packing differs from that of individual supplies in that either 10 or 20 HDD, each packed in an anti-static pouch, are stacked into slots of a foam core box, which doubles as shipping packaging. Seagate usually delivers larger quantities of HDD on pallets, and each pallet contains on average about 32 of the core boxes. Only very small quantities of HDDs will be sold individually boxed.

## 6.5   Engines Plus Corp.

Engines Plus Corp. was incorporated in 1989, and was last located at 196 Van Winkle Avenue, Garfield, NJ. Company searches undertaken by us appear at Exhibit W.

The location consists of an annex to a duplex residential dwelling house, one of which is occupied by the owner of the annex. The frontage consists of a roller shutter door, with a separate steel door to the right, and a grilled window to the left. At the time of our visit (in February 2000), the premises were empty and unoccupied.

According to information received, Engines Plus Corp. ceased its business in October 1999, when all of its stock was sold by way of a Sheriff's auction. Operators of neighboring shops informed us that Engines Plus Corp. had been engaged in the wholesale and retail of auto parts, as well as undertaking auto repairs.

We were informed by detectives of the local police station that the business had been owned and operated by Lowei M Najjar, an African-American, born on January 18, 1966, of 5'9" in height, and 185 lbs. in weight. Najjar was registered with the Garfield police as a category III sex offender, following a conviction in 1996. His residential address was given as 28 Ryerson Avenue, Bloomingdale, NJ.

Attempts to contact Lowei Najjar at that address were unsuccessful. Najjar had vacated the Bloomingdale property (which was owned by his father, and had been sold in January 2000). Even though we requested his father's attorney as well as Bloomingdale detectives to ask him to contact us, he failed to respond.

MOAC
June 5, 2000
Report 99560
Page 23

Apparently, Najjar still resides in the Bloomingdale area (where he is currently registered with the local police station). We sent two letters to Lowei Najjar, addressed to his former residence, inviting him to contact us. Although he did not respond to either of them, the USPS did not return them to us.

Capt. Holt of the Garfield Police Station advised us that officers had attended on several occasions at the premises of Engines Plus Corp. because large vehicles, including trailers with containers, had been parked in front of the building, blocking the right-turn lane into Midland Avenue. On none of these occasions had any violation tickets been issued since the obstructions were either removed immediately or loading and unloading was due to be completed in a short period of time.

During our visit to Garfield, NJ, we also inspected the vicinity of the premises of Engines Plus Corp., searching for nearby warehousing space. There is only one complex containing warehouse units within about a 1 mile radius, located immediate behind the (former) premises of Engines Plus Corp., accessible from both Midland Avenue and Van Winkle Avenue. We spoke to several of the occupiers of individual units (which include a precision instrument manufacturer, a supermarket, a dance studio, and a sports center) as well as the management company, and none of them were familiar with the name of Michael Rokeach (or Michael Reich) or Micro-Spy Inc. All of the units except one were occupied, and none of them had any relation to Michael Rokeach or Micro-Spy Inc.

## 6.6    American Export Lines

We met with Ali Aelaei, manager of the Newark office of American Export Lines ("AEL"). We learned from Mr. Aelaei that he had dealt with Arween Sahni only twice, namely in connection with the two shipments consigned to Al-Tamasok in Kuwait. The Rednihom shipment had been handled by AEL's Jamaica, NY, office.

Accordingly to Mr. Aelaei, the circumstances relating to the transport of the two containers were not any way different from those in respect of other shipments for other customers, except that he had been slightly surprised that Arween Sahni had expressly requested on both occasions that the containers should be shipped by Maersk Line and that he required a Maersk Bill of Lading for each of the containers. Most of his customers would not be too concerned about the choice of carrier, as long as it was a reputable shipping line. He had not given the requests of Arween Sahni too much thought since AEL was arranging shipments with Maersk on a regular basis.

Mr. Aelaei explained that he had taken a photocopy of Arween Sahni's New York State Identification Card (at Exhibit B) for his file merely as he had not dealt with either Neewra Inc. or Arween Sahni before.

MOAC
June 5, 2000
Report 99560
Page 24

## 6.7    Investigations in Kuwait

During our visit to Kuwait, we met with various representatives of Maersk's Kuwait office, The Gulf Bank, as well as several other persons directly or indirectly connected with the shipment subject to claim.

### 6.7.1  Maersk Line

We were informed by Soren Hansen, General Manager of Maersk Kuwait Co. that that several weeks before the arrival of the second container shipped by Neewra Inc., he had been approached by an employee of his company, Elvis Pinto, who told him that he had been contacted by several members of the local (Kuwaiti) Indian community with requests to provide blank Maersk Bills of Lading, for which he was offered KD 100 and KD 500 (equivalent to US$ 300.00 to US$ 1,500.00). We were informed by Mathew Kuruvilla, Sales Manager at the Kuwait office of Maersk that larger quantities of blank Bill of Lading were always kept in the office. About two years ago, when Maersk changed the structure of the Bills from a fully printed version (containing the text boxes as well as the "small print") to the current one, several hundred Bills of Lading of the old type had awaited destruction for some time and he could not be sure if they had actually been destroyed or otherwise removed.

At about the same time, Soren Hansen learned that a Kuwaiti resident, John C Fernandes (employed as a webmaster by the Kuwaiti Canadian Consulting Group), also had been approached by local Indian residents with a request to produce on his computer a replica of a Maersk Bill of Lading form.

When we met with John C Fernandes, he informed us that he had been working on a project sponsored by Sheikh Fahad of the Royal Kuwaiti family when he first met Peter Vincent Fernandes, who originates from Banglahore, India. In spite of the similarity of the names, the two are apparently not related.

Between June 27 and July 5, Peter Vincent Fernandes and Sabharwal Kumar Chandra came to John C Fernandes' office at the Al-Usaimi Building in Kuwait. Peter Vincent Fernandes explained that he and others were expecting a consignment of goods, but because all the documents required for clearance and import had been lost, they stood to loose a substantial amount of money. Therefore, Peter Vincent Fernandes asked John C Fernandes to help him out by reproducing a document (the term "Bill of Lading" as such was not mentioned) against payment of KD 500 (about US$ 1,500.00). Peter Vincent Fernandes presented him with what looked like an original Maersk Line Bill of Lading with a signature at the bottom in blue ink. The only other recollection John C Fernandes had of the document was that the word "Newark" was mentioned.

MOAC
June 5, 2000
Report 99560
Page 25

Peter Vincent Fernandes explained that he wanted John C Fernandes to produce on his computer the individual text boxes that appear on the Bill of Lading and to add in the boxes the standard small print. The word "original" had to appear in the center like a watermark, and the signature should be removed. Peter Vincent Fernandes apparently stated that he had a supply of blank Bills of Lading available, and would fill in the text boxes himself using a typewriter.

John C Fernandes agreed to undertake the work in the belief that in this manner, we would be able to recover a loan previous granted to Peter Vincent Fernandes. He started with the general layout, saving each stage on a floppy disk. Upon being advised by a friend of his, who worked for a shipping company in Kuwait, of the relevance and function of an original Bill of Lading, John C Fernandes allegedly ceased all further work, subsequently handing the floppy disk to Peter Vincent Fernandes (with whatever work that had been saved on it) together with the Bill of Lading sample.

Prior to the release of the container subject to claim to Al-Tamasok, the owner of the company, Adel Baron (the original Arabic name can also be anglicized to Adil Badun), came only once to the office of Maersk. According to Soren Hansen, Adil (Mahmud Abbas) Badun, a Kuwaiti national has had various convictions, including check fraud.

Soren Hansen informed us that, following the return of the cashier's check for KD 10,000 to Peter Vincent Fernandes in exchange for the "original" Bill of Lading, Peter Vincent Fernandes cashed the check. It was discovered on this occasion that the Civil ID of Peter Vincent Fernandes (the production of which was required by the bank for the transaction) had expired in 1996 and not been renewed, indicating that he was in Kuwait without a valid visa for three years.

As far as the Rednihom container is concerned, Soren Hansen's attention was aroused by the fact that the name of the shipper seemed strange ("Rednihom" – reading "Mohinder" backwards) and that Rednihom was identified as operating from the same address as Neewra Inc. Further, he noticed that the same freight forwarder (International Shipping) had been used.

Inquiries made by Soren Hansen showed that the consignee of the Rednihom container, Arab Gulf Trading, appeared to be operating from an empty office with no telephone connection. Although Maersk issued a delivery order on August 8, 1999, no one came forward claiming the container.

Maersk's Kuwait office has since received various inquiries for quotations from Mohinder Singh of Rednihom Inc. for the shipment of autoparts to India. Similar inquiries have been made by Sabharwal Kumar Chandra (see Exhibit R).

MOAC
June 5, 2000
Report 99560
Page 26

## 6.7.2  Customs Clearance Procedures

During our visit to Kuwait, we had the opportunity to see the Shuaiba Port container terminal, and meet with local Customs officials as well as port personnel.

Following discharge of a container onto the quay, the seals are checked. If they are found to be undamaged, the container is trucked to the container terminal storage area, which can only be accessed through a guarded gate. If the seal is damaged, a report will be issued and filed by the stevedores, a new port seal attached, and only then the container is moved to the container terminal area.

Following the dropping off at the terminal, an arrival notice is issued by the shipping line to the consignee. Only reefer containers are usually delivered within 2 days maximum; standard general cargo containers can remain in the terminal area for an average period of at least 14 – 28 days or even longer. The reason is that the terminal storage charges are often lower than warehousing costs.

On request of the consignee, his customs broker will prepare the "Bayan", the customs clearance request. Once prepared, a freight forwarder will be dispatched to collect the container from the terminal area. The first stop is at the terminal exit gate, where the Bayan has to be produced, together with the delivery order issued by the carrier before being allowed to proceed to the adjacent customs clearance area.

The clearance area consists of another gated complex, to which the container will be driven. The truck driver enters the customs counter area, and presents the Bayan, the delivery order, commercial invoice and packing list. The customs officer merely checks if the description of the cargo, quantities, weights etc contained in the documents are all identical. If they are, the driver will be directed to proceed with the container to the inspection area located behind the customs building. The inspection area consists of an elevated quay-type concrete construction with 15 bays on either side. The container is then placed in one of the bays, doors facing the quay, and opened. The driver and his helpers undertake all work, the customs officer merely supervising and directing.

The extent of the inspection process is left to the individual customs officer. The examination can range from merely opening the doors and having a brief look inside the container, to emptying the entire container and opening the contents.

The custom officers are primarily interested in checking the uniformity of the cargo descriptions in the documents and whether the container possibly contains illegal products. Another concern may be the country of origin of the goods since different custom tariffs apply to certain countries of origin. Any adverse findings will be entered in the Bayan by the inspecting customs officer.

MOAC
June 5, 2000
Report 99560
Page 27

After completion of the inspection, the Bayan will be stamped by customs, and the container is cleared for delivery. The Bayan will again have to be produced at the security gate on exiting the port.

A copy of the Bayan is retained by the inspecting custom officer and filed. File copies will only be kept at the port office for up to one month, after which they will be moved to a central filing department, located some 50 miles to the south of Kuwait City.

We made several attempts through Maersk in Kuwait to obtain copies of the documents contained in the customs file, which would have been submitted by Al-Tamasok upon taking delivery of the container subject to claim, but todate, only a general visual file inspection has been permitted. We were informed by Soren Hansen that the customs file contained a commercial invoice issued by National Brake Service for US$ 9,900.00 (possibly the same invoice as was presented by Peter Vincent Fernandes to Maersk in April 1999) as well as a copy of a Bill of Lading, said to be different from the original issued by Maersk Line in the US and the one submitted as an "original" by Al-Tamasok (and exchanged against the cashier's check). As yet, we have not been advised of the contents of the Bayan or any Customs inspection Report. Therefore, it is not known whether the contents of the container subject to claim was actually inspected by Customs in any detail, and what the outcome of the inspection was.

### 6.7.3 Al-Tamasok's Offices

We attended the office address of Al-Tamasok (Office 8, 3rd Floor, Ninth Commercial, Division 0009, Building 13, Kuwait City) in the Hawali District of Kuwait. The "office" consisted of a single room with one desk and one telephone, occupied by one person who, as we understand, takes messages for several companies, all of which allegedly operate from the same office. There was no sign pointing to the presence of Al-Tamasok, who apparently no longer use the message service and allegedly "moved to an unknown location.

We visited on the occasion several companies, either involved in the computer business or trading with computer parts (Al Faris Information Technologies Co., Qabazard Systems & Electronics, Computer Experts Corp., Al_Wazzan Computer Systems Co WLL, AlphaBeta Computer Systems, Gulfland General Trading and Contractors Co, Arab Information Management Services, and Al-Sharhan Computers). None of them ever had any dealings with Al-Tamasok or heard the name of the company before.

### 6.8   V.G. Transports

We were informed by Ali Aelaei of AEL that V.G. Transports sold its business at some time in 1999. Subsequent inquiries conducted by us with the purchaser of

MOAC
June 5, 2000
Report 99560
Page 28

the business, another transport company, revealed that the owner of the business, Victor Goncalves, had relocated to California after the sale, but we have not yet been able to identify his current address.

## 7.0    Quantum of Loss

Pursuant to Neewra Inc.'s (re-issued) Commercial Invoice No. 2/99/D dated March 31, 1999, the CIF price for the 2,000 HDDs was US$ 1,860,000.00.

Neewra Inc. claims not to have been paid by Al-Tamasok in respect of this invoice. We understand that no steps have been taken or intimated by Micro-Spy Inc. to make a collection against the invoice issued to Neewra Inc. on February 25, 1999. Equally, we have not been advised by Neewra Inc. that it has been approached by Michael Rokeach with requests for payment.

## 8.0    Cause of Loss

In the event that the container No. # BENU 232656-0 actually contained 2,000 Seagate SCSI HDDs, the loss resulted from the fraudulently obtained delivery of the container and contents by persons acting on behalf of Al-Tamasok, the consignee, and the circumvention of the "cash against documents" payment mechanism.

## 9.0    Summary and Conclusions

The claim by the Insured, Neewra. Inc., is for US$ 1,860,000.00, and relates to the alleged loss of a consignment of 2,000 Seagate SCSI hard drives, shipped by sea from Newark, NJ, to Kuwait, and delivered to the consignee named in the Bill of Lading, Al-Tamasok Al-Arabi Est., by the ocean carrier Maersk following the presentation of a forged "original" Bill of Lading by persons acting on behalf of Al-Tamasok.

In the course of our investigations, we were unable to find any evidence that Michael Rokeach actually supplied any HDDs to Neewra Inc. or whether the HDDs were actually loaded into the shipping container. Various accounts given by Rokeach as to the circumstances of the loading of the shipping container are irreconcilable with records provided by the transport company involved in the pickup of the container, and no explanation has been given by any party why or how a company specializing in the wholesale of auto parts (Engines Plus Corp.) was chosen as the loading location for the HDDs. Conversely, Rokeach should, in our view, have no reason to conceal the actual loading location (or even offer to us to provide deliberately false "evidence" of yet another loading location) if HDDs had actually been loaded at Engines Plus Corp. in Garfield, NJ.

MOAC
June 5, 2000
Report 99560
Page 29

In our view, there are strong indications that Neewra Inc. and/or Arween Sahni may be involved in another shipment, declared to have consisted of HDDs, and on this occasion using the company of Rednihom Inc., which, on arrival in Kuwait, was found to consist of waste products and auto spare parts.

To conclude, it appears to us that the 2,000 Seagate SCSI HDDs, which are the subject of this claim, may not have been supplied by Michael Rokeach and/or Micro-Spy Inc. and shipped as alleged.

* * *

This report is without prejudice to the rights and defenses of all parties; it is preliminary in nature and based on the information and documents provided todate; we reserve the right to change, amend and/or supplement it should further information and/or documentation become available to us, especially in the course of the schedule Examination under Oath of Arween Sahni.

Very truly yours,

JOHN ALDER & Co. Inc.

Jurgen W Schulze

99\560\report-final01



"B"

## EXHIBIT B

### Document Index

Bill of Lading # NYC688143 dated February 26, 1999

Power of Attorney for Export Declaration dated February 19, 1999

~~Shipper's Export Declaration~~

Commercial Invoice No. 1/99 dated February 10, 1999

Certificate of Origin dated February 25, 1999

Packing and Weight List

MOAC Certificate of Insurance #OC122869

Dock Receipt dated February 22, 1999

Fax Letter from Maersk to AEL dated February 19, 1999

AEL Client Booking Information Sheet dated February 19, 1999

New York State Identification card for Arween Sahni Singh

Invoice Jeffron Consular Service dated March 3, 1999

AEL File Note (undated)

AEL Shipment Confirmation dated March 28, 1999

Letter Neewra to AEL dated February 27, 1999

Copies of two Neewra checks for US$ 500.00 and US$ 2,521.00

# MAERSK LINE

| COMBINED TRANSPORT BILL OF LADING | B/L No. |
|---|---|
| | NYC688143 |

| Shipper/Exporter (complete name and address) | Booking No. |
|---|---|
| NEEWRA INCORPORATED<br>4018 HAMPTON STREET<br>ELMHURST, NEW YORK 11373 | 000493251 |
| | Export references |
| | NJ200802 |

| Consignee (complete name and address) | Forwarding agent - references  FMC 3969 |
|---|---|
| AL TAMASOK AL ARABI EST<br>P.O. BOX 384 HAWALLI<br>KUWAIT 32004 | INTL SHIPPING CORP<br>169 FRELINGHUYSEN AVE<br>NEWARK NJ 07114 |
| | Point and Country of Origin |
| | U.S.A. |

| Notify Party (complete name and address) | Domestic routing/export instructions |
|---|---|
| SAME AS CONSIGNEE<br>TEL: 2451152 | |

| *Precarriage by | *Place of Receipt | |
|---|---|---|

| Vessel | Voy No. | Port of Loading | Onward inland routing |
|---|---|---|---|
| SL CHAMPION | 039E | NEWARK | |
| Port of Discharge | | *Place of Delivery | |
| KUWAIT | | | |

## CARRIER'S RECEIPT

### PARTICULARS FURNISHED BY SHIPPER - CARRIER NOT RESPONSIBLE

| Container No./Seal No. Marks and Numbers | No. of Containers or pkgs. | Kind of packages; description of goods | Gross Weight | Measurement |
|---|---|---|---|---|
| CLHU2069440<br>93060 | 1 | CY / CY<br>SHIPPERS LOAD, STOW AND COUNT<br>FREIGHT PREPAID<br>20' CTNR SAID TO CONTAIN<br>20 CRATES<br>AUTOMOTIVE SPARE PARTS &<br>ACRSSORIES<br>COMM CODE: 8900 9900000440 | 6600.000 LBS | |

THESE COMMODITIES, TECHNOLOGY, OR SOFTWARE WERE EXPORTED FROM THE UNITED STATES IN ACCORDANCE WITH THE EXPORT ADMINISTRATION REGULATIONS DIVERSION CONTRARY TO U.S. LAW PROHIBITED

| | Unit | Prepaid | Collect |
|---|---|---|---|

LADEN ON BOARD SL CHAMPION    039E    AT NEWARK    ON    FEB 26 1999

| Declared Value Charges (see clause 6) for Declared Value of US $ | Total Prepaid | |
|---|---|---|
| Number of Original Bls/L | Total Collect | |
| 3/THREE | | |
| Place of Issue | Date | |
| NEW YORK | FEB 26 99 | |

For Dampskibsselskabet af 1912, Aktieselskab and Aktieselskabet Dampskibsselskabet Svendborg as carrier

MAERSK INC AS AGENTS FOR THE CARRIER

As Agent(s) only

*Applicable only when document used as a Combined Transport Bill of Lading

MAERSK LINE U.S. CUSTOMS CONTAINER BOND NO. 1085-20591



# International Shipping Co. (USA), Inc.

International Freight Forwarders, Expediters, Consolidators          F.M.C. # 3960

---

\* POWER OF ATTORNEY FOR PREPARATION OF EXPORT DECLARATION \*

DATE: __2|19|99__

---

THE EXPORTER AUTHORIZES THE ABOVE NAMED FORWARDER TO ACT AS A
FORWARDING AGENT FOR EXPORT CONTROL AND CUSTOMS PURPOSES.

I CERTIFY THAT ALL STATEMENTS MADE AND ALL INFORMATION CONTAINED
IN EXPORT DECLARATION ARE TRUE AND CORRECT AND THAT I HAVE READ
AND UNDERSTAND THE INSTRUCTIONS FOR PREPARATION OF THIS
DOCUMENT, SET FORTH IN THE CORRECT WAY TO FILL OUT THE SHIPPER'S
EXPORT DECLARATION. I UNDERSTAND THAT CIVIL AND CRIMINAL
PENALTIES, INCLUDING FORFEITURE AND SALE MAY BE IMPOSED FOR
MAKING FALSE OR FRAUDULENT STATEMENTS HEREIN, FAILING TO PROVIDE
THE REQUESTED INFORMATION OF FOR VIOLATION OF U.S. LAWS ON
EXPORTATION.
(13 U.S.C. SEC.305; 22 U.S.C. SEC 401; 18 U.S.C. SEC 1002; 50 U.S.C. APP 2410)

ALL EXPORT SHIPMENTS ARE SUBJECT TO INSPECTION BY U.S. CUSTOMS
SERVICE AND OR OFFICE OF EXPORT ENFORCEMENT.
IT IS THE RESPONSIBILITY OF THE EXPORTER TO MAKE THE CARGO
AVAILABLE TO BEAR THE COSTS OF EXPORT EXAMINATIONS PERFORMED BY
CUSTOMS. SHIPMENTS WILL NOT BE LOADING ANY VESSEL UNTIL RELEASED
BY CUSTOMS.

__ARWEEN   SAHNI__
AUTHORIZED EXPORTER'S SIGNATURE              BOOKING NUMBER

---

TOTAL VALUE OF CARGO IN
U.S. DOLLARS $ __10,180__          __KUWAIT__
                              COUNTRY OF ULTIMATE DESTINATION

169 Frelinghusyen Ave. Newark, New Jersey 07114
Phone:(973)824-2333    Fax: (973)824-8319

SHIPPER'S EXPORT DECLARATION

Authorized by the Secretary of Commerce (15 U.S.C. 301(j))

DO NOT USE THIS AREA

2. EXPORTER (Principal or seller-licensor and address including ZIP Code)

NEEWRA INCORPORATED
4018 HAMPTON STREET
ELMHURST, NEW YORK

ZIP CODE
11373

1. CONSIGNED TO

AL TAMASOK AL ARABI EST
P.O.BOX 384 HAWALLI
KUWAIT 32004

4. NOTIFY PARTY/INTERMEDIATE CONSIGNEE (Name and address)

SAME AS CONSIGNEE
TEL: 2451152
KUWAIT

5. DOCUMENT NUMBER
BOOKING NO. 493251

5a. B/L OR AWD NUMBER

6. EXPORT REFERENCES
REF: NJ200802

7. FORWARDING AGENT (Name and address - references)

INT'L SHIPPING COMPANY (USA)  FMC# 3960
169 FRELINGHUYSEN AVE.
NEWARK, NEW JERSEY 07114

8. POINT (STATE) OF ORIGIN OR FTZ NUMBER
U.S.A.

9. DOMESTIC ROUTING/EXPORT INSTRUCTIONS

REVISED EXPORT DECLARATION

12. PRE-CARRIAGE BY

13. PLACE OF RECEIPT BY PRE-CARRIER

14. EXPORTING CARRIER
SEALAND CHAMPION 039E

15. PORT OF LOADING/EXPORT
NEW YORK

16. FOREIGN PORT OF UNLOADING (Vessel and air only)
KUWAIT

17. PLACE OF DELIVERY BY ON-CARRIER

11. TYPE OF MOVE
OCEAN

11a. CONTAINERIZED (Vessel only)
☒ Yes   ☐ No

28. THE UNDERSIGNED HEREBY AUTHORIZES
INT'L SHIPPING CO.

TO ACT AS FORWARDING AGENT FOR EXPORT CONTROL AND CUSTOMS PURPOSES.

EXPORTER NEEWRA INCORPORATE
(BY DULY AUTHORIZED
OFFICER OR EMPLOYEE) CARLA BRANCA

30. METHOD OF TRANSPORTATION (Mark one)
☒ Vessel   ☐ Other - Specify
☐ Air

31. ULTIMATE CONSIGNEE (Give name and address or see item 3
SAME AS BUYER #3

32. DATE OF EXPORTATION (Not required for vessel shipment)

33. COUNTRY OF ULTIMATE DESTINATION
KUWAIT

34. EXPORTER'S EIN (IRS) NUMBER
N/A

35. PARTIES TO TRANSACTION
☐ Related   ☒ Non-related

Export shipments are subject to inspection by U.S. Customs Service and/or Office of Export Enforcement.

AUTHENTICATION (When required)

| MARKS AND NUMBERS (18) | NUMBER OF PACKAGES (19) | DESCRIPTION OF COMMODITIES in Schedule B detail (20) | D OR F (23) | GROSS WEIGHT (Kilos) (21) | MEASUREMENT (22) | CD - Check digit | 24. SCHEDULE B NO. | | 25b. QUANTITY 2 |
|---|---|---|---|---|---|---|---|---|---|
| CONTAINER NO. CLHU206944-0  SEAL NO. 93060 | 1 | 20' CONTANIER, S.T.C.: 20 CRATES OF AUTOMOTIVE SPARE PARTS, & ACCESSORIES. ----- FREIGHT PREPAID | D | 8600 LBS 3901 KGS | 1050 CFT 29.7 CBM | | 8483.60.8000 | | CO 9 |
| | | | | | | | 25a. QUANTITY 1 X | | |
| | | | | | | | 26. VALUE $10,180.00 | | |

27. VALIDATED LICENSE NO./GENERAL LICENSE SYMBOL
NLR

28. ECCN (When required)

THESE COMMODITIES, TECHNOLOGY OR SOFTWARE WERE EXPORTED FROM THE UNITED STATES IN ACCORDANCE WITH THE EXPORT ADMINISTRATION REGULATIONS. DIVERSION CONTRARY TO UNITED STATES LAW PROHIBITED.

30. I certify that all statements made and all information contained herein are true and correct and that I have read and understand the instructions for preparation of this document, set forth in the "Correct Way to Fill Out the Shipper's Export Declaration." I understand that civil and criminal penalties, including forfeiture and sale, may be imposed for making false or fraudulent statements herein, failing to provide the requested information or for violation of U.S. laws on exportation (13 U.S.C. Sec. 305; 22 U.S.C. Sec 401; 18 U.S.C. Sec. 1001; 50 U.S.C. App. 2410).

CARLA BRANCA

WHSE #0807

# COMMERCIAL INVOICE

INVOICE NO:1/99
DATE:FEBRUARY 10 1999

NEEWRA INCORPORATED
40-18 HAMPTON ST
ELMHURST NEW YORK USA
TEL:718 458 3128

TO:
AL TAMASOK AL ARABI EST
P O BOX 384 HAWALLI
KUWAIT 32004
TEL:2451152

SHIP TO:
SAME

TERMS:CIF KUWAIT
VESSEL:SL CHAMPION V.039E
COUNTRY OF ORIGIN:USA
DESCRIPTION: NATIONAL BRAKE BLOCK BRAKE PADS

| QUANTITY | DESCRIPTION | PRICE | TOTAL |
|---|---|---|---|
| 17 | D237 | $ 10.00 | $ 170.00 |
| 9 | D139 | $ 10.00 | $ 90.00 |
| 17 | D55 | $ 10.00 | $ 170.00 |
| 30 | D84 | $ 10.00 | $ 300.00 |
| 15 | D142 | $ 10.00 | $ 150.00 |
| 5 | D139 | $ 10.00 | $ 50.00 |
| 26 | D190 | $ 10.00 | $ 260.00 |
| 7 | D203 | $ 10.00 | $ 70.00 |
| 13 | D179 | $ 10.00 | $ 130.00 |
| 3 | D182 | $ 10.00 | $ 30.00 |
| 1 | D142 | $ 10.00 | $ 10.00 |
| 1 | D191 | $ 10.00 | $ 10.00 |
| 1 | D237 | $ 10.00 | $ 10.00 |
| 10 | D190 | $ 10.00 | $ 100.00 |
| 10 | D179 | $ 10.00 | $ 100.00 |
| 20 | D39 | $ 10.00 | $ 200.00 |
| 10 | D91 | $ 10.00 | $ 100.00 |
| 20 | D90 | $ 10.00 | $ 200.00 |
| 10 | D85 | $ 10.00 | $ 100.00 |
| 10 | D39 | $ 10.00 | $ 100.00 |
| 20 | D90 | $ 10.00 | $ 200.00 |
| 50 | D7071 | $ 10.00 | $ 520.00 |
| 2 | R445 | $ 10.00 | $ 20.00 |
| 10 | D204 | $ 10.00 | $ 100.00 |
| 11 | D294 | $ 10.00 | $ 110.00 |
| 11 | D237 | $ 10.00 | $ 110.00 |
| 1 | D408 | $ 10.00 | $ 10.00 |
| 1 | R260 | $ 10.00 | $ 10.00 |
| 1 | R264 | $ 10.00 | $ 10.00 |
| 1 | R152 | $ 10.00 | $ 10.00 |
| 1 | R449 | $ 10.00 | $ 10.00 |
| 1 | R154 | $ 10.00 | $ 10.00 |
| 2 | R284 | $ 10.00 | $ 20.00 |
| 10 | D16 | $ 10.00 | $ 100.00 |
| 3 | D237 | $ 10.00 | $ 30.00 |
| 10 | D249 | $ 10.00 | $ 100.00 |
| 1 | D10 | $ 10.00 | $ 10.00 |
| 4 | D20 | $ 10.00 | $ 40.00 |
| 6 | D220 | $ 10.00 | $ 60.00 |
| 6 | D204 | $ 10.00 | $ 60.00 |
| 2 | D150 | $ 10.00 | $ 20.00 |
| 1 | D55 | $ 10.00 | $ 10.00 |
| 1 | D181 | $ 10.00 | $ 10.00 |
| 1 | D85 | $ 10.00 | $ 10.00 |
| 1 | D310 | $ 10.00 | $ 10.00 |
| 11 | D150 | $ 10.00 | $ 110.00 |
| 15 | D220 | $ 10.00 | $ 150.00 |
| 7 | D179 | $ 10.00 | $ 70.00 |
| 6 | D16 | $ 10.00 | $ 60.00 |

2 of 3

# COMMERCIAL INVOICE

INVOICE NO:1/99
DATE:FEBRUARY 10 1999

NEEWRA INCORPORATED
40-18 HAMPTON ST
ELMHURST NEW YORK USA
TEL:718 458 3128

| TO: | SHIP TO: |
| --- | --- |
| AL TAMASOK AL ARABI EST | SAME |
| P O BOX 364 HAWALLI | |
| KUWAIT 32004 | |
| TEL:2451152 | |

TERMS:CIF KUWAIT
VESSEL:SL CHAMPION V.039E
COUNTRY OF ORIGIN:USA
DESCRIPTION: NATIONAL BRAKE BLOCK BRAKE PADS

| | | | |
| --- | --- | --- | --- |
| 14 | D142 | $ 10.00 | $ 140.00 |
| 4 | D214 | $ 10.00 | $ 40.00 |
| 18 | D218 | $ 10.00 | $ 180.00 |
| 2 | D262 | $ 10.00 | $ 20.00 |
| 6 | D38 | $ 10.00 | $ 60.00 |
| 8 | D50 | $ 10.00 | $ 80.00 |
| 4 | D10 | $ 10.00 | $ 40.00 |
| 8 | D85 | $ 10.00 | $ 80.00 |
| 9 | D38 | $ 10.00 | $ 90.00 |
| 1 | D36 | $ 10.00 | $ 10.00 |
| 10 | D120 | $ 10.00 | $ 100.00 |
| 5 | D139 | $ 10.00 | $ 50.00 |
| 5 | D151 | $ 10.00 | $ 50.00 |
| 10 | D84 | $ 10.00 | $ 100.00 |
| 10 | D204 | $ 10.00 | $ 100.00 |
| 40 | D84 | $ 10.00 | $ 400.00 |
| 5 | D152 | $ 10.00 | $ 50.00 |
| 5 | D181 | $ 10.00 | $ 50.00 |
| 24 | D142 | $ 10.00 | $ 240.00 |
| 24 | D179 | $ 10.00 | $ 240.00 |
| 2 | R447 | $ 10.00 | $ 20.00 |
| 40 | D84 | $ 10.00 | $ 400.00 |
| 10 | D55 | $ 10.00 | $ 100.00 |
| 24 | D237 | $ 10.00 | $ 240.00 |
| 24 | D182 | $ 10.00 | $ 240.00 |
| 1 | D52 | $ 10.00 | $ 10.00 |
| 1 | R447 | $ 10.00 | $ 10.00 |
| 10 | D84 | $ 10.00 | $ 100.00 |
| 5 | D84 | $ 10.00 | $ 50.00 |
| 10 | D237 | $ 10.00 | $ 100.00 |
| 35 | D87 | $ 10.00 | $ 350.00 |
| 1 | D129 | $ 10.00 | $ 10.00 |
| 32 | D142 | $ 10.00 | $ 320.00 |
| 4 | D87 | $ 10.00 | $ 40.00 |
| 14 | D147 | $ 10.00 | $ 140.00 |
| 2 | D262 | $ 10.00 | $ 20.00 |
| 14 | D142 | $ 10.00 | $ 140.00 |
| 1 | D261 | $ 10.00 | $ 10.00 |
| 1 | D139 | $ 10.00 | $ 10.00 |
| 10 | D151 | $ 10.00 | $ 100.00 |
| 12 | D39 | $ 10.00 | $ 120.00 |
| 10 | D87 | $ 10.00 | $ 100.00 |
| 2 | D154 | $ 10.00 | $ 20.00 |
| 9 | D142 | $ 10.00 | $ 90.00 |
| 4 | D87 | $ 10.00 | $ 40.00 |
| 10 | D152 | $ 10.00 | $ 100.00 |
| 9 | D63 | $ 10.00 | $ 90.00 |
| 5 | D165 | $ 10.00 | $ 50.00 |
| 9 | D152 | $ 10.00 | $ 90.00 |

3

## COMMERCIAL INVOICE

INVOICE NO:1/99
DATE:FEBRUARY 10 1999

NEEWRA INCORPORATED
40-18 HAMPTON ST
ELMHURST NEW YORK USA
TEL:718 458 3128

TO:                                    SHIP TO:
AL TAMASOK AL ARABI EST                SAME
P O BOX 384 HAWALLI
KUWAIT 32004
TEL:2451152

TERMS:CIF KUWAIT
VESSEL:SL CHAMPION V.039E
COUNTRY OF ORIGIN:USA
DESCRIPTION: NATIONAL BRAKE BLOCK BRAKE PADS

| | | | | | |
|---|---|---|---|---|---|
| 5 | D121 | $ | 10.00 | $ | 50.00 |
| 5 | D11 | $ | 10.00 | $ | 50.00 |
| 5 | D20 | $ | 10.00 | $ | 50.00 |
| 10 | D182 | $ | 10.00 | $ | 100.00 |

GRAND
TOTAL    $ 10,180.00

Arween Sahni

President



MARITIME CHAMBER OF COMMERCE, INC.
A RECOGNIZED CHAMBER OF COMMERCE
NEW YORK STATE

A.S.