```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
MAERSK, INC., and A.P. MOLLER-MAERSK A/S,

                    Plaintiffs,            05 Civ. 4356(CM)(DFE)

        -against-                          REPORT AND RECOMMENDATION
                                           TO JUDGE McMAHON
NEEWRA, INC., REDNIHOM, INC.,
AREF HASSAN ABUL, INC., et al.,

                    Defendants.
------------------------------------------X
```

DOUGLAS F. EATON, United States Magistrate Judge.

    On May 26, 2006, Judge Casey entered a default judgment against three of the defendants: Neewra, Inc. ("Neewra"), Rednihom, Inc. ("Rednihom"), and Aref Hassan Abul, Inc. ("Aref"). He then referred the case to me to conduct an inquest into damages as to those three defendants, and to write a Report and Recommendation as to the amount of damages to be awarded to the plaintiffs, plus reasonable attorneys' fees, if any, pursuant to (a) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, (b) federal maritime law, and (c) common law fraud.

    On September 18, 2006, plaintiffs filed their memorandum of law and declarations in support of an inquest. (Docket Items # 96-99.) None of the defaulting defendants filed opposition papers. At my request, plaintiffs submitted supplemental papers on March 1, 2007, regarding their requests for attorneys' fees and for damages incurred in India. (Docket Items # 118-121.) Again, the defaulting defendants did not respond. After Judge Casey's untimely death, the case was reassigned to Judge McMahon on May 18, 2007.

    In September 2007, I asked plaintiffs to submit a second set of supplemental papers addressing (1) the Second Circuit's decision in *Silge v. Merz*, 510 F.3d 157 (2007), regarding prejudgment interest, (2) the status of the legal proceedings in Kuwait and the possibility that they may have *res judicata* effect on plaintiffs' claim against Neewra, and (3) several discrepancies I found in plaintiffs' requests for damages. On February 28, 2008, I received plaintiffs' second set of supplemental papers. On March 28, 2008, plaintiffs sent me a copy of Judge McMahon's March 27, 2008 decision. On April 2,

2008, plaintiffs sent me a letter clarifying the damages they seek for the first cause of action.

BACKGROUND

Upon the entry of a default judgment, the Court accepts as true all of the facts alleged in the complaint, except those relating to the amount of damages. *See Au Bon Pain Corp. v. Artect Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). An inquest is then conducted to determine the amount of damages. Accordingly, I accept the truth of the following facts gleaned from the Amended Complaint. I note at the outset that the defaulting corporations are charged in the first six causes of action. The Sixth Cause of Action charges that the defendants all conspired to defraud the plaintiffs through mail fraud and wire fraud constituting a pattern of racketeering, and that all of the defendants are jointly and severally liable for treble damages and for attorneys' fees.

Maersk, Inc. is a New Jersey corporation, and it is the general agent in the United States for A.P. Moller-Maersk A/S, which is a Danish corporation. (Am. Compl. ¶¶ 3-5.) I will refer to both plaintiffs jointly as "Maersk."

Neewra, Rednihom and Aref were New York corporations; they are now dissolved. (Am. Compl. ¶¶ 6-10.) They were apparently controlled by various members of the Sahni family including Arween Singh Sahni ("A.S.") and Mohinder Singh Sahni ("M.S."), who are named as individual defendants. M.S. and his son Mandeep Sahni are represented as garnishees by attorney Donald J. Kennedy. Two other men, Joginder Singh Sahni ("J.S.") and Parker Dawood Tajuddin Tajudis Ismail Parker, are represented by attorney Harry H. Wise, III. The rest of the individual defendants are defending themselves *pro se.*

<u>First Cause of Action: Fraudulent Shipments
 in 2001 Caused by Aref and Rednihom</u>

In April 2001, A.S. called Maersk on Aref's behalf to get a price quote to ship 720 containers of used auto and truck tires from the United States to India. A.S. represented to Maersk that Aref had a buyer in India who wanted to recycle the used tires by turning them into conveyor belts. He said that the contract between Aref and the buyer provided for shipment on a "freight collect" basis (i.e., the consignee must pay for the ocean freight before it could receive the cargo). However, A.S. lied -- Aref had no contract to sell the used tires to anyone in India. (Am. Compl. ¶¶ 28-29.)

-2-

Used tires are a solid and sometimes hazardous waste, subject to regulations under the Solid Waste Disposal Act. As such, their disposal fees are costly. Prior to May 2, 2001, Aref and Rednihom entered into contracts with New York and New Jersey waste tire facilities; the facilities agreed to pay Aref and Rednihom to have Maersk take used tires from the New York and New Jersey facilities and transport them abroad. (Am. Compl. ¶¶ 33-36, 53.) On May 2, 2001, Aref and Maersk entered into a service contract; it was agreed that Maersk would ship 720 containers of used tires from the United States to Aref's alleged buyer in India. A forum selection clause in Maersk's bills of lading, which had been incorporated into the contract, provided for jurisdiction before our Court. (Am. Compl. ¶¶ 2, 31, 33.)

Sometime between May 2 and May 16, 2001, Maersk received 273 containers of used tires. It shipped 204 containers to India, and stored the remaining 69 containers in Newark. (Kahn 4/2/08 letter; Am. Compl. ¶¶ 37-38, 43; 2/28/08 Messkoub Supp. Decl. ¶ 5.) On May 16, 2001, Maersk learned that "Golden Traders," the consignee of record in India for the shipment of the tires, was either fictitious or had no interest in the shipment; Maersk so advised Aref. (Am. Compl. ¶ 38.)

On May 17, 2001, Aref gave Maersk details about a replacement consignee called "Poonanam Ent." However, Poonanam Ent. did not have a contract with Aref; on May 18, Poonanam Ent. advised Maersk that it was not interested in the tires. (Am. Compl. ¶¶ 37-42.) In an effort to induce Maersk to accept less than the full amount due for the transportation, Aref alleged to Maersk on May 21 that Poonanam Ent. had offered to pay $1,000 per container. Maersk accepted the alleged offer. (Am. Compl. ¶ 42.)

On June 15, 2001, Maersk learned that Poonanam Ent. would not take any of the containers of tires, nor would it pay for them. Moreover, India Customs officials refused to permit the cargo to enter into India, and they impounded the containers. (Am. Compl. ¶ 44.) As a result of Aref's actions, Maersk incurred substantial costs relating to the storage and disposal of the tires, as well as costs associated with the loss of the use of the containers. (Am. Compl. ¶¶ 46-51.)

At about the same time as the Aref shipment, a similar problem occurred. Rednihom (through A.S. and/or M.S.) made arrangements with Maersk and other shipping lines, to ship 700 containers of used tires. The Rednihom arrangements were based on similar misrepresentations and fraud, and Maersk sustained similar damages. (Am. Compl. ¶¶ 30, 45, 57-62.)

### Second Cause of Action: Statutory Violations

Aref's and Rednihom's actions caused Maersk to be in potential violation of (a) the Solid Waste Disposal Act, 46 U.S.C. § 6901 *et seq.*, and (b) the laws of India against smuggling. (Am. Compl. ¶¶ 53-57, 60.) Moreover, Aref and Rednihom (through A.S. and M.S.) committed crimes under the Bills of Lading Act, 49 U.S.C. § 80116, when they caused Maersk to issue bills of lading containing false statements. (Am. Compl. ¶¶ 58-59.) As a result of the defendants' fraudulent scheme, the plaintiffs sustained damages, but I find that those damages are already covered by the First Cause of Action. (Am. Compl. ¶ 62.)

### Third Cause of Action: Neewra Fraudulently Obtains $1.86 Million from Maersk [1]

Two years earlier, on February 26, 1999, Neewra (through A.S.) caused Maersk to ship a container to a buyer/consignee named Al Tamasok in Kuwait, apparently as a "test run" to learn about Maersk's business practices and documents. (Am. Compl. ¶ 70.)

On March 5, 1999, Neewra contracted with Maersk to ship a container containing "20 crates of electrical spare parts" from Newark to buyer/consignee Al Tamasok in Kuwait. Prior to the arrival of the Neewra shipment, Sabharwal Chandra Kumar ("S.K.") on behalf of Al Tamasok, contacted Maersk and asked whether the container could be presented without the original bill of lading if a personal guarantee were posted. Maersk passed along the request to Neewra, who declined it and insisted that the original bill of lading be surrendered. Maersk shipped the container without incident, and satisfied all of its obligations to Neewra under the contract of carriage. (Am. Compl. ¶¶ 71-73.)

Several weeks went by and no representative from Al Tamasok claimed the container. Eventually, representatives from Al Tamasok, including S.K., appeared at Maersk's Kuwait offices and requested that the container be released to them without presenting the original bill of lading. Neewra refused to permit the release of the container, claiming that it had not been paid by Al Tamasok. Moreover, A.S. falsely represented to Maersk that Neewra had sent the original bill of lading to Al Tamasok on April 15, 1999. (Am. Compl. ¶¶ 74-77.)

---

[1] See the 6/8/06 Ghirardani Decl., which is annexed to the 9/18/06 Kahn Aff. as Exh. 9, for more details about this cause of action.

On May 4, 1999, Neewra (through A.S.) gave Maersk authorization to allow delivery to Al Tamasok against a bank check as security for the original bill of lading. A.S. provided Al Tamasok with an invoice showing that the goods in the container were valued at less than $10,000. Based on that representation, Maersk advised Al Tamasok that it needed a bank check of $30,000 to release the cargo. Upon delivery of the check and invoice, Maersk released the container to Al Tamasok, who had cleared it through Kuwaiti customs with a declaration that said that the goods were "electrical spare parts" worth less than $10,000. (Am. Compl. ¶¶ 79-80.)

Meanwhile, intermediaries of M.S. and/ or Joginder Singh Sahni ("J.S.") had succeeded in convincing one Maersk employee to provide them with a blank form bill of lading. The intermediaries then gave the original bill of lading and the blank one to a Kuwaiti website designer named Mr. Fernandez. Mr. Fernandez was asked to produce a fake bill of lading that could be substituted in place of the original bill of lading for the Neewra shipment. A friend of Mr. Fernandez advised him to stop work on the project; Mr. Fernandez returned all of the materials to the intermediaries. Soon, S.K. presented a fake bill of lading to Maersk, alleging that it was the original. In exchange for the fake bill of lading, Maersk released Al Tamasok's check and supporting documentation to S.K. (Am. Compl. ¶¶ 81-85.)

Upon learning that Al Tamasok had both the container and the money, Neewra forwarded the original bill of lading to A.S.'s bank with instructions that the bank could not release the original bill until Al Tamasok paid the purchase price of $1.86 million. A.S.'s bank contacted Al Tamasok's bank and requested payment in exchange for the original bill of lading. (Am. Compl. ¶¶ 86-88.)

Maersk eventually learned that the bill of lading in its possession was fraudulent, and it notified Neewra and the Kuwaiti police. It also learned that Al Tamasok abandoned its premises. Maersk then advised Neewra and A.S. that the container had been released against a fraudulent bill of lading. A.S. told Maersk that the container held new Seagate computer hard drives worth approximately $1.86 million, and that Neewra was holding Maersk responsible for the damages. Neewra falsely claimed that it had purchased the hard drives from Seagate Technology and it presented a false invoice from a company called "Micro-Spy Inc." in the amount of $1.6 million. Seagate Technology later confirmed to the plaintiffs that it did not sell any hard drives to Micro-Spy or to Neewra or to A.S. Maersk also learned that the container had been stuffed and sealed at a small auto parts

supply shop called "Engines Plus Corporation," which was owned and/or operated by Lowei Najjar, a registered sex offender. Mr. Najjar had closed down the shop and had moved without registering his new address with the police. (Am. Compl. ¶¶ 89-98.)

Meanwhile, Neewra retained counsel and sued its cargo underwriter (CNA) for a $1.86 million loss of the stolen hard drives. CNA's private investigator obtained evidence that Neewra's claim was false; the lawsuit was dismissed. (Am. Compl. ¶¶ 99.) Shortly thereafter, Neewra instructed its attorneys to pursue the same claim against Maersk in New York and New Jersey courts. When presented with evidence that the claims were fraudulent, Neewra's attorneys withdrew their claims. (Am. Compl. ¶¶ 100-101.) In March or April 2004, Neewra, knowing its claim was false, sued Maersk in Kuwait on the same claim. This resulted in the wrongful arrest of one of Maersk's large container ships, the M/V Alva Maersk. After several days of negotiations, the ship was released after Maersk posted approximately $1.86 million in cash with the Kuwaiti court to act as substitute security for the vessel. Neewra's counsel then tried to have the vessel restrained again, but this was unsuccessful and the ship left port. (Am. Compl. ¶¶ 103-107.)

In April 2004, Maersk directed English solicitor Paolo Ghirardani of the law firm of Stephenson Harwood, to go to Kuwait to investigate the fraudulent claim. Mr. Ghirardani arranged an unsuccessful settlement conference with an individual who identified himself as Neewra's decision maker, Joginder Singh Sahni ("J.S."). It was later learned that the individual was really M.S. (Am. Compl. ¶¶ 107-112.)

While in Kuwait, Mr. Ghirardani met with Elvis Pinto, the manager of a Maersk affiliate known as Safmarine Kuwait. Mr. Pinto had been chiefly responsible for investigating the Neewra and Rednihom claims. Mr. Pinto signed a written statement about his findings and indicated to Mr. Ghirardani that he would be willing to give testimony in the case. However, Mr. Pinto later dissociated himself from the case after his wife was brutally attacked while on vacation in India, and he was "made to understand that this was a warning to him that his family would be in danger if he continued to investigate or participate in this matter on behalf of Maersk." (9/18/06 Kahn Aff., Exh. 9 (the Ghirardani Decl. ¶¶ 24-27); 7/30/07 RICO Case Statement, pp. 23.)

The proceedings continued in the Kuwait courts. Maersk obtained a judgment in its favor in the lower court, which was reversed on appeal. Maersk has appealed the reversal, and the

case is still pending. Meanwhile, the $1.86 million posted by Maersk was transferred by the Kuwaiti court to Neewra. (6/8/06 Ghirardani Decl. ¶¶ 65-67.)

As a result of the defendants' actions, Maersk sustained serious damages. (Am. Compl. ¶¶ 113-114.)

<u>Fourth Cause of Action: Costs Incurred by Maersk
in Neewra's Fraudulent Litigation in Kuwait</u>

Maersk has not been paid freight for its carriage of the Neewra shipment to Kuwait, and it is owed approximately $2,500. Moreover, Neewra's fraudulent litigation in Kuwait cost Maersk more than $447,954.74 in legal fees, costs and expenses. (Am. Compl. ¶¶ 116-117.)

<u>Fifth Cause of Action: A Fraudulent
Shipment in 1999 Caused by Rednihom</u>

In July 1999, Rednihom (through M.S.) contracted with Maersk to ship a container of 4,000 pieces of "PC parts" to Kuwait. The container was abandoned by the named consignees for nearly three months, during which time it incurred demurrage, storage and other fees. Maersk suspected that this shipment was fraudulent; Maersk broke the container's seal and discovered that the container held a number of low value goods, mainly used auto parts, but no PC parts. Moreover, it learned that the consignee was fictitious. (Am. Compl. ¶¶ 119-122.)

The defendants then tried to find an alternative way to present a false claim with regard to the shipment. Specifically, Rednihom tried to disguise the fact that its shipment was connected to the Neewra shipment. However, the two companies shared the same fax and phone numbers, and M.S. was listed as the president of Rednihom and as one of the principals of Neewra. (Am. Compl. ¶¶ 123-124.)

As a result of Rednihom's actions, Maersk sustained significant damages. (Am. Compl. ¶¶ 125-126.)

<u>Sixth Cause of Action: RICO</u>

Virtually all of the contact between Maersk and the defendants was conducted through telephone, facsimile, mail, telex, and email. (Am. Compl. ¶¶ 28, 39, 42, 54, 56-59, 61, 71, 80, 92, 119.) The Sixth Cause of Action alleges that all of the defendants conspired to defraud Maersk, and that the defendants participated in repeated acts of mail fraud and wire fraud, in

violation of 18 U.S.C. §§ 1341 and 1343.  Maersk claims that the defendants' actions constituted a pattern of racketeering activity within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961.  Maersk seeks treble damages, the cost of the lawsuit, and reasonable attorneys' fees.  (Am. Compl. ¶¶ 128-135.)

DAMAGES

I find that Maersk sustained the following damages as a result of the defaulting defendants' actions:

First Cause of Action

| | |
|---|---:|
| a. Freight for shipping the 204 containers to India. (See Kahn 4/2/08 letter and Messkoub 2/28/08 Supp. Decl. ¶ 5; these make corrections to Inquest Memo. ¶ 55, Messkoub 9/18/06 Decl. ¶ 11, and Am. Compl. ¶¶ 38, 46.) | $335,873.13 |
| b. Freight for the 69 containers stored in Newark, NJ. (See Kahn 4/2/08 letter; Inquest Memo. ¶ 56; Messkoub 9/18/06 Decl. ¶ 8.) | $117,012.27 |
| c. Deadfreight for the 447 containers that were contracted for a discounted rate of $250 per container pursuant to the service contract, but never shipped. (See Kahn 4/2/08 letter; this makes corrections to Inquest Memo. ¶ 57, Messkoub 9/18/06 Decl. ¶ 16, and Am. Compl. ¶ 46.) | $111,750.00 |
| d. Demurrage, storage and related charges in India and Newark for the 273 containers. (See Kahn 4/2/08 letter and Messkoub 2/28/08 Supp. Decl. ¶¶ 6-9; these make corrections to Inquest Memo. ¶¶ 55-60, 63-66, Messkoub 9/18/06 Decl. ¶¶ 8-18, 28, and Am. Compl. ¶¶ 46-51.) | $2,001,376.00 |

e. Loss of use of the 273 containers.  $1,283,100.00
(See Kahn 4/2/08 letter and Messkoub
2/28/08 Supp. Decl. ¶¶ 12-14; these make
corrections to Inquest Memo. ¶¶ 55-60,
63-66, Messkoub 9/18/06 Decl. ¶¶ 8-18, 28,
and Am. Compl. ¶¶ 46-51.)

f. Disposal of the used tires.  $104,200.00
(See Kahn 4/2/08 letter;
Inquest Memo. ¶ 64; Messkoub
9/18/06 Decl. ¶¶ 14 and Exh. G;
Am. Compl. ¶ 49.)

g. Pre-November 2001 attorneys' fees  $5,858.94
incurred in attempting to recoup the
amounts due for freight and demurrage.
(See Kahn 4/2/08 letter; Inquest Memo.
¶ 66; Messkoub 9/18/06 Decl. ¶ 28;
Am. Compl. ¶ 50.)
                                                          --------------------
**Total damages sought for the First
Cause of Action that I approve**:  **$3,959,170.34**


Second Cause of Action

The damages under the Second Cause of Action duplicate the last two items of damages in the first cause of action, namely items f and g. (See Inquest Memo. ¶¶ 64, 66, 71; Messkoub 9/18/06 Decl. ¶¶ 14, 28.) To avoid double counting, I recommend no damages on the Second Cause of Action.


Third Cause of Action

a. Loss of hire of "ALVA MAERSK" for  $178,750.00
13 days @ USD $13,750 per day.
(See Kahn 9/18/06 Aff. ¶¶ 33 and Exh. 12.)

b. Hire of substitute vessel "MAERSK  $180,000.00
ARIZONA" for 8 days @ USD $22,500
per day.
(*Ibid*.)

c. Bunkers and port expenses.  $40,000.00
(*Ibid*.)

d. 200 refrigerated containers were  $39,200.00

-9-

delayed at the Port of Jebel Ali
(one of the ports to be visited by
"ALVA MAERSK") at a cost of $28 per day.
(*Ibid*.)

e. Bank charges incurred in establishing           $19,081.78
bank guarantee for fraudulent claim.
(*Ibid*.)
                                                --------------------

**Total damages sought for the Third**
**Cause of Action that I approve**:                 **$457,031.78**

    Note: During the pendency of Maersk's appeal of the Kuwaiti court's unfavorable ruling, the $1.86 million guarantee was released to Neewra's agents in Kuwait. (See Inquest Memo. ¶¶ 81-84; Becker 9/18/06 Decl. ¶¶ 10-12.) On the present state of the record, I cannot recommend that our Court award Maersk the $1.86 million. Our Court may be obligated to honor the Kuwaiti court's ruling as a condition of comity between sovereign courts. Indeed, in her March 27, 2008 Decision at pages 69-70, Judge McMahon said:

> I cannot decide on the record currently before me whether or not the Kuwaiti judgment was "a final judgment on the merits." The submissions of the parties are in conflict on this point. Further this issue of whether or not a fraud on the Kuwaiti court has been perpetrated -- which is also crucial to Mohinder's argument -- cannot be decided on the sparse records before me. It is also possible that the forum selection clause in Maersk's bill of lading vested this court with exclusive jurisdiction to hear all disputes arising out of the Neewra shipment, although it is not necessary to decide this question (and I will not).

If Maersk wishes, it may file objections to this Report and Recommendation, and may provide Judge McMahon with any updated information concerning the Kuwaiti proceedings.


<u>Fourth Cause of Action</u>

a. Unpaid ocean freight.                                         $2,500.00
(See Inquest Memo. ¶ 85;
Messkoub 9/18/06 Decl. ¶ 22.)
                                                --------------------
**Total damages sought for the Fourth**
**Cause of Action that I approve**:                 **$2,500.00**

Note:  The Fourth Cause of Action also mentioned attorneys' fees, but those fees are now part of the fees being sought under the Sixth Cause of Action.


Fifth Cause of Action

| | |
|---|---:|
| a. Unpaid ocean freight.<br>(See Inquest Memo. ¶ 87;<br>Messkoub 9/18/06 Decl. ¶ 27.) | $2,500.00 |
| b. Demurrage and storage charges.<br>(See Inquest Memo. ¶ 88;<br>Messkoub 9/18/06 Decl. ¶ 27.) | $29,500.00 |
| c. Container survey fees.<br>(See Inquest Memo. ¶ 89;<br>Messkoub 9/18/06 Decl. ¶ 27.) | $2,500.00 |
| **Total damages sought for the Fifth Cause of Action that I approve**: | **$34,500.00** |

Sixth Cause of Action

     To establish a claim for a civil violation under RICO, the plaintiff must demonstrate that a RICO violation caused an injury to business or property, and that the plaintiff was injured by the defendants' "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco v. Bernas,* 244 F.3d 286, 305 (2d Cir. 2001).  "In short, to establish a violation of 18 U.S.C. § 1962(c), a plaintiff must establish that a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce."  *Id.* at 306 (internal citations omitted).  Once the plaintiff meets its burden, the RICO statute provides for an award of treble damages:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee...

18 U.S.C. § 1964(c).

-11-

Judge McMahon recently ruled that the Amended Complaint adequately alleges a RICO conspiracy involving the defaulting defendants (Neewra, Rednihom, and Aref). In her March 27, 2008 Decision, Judge McMahon wrote: "Here, the allegations of mail and wire fraud are clearly made out as to the New York Defendants [Neewra, Rednihom, Aref, Arween Singh Sahni and Mandeep Singh Sahni]." (Document No. 155, p. 65.) She also wrote: "I have already found that Plaintiffs have adequately alleged a conspiracy -- involving, among others, Mohinder and the New York Defendants -- to commit the very frauds that are the predicate acts of the RICO scheme. Thus, Plaintiffs have also properly pleaded a RICO conspiracy claim under § 1961(d)...." (*Id.*, p. 68.)

Plaintiffs have submitted timesheets showing that they incurred attorneys' fees and costs of $1,071,658.45. [2] I have reviewed these requests, and find them to be reasonable. (See Becker 2/26/07 Supp. Decl. ¶¶ 3-5; Lenck 2/23/07 Aff.; Zakaria 2/15/07 Decl.; Becker 9/18/06 Decl. ¶¶ 12-15.) Accordingly, I recommend that Judge McMahon award Maersk **$1,071,658.45** in attorneys' fees and costs.

Plaintiffs ask me to treble the total compensatory damages that I recommend under the first five causes of action. I agree, and my computation is as follows:

| | |
|---|---|
| **First Cause of Action** (excluding $5,858.94 in attorneys' fees) | **$3,953,311.40** |
| **Second Cause of Action**: zero, because these damages are covered by the First Cause of Action | -- |
| **Third Cause of Action** | **$457,031.78** |
| **Fourth Cause of Action** | **$2,500.00** |

---

[2] Plaintiff originally sought $1,298,065.40 in attorneys' fees. (Document # 98.) However, Maersk's General Manager of Claims, Tom Becker, later submitted his February 26, 2007 Supplemental Declaration (Document # 19); at ¶ 4, Mr. Becker says: "The charges for legal fees and expenses reflected in the Declarations/Affidavit and the attached billing statements are correct and total $1,071,658.45. ... [T]hese new calculations are based on the fees and expenses incurred [only] up to May 26, 2006, the date the default judgment against the Defaulting Defendants was entered."

| | |
|---|---|
| **Fifth Cause of Action** | $34,500.00 |
| **Total Compensatory Damages** | $4,447,343.18 |
| multiplied by 3 | x 3 |
| **Treble Damages** | $13,342,029.54 |
| plus | |
| **Attorneys' fees and costs** | $1,071,658.45 |
| **Total Amount Recommended under the Sixth Cause of Action** | $14,413,687.99 |

To avoid double counting, I recommend that no separate award be made on the first five causes of action. Finally, I recommend that Judge McMahon grant the plaintiffs' request for prejudgment interest at a rate of 9% per annum starting from December 31, 2005. *See Int'l Gemmological Institute, Inc. v. Rafaeil*, 05 Civ. 2395(JGK)(JCF), 2005 WL 3880222, at *6-7 (S.D.N.Y. Aug. 17, 2005) (Francis, M.J.) (recommending 9% in a civil RICO case), *Report and Recommendation adopted by Judge Koeltl*, 2006 WL 739822 (S.D.N.Y. March 21, 2006).

I agree with plaintiffs that *Silge v. Merz*, 510 F.3d 157 (2d Cir. 2007), is not on point because both the original Complaint and the Amended Complaint clearly warned defendants that Maersk was seeking interest.

<u>CONCLUSION AND RECOMMENDATION</u>

I recommend that Judge McMahon award Maersk the following damages against Neewra, Inc., Rednihom, Inc., and Aref Hassan Abul, Inc., jointly and severally: **$14,413,687.99** plus **interest at 9% per annum** from December 31, 2005.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e. **no later than April 29, 2008**) by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Colleen McMahon, U.S.D.J. at Room 533, 500 Pearl Street, New York, NY

10007, and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to Judge McMahon.

*[signature: Douglas F. Eaton]*

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007
Telephone: (212) 805-6175
Fax: (212) 805-6181

Dated:   New York, New York
         April 9, 2008

Copies of this Report and Recommendation will be mailed by April 10, 2008 to:

Eric E. Lenck, Esq.
Lawrence J. Kahn, Esq.
Freehill, Hogan & Mahar LLP
80 Pine Street
New York, NY 10005-1759

Neewra, Inc.
86-10 Roosevelt Ave., Store #9
Jackson Heights, NY 11372

Neewra, Inc.
80-50 Baxter Ave., Suite #189
Elmhurst, NY 11373

Neewra, Inc.
c/o Secretary of State of New York
41 State Street
Albany, NY 12231

Rednihom, Inc.
80-50 Baxter Ave., Office #189
Elmhurst, New York, 11373

Rednihom, Inc.
c/o Secretary of State of New York
41 State Street
Albany, NY 12231

Aref Hassan Abul, Inc.
50-08 Ithaca Street
Elmhurst, NY 11373

Aref Hassan Abul, Inc.
80-50 Baxter Ave., Suite #189
Elmhurst, NY 11373

Aref Hassan Abul, Inc.
c/o Secretary of State of New York
41 State Street
Albany, NY 12231

Harry H. Wise, III, Esq.
Law Office of Harry H. Wise, III
500 Fifth Avenue, Suite 1650
New York, NY 10110

Donald Joseph Kennedy, Esq.
Carter Ledyard & Milburn LLP
2 Wall Street
New York, NY 10005

Hon. Colleen McMahon