UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————————————x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12 | 17 | 09

MAERSK, INC. and A.P. MOLLER-MAERSK A/S,

             Plaintiffs,

      -against-                            05 Civ. 4356 (CM)

NEEWRA, INC., REDNIHOM, INC., AREF HASSAN
ABUL INC., ARWEEN SINGH SAHNI a/k/a
ARWEEN SAHNI SINGH a/k/a ARWEEN SAHNI
a/k/a ARWEEN SINGH a/k/a ABUL SABAH a/k/a
AREF HASSAN ABUL, MOHINDER SINGH SAHNI
a/k/a MOHINDER SAHNI SINGH a/k/a MOHINDER
SAHNI a/k/a MOHINDER SINGH a/k/a MOHINDER
SINGH SAHANI a/k/a MOHINDER SAHANI a/k/a
MOHINDER SAHANI SINGH a/k/a JOGINDER
SINGH SAHNI, JOGINDER SINGH SAHNI, a/k/a
JOGINGER SINGH SAHNI a/k/a JOGINDER SAHNI
SINGH a/k/a JOGINGER SAHNI SINGH a/k/a
JOGINDER SINGH a/k/a JOGINDER SAHNI a/k/a
JOGINGER SINGH a/k/a JOGINGER SAHNI,
SABHARWAL CHANDRA KUMAR a/k/a
SABHARWAL K. CHANDRA, MANDEEP SINGH
SAHNI a/k/a MOHINDER SINGH SAHANI, HELP
LINE COLLECTION CO. W.L.L., PARKER
DAWOOD TAJUDDIN TAJUDIS ISMAIL PARKER,
SARDAR TRADERS EST., SARDAR
INTERNATIONAL TRADING CO., and AL
TAMASOK AL ARABI EST.,

             Defendants.

——————————————————————————————————x

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION TO STRIKE
DEFENDANTS' JURY DEMAND

McMahon, J.:

## INTRODUCTION

This case arises out of a series of international shipping frauds worthy of a bestselling adventure novel. The victims of those frauds are plaintiffs A.P. Moller-Maersk A/S, a Danish conglomerate, and its New Jersey-based affiliate, Maersk, Inc. (together, "Plaintiffs" or "Maersk"). Maersk, one of the world's largest ocean shipping outfits, brought this action in 2005 against multiple corporate and individual defendants, alleging that they had conspired to defraud Maersk in connection with three separate international cargo shipments.

Three motions are now pending before the Court. The first two are cross-motions for summary judgment, one filed by Maersk, the other by the three remaining defendants: Joginder Singh Sahni ("Joginder"), Dawood Tajuddin Parkar ("Parkar") and Help Line Collection Co. W.L.L. ("Help Line") (collectively, the "Remaining Defendants"). Also pending before the Court is Maersk's separate motion to strike the Remaining Defendants' demand for a jury trial.

For the reasons stated below, Maersk's summary judgment motion is granted in part and denied in part; the Remaining Defendants' summary judgment motion is denied; and Maersk's motion to strike the Remaining Defendants' jury demand is denied.

For purposes of this opinion, the Court presumes familiarity with its March 27, 2008 Decision and Order in this case, in which the Court resolved various defendants' motions to dismiss. Maersk, Inc. v. Neewra, Inc., 554 F. Supp. 2d 424 (S.D.N.Y. 2008) (McMahon, J.) (the "March 27, 2008 Opinion"). The reader will find it particularly helpful to refer to the March 27, 2008 Opinion for its discussion of the underlying factual allegations, for information about the named defendants no longer in the action, and for litigation history prior to March 27, 2008. Id. at 429-39.

2

## BACKGROUND

I.     **Litigation History Since the March 27, 2008 Opinion**

    A.     **Default Judgments**

In the March 27, 2008 Opinion, the Court dismissed the Amended Verified Complaint ("AVC") as against defendants Sardar Traders Est. and Sardar International Trading Co. (together, "Sardar") for lack of personal jurisdiction, and denied the other motions to dismiss. Maersk, 554 F. Supp. 2d at 467. Since then, default judgments have been entered against defendants Neewra, Inc. ("Neewra"), Rednihom, Inc. ("Rednihom"), Aref Hassan Abul Inc. ("Aref"), Arween Singh Sahni ("Arween") and Sabharwal Chandra Kumar ("Kumar") (collectively, the "Defaulting Defendants").

On May 26, 2006, Judge Casey issued an Order for Entry of Default Judgment against defendants Neewra, Rednihom and Aref, and referred the case to Magistrate Judge Eaton to conduct an inquest into damages. (Docket No. 51.) Magistrate Eaton issued a Report and Recommendation concluding that the Court should award Maersk $14,413,687.99 plus interest, jointly and severally against Neewra, Rednihom and Aref. (Docket No. 157.) The Court modified Magistrate Eaton's Report and Recommendation, finding that Maersk was entitled to an additional $5,580,000 in damages, and adopted the Report as amended. (Docket No. 165.) On May 20, 2008, judgment was accordingly entered for Maersk jointly and severally against Neewra, Rednihom and Aref in the amount of $19,993,687.99, plus costs of $250 and interest at 9% per annum beginning December 31, 2005. (Docket No. 167.) On March 30, 2009, judgment was entered in favor of Maersk jointly and severally against additional defaulting defendants Arween and Kumar for the same amount. (Docket No. 183.)

3

Maersk has not pursued its claims against defendant Al Tamasok Al Arabi Est. ("Al Tamasok"). (Pls.' Mem. in Supp. of Mot. for Summ. J., Mar. 31, 2009 ("Pls.' Mem."), at 1-2.) Maersk did not timely serve defendant Mandeep Singh Sahni ("Mandeep"). (Id. at 2.) Finally, Maersk has settled with defendant Mohinder Singh Sahni ("Mohinder"). (Docket No. 189.)

Thus, the only remaining defendants are Joginder, Parkar and Help Line. On April 11, 2008, these three Remaining Defendants answered the AVC. (Docket Nos. 158-60.) On April 15, 2008, less than ten days after serving their answers, each of the three Remaining Defendants timely filed a demand for trial by jury. (Docket Nos. 161-63.)

**B.    Discovery**

The Remaining Defendants refused to participate meaningfully in discovery, and Magistrate Eaton sanctioned them accordingly. Joginder, Parkar and Help Line are prohibited from using their own affidavits or testimony in opposition to Maersk's claims, and are almost entirely precluded from introducing documentary evidence to oppose any summary judgment motion or at trial.

The Remaining Defendants sought to have their depositions taken in Kuwait, where they reside. (Mem. & Order, Sept. 17, 2008 (Docket No. 174), at 1-2.) Plaintiffs' counsel, citing security concerns, argued that the Remaining Defendants' depositions should take place in New York. (Id. at 2.) Magistrate Eaton held a telephonic oral argument, and ruled that the Remaining Defendants must travel to New York for their depositions. (Id. at 2-3.) Magistrate Eaton entertained the Remaining Defendants' letter motion for reconsideration (id. at 6), but adhered to his decision that the Remaining Defendants would be deposed in New York. (Order, Sept. 17, 2008 (Docket No. 175), at 1-2.)

Magistrate Eaton ordered that the Remaining Defendants' depositions "should be scheduled to follow closely" upon the deposition of Maersk witnesses Elvis Pinto ("Pinto") and/or Bimal Kanal ("Kanal"). (Mem. & Order, Sept. 23, 2008 (Docket No. 176), at 2.) Maersk arranged for Pinto and Kanal to travel from Kuwait and China to New York, where they were deposed on October 29 and November 13, 2008. (Mem. & Order, Mar. 6, 2009 (Docket No. 178), ¶ 6.) On October 30, 2008, Maersk served counsel for the Remaining Defendants with notices to depose his three clients in New York in quick succession beginning November 24, 2008. (Id. ¶ 7.) "The October 30 deposition notices clearly complied with [Magistrate Eaton's] September 23 order. These three [Remaining Defendants] were clearly required to appear in New York City for their depositions starting on November 24." (Id. ¶ 12.) Joginder, Parkar and Help Line refused to appear for their court-ordered depositions; they never even made any travel arrangements for those depositions. (Id.) Magistrate Eaton concluded that Joginder, Parkar and Help Line had "violated [his] orders with no good excuse." (Id. ¶ 13.) Magistrate Eaton imposed the following sanctions pursuant to Federal Rule of Civil Procedure 37(2)(A)(ii): "I prohibit the defendants from introducing any affidavit or testimony of [Joginder], [Parkar], or any employee of [Help Line] in connection with any motion for summary judgment or any trial in this lawsuit." (Id.)

The Remaining Defendants not only refused to appear for their depositions, but also failed to produce certain documents requested by Maersk during discovery. (See id. ¶¶ 16-19.) As a result, Magistrate Eaton imposed further sanctions against the Remaining Defendants pursuant to Rule 37(2)(A)(ii):

> I prohibit [Joginder, Parkar and Help Line] from introducing any document into evidence in connection with any motion for summary judgment or any trial in this lawsuit if plaintiffs requested that document and (a) on or before February 20, 2009,

> [Joginder, Parkar or Help Line] asserted that the document was
> irrelevant, or (b) on or before February 20, 2009, [Joginder, Parkar
> or Help Line] asserted that the document was not in his [or its]
> possession or control (unless he [or it] proves to Judge McMahon
> that he [or it] did not have possession or control of the document
> until after February 20, 2009, and that he [or it] promptly provided
> a copy to plaintiffs).[1]

(Id.) Magistrate Eaton also specifically "prohibit[ed] [Parkar] from introducing any document

into evidence to explain what he did with the $1.86 million [that was released to Parkar by a

Kuwaiti court in connection with the Neewra claim, see infra Background II.B.2], except for any

document that he supplied to plaintiffs on or before February 20, 2009."  (Id. ¶ 18.)

Counsel for the Remaining Defendants submits a reply declaration asserting that his

clients *did* meaningfully participate in discovery.  (Reply Decl. of Harry H. Wise, III, Apr. 20,

2009 ("Wise Reply Decl.")), ¶ 2.)  Annexed to the Declaration are documents produced by the

Remaining Defendants that total about 200 pages.  The Court does not look favorably upon the

Remaining Defendants' submission: it accompanies the very last of the six briefs filed in

connection with the cross-motions for summary judgment, thereby denying Maersk the ability to

respond (and Maersk expressly raised the issue of the Remaining Defendants' deficient

document production in the first of those six briefs (Pls.' Mem. at 2-3)).  Mr. Wise's Declaration

correctly anticipates that, in accordance with the sanctions imposed by Magistrate Eaton, the

Court will not consider the documents as substantive evidence.  (See Wise Reply Decl. ¶ 3.)

Instead, the Remaining Defendants purport to submit the documents solely to demonstrate their

participation in discovery.  (Id.)  But the Remaining Defendants' production of a limited set of

self-selected documents hardly changes the fact that they refused to appear for court-ordered

depositions, and that their failure to respond to Maersk's document requests was sufficiently

---

[1] February 20, 2009 was the deadline for completion of all discovery, and the date on which the parties submitted a
joint letter to Magistrate Eaton presenting their disputes over depositions and document requests.  (Id. ¶¶ 4-5, 9.)

egregious to warrant the imposition of sanctions. It certainly does not prove that the Remaining Defendants—who willfully violated Court orders—participated meaningfully in discovery.

## C.     Claims Against the Remaining Defendants

The AVC asserts seven causes of action against different combinations of defendants (AVC ¶¶ 27-142). The claims against the Remaining Defendants are as follows: Count III, arising out of the Neewra shipment, alleges fraud against Joginder and Parkar. (Id. ¶¶ 63-114.) Count IV, also arising out of the Neewra shipment, alleges breach of contract—the Maersk bill of lading[2] for that shipment—against Joginder. (Id. ¶¶ 115-17.) Count V, arising out of the Rednihom shipment, alleges fraud against Joginder and Help Line. (Id. ¶¶ 118-26.) Count VI asserts a civil RICO claim against all three Remaining Defendants. (Id. ¶¶ 127-35.) Count VII, based on the entirety of the conduct alleged in the AVC, asserts claims against Joginder and Help Line for common-law conspiracy to commit fraud. (Id. ¶¶ 136-42.)

Maersk seeks judgment jointly and severally against Joginder, Parkar and Help Line in the same amount—$19,993,687.99 plus costs and interest—as was previously entered against the Defaulting Defendants. (Pls.' Mem. at 11.)

## D.     The Summary Judgment Motions

Maersk moves for summary judgment on all claims against the Remaining Defendants. The gist of Maersk's motion is straightforward: the factual record developed to date makes it clear that the Remaining Defendants participated in the fraudulent schemes at issue; and, as a result of the discovery sanctions imposed by Magistrate Eaton, the Remaining Defendants are not in a position to contest the allegations against them, making trial unnecessary and summary judgment appropriate. (See Pls.' Mem. at 1, 4.)

---

[2] A "bill of lading" is a document that records the carrier's (here, Maersk's) receipt of specified goods from the shipper (or consignor), identifies the buyer (or consignee), and provides the terms for the carriage of the goods. See Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 18 (2004); Black's Law Dictionary 176 (8th ed. 2004).

The Remaining Defendants, having brazenly refused to appear for their court-ordered depositions, and having failed to respond to certain of Maersk's document requests, now assert that *they* are entitled to summary judgment on the ground that Maersk has not mustered sufficient evidence linking them to the frauds. (Defs.' Mem. in Supp. of Mot. for Summ. J., Apr. 1, 2009 ("Defs.' Mem."), at 6.) It is difficult to view the Remaining Defendants' motion as anything other than an attempt to use their wrongful refusal to participate in discovery as a sword against Maersk. The Court does not countenance such tactics.

In any event, even viewed most charitably, the Remaining Defendants' motion is meritless. In support of their motion, the Remaining Defendants submit a Rule 56.1 Statement that contains a single, purportedly undisputed—and wholly unsupported—"fact": "There is no competent relevant evidence in this case tending to prove that [Joginder, Parkar or Help Line] participated in any conspiracy to defraud plaintiffs." (Defs.' Rule 56.1 Stmt., Mar. 30, 2009 ("Defs.' 56.1 Stmt.").) Not only does the Remaining Defendants' Rule 56.1 Statement fail to comply with Local Civil Rule 56.1, but the record contains ample evidence tending to prove the Remaining Defendants' involvement in the frauds.

The meritlessness of the Remaining Defendants' motion makes the Court's task easier, as it need not juggle opposing standards of review in resolving these cross-motions for summary judgment. Instead—as will become readily apparent as the Court sets forth the factual record below—the question with respect to each of the remaining claims is whether, viewing the evidence in the light most favorable to the nonmovant Remaining Defendants, Maersk is entitled to summary judgment, or whether a genuine issue of material fact exists that necessitates a trial.

## II.    Factual Record

The basis for this lawsuit is a series of frauds and attempted frauds that were allegedly

perpetrated against Maersk in connection with three separate international cargo shipments,

referred to as the "Tires Fraud," the "Neewra Fraud" and the "Rednihom Fraud."  All three

shipments were subject to Maersk's standard bill of lading.  (Pls.' Rule 56.1 Stmt., Mar. 31, 2009

("Pls.' 56.1 Stmt."), ¶ 7.)  The undisputed facts for these cross-motions for summary judgment

are taken from the parties' Rule 56.1 statements, the stipulated facts in the Joint Pretrial Order,

and certain affidavits and deposition testimony.  Paragraphs in Maersk's Rule 56.1 Statement

that are not "*specifically* controverted by *a correspondingly numbered paragraph*" in the

Remaining Defendants' Rule 56.1 Counterstatement are deemed admitted for purposes of

Maersk's summary judgment motion.  Local Civ. R. 56.1(c) (emphasis in original).

### A.    Tires Fraud

The Tires Fraud involved multiple shipments of used tires from the United States to

India.  (Pls.' 56.1 Stmt. ¶ 3.)  The shippers, who collected a fee for disposing of the tires, knew

there was no consignee in India to which Maersk would be able to deliver the tires.  (Id.)  Counts

I and II of the AVC allege fraud and breach of contract based on the Tires Fraud against

defendants other than the Remaining Defendants.  (AVC ¶¶ 27-62.)

The AVC does not contain any specific allegation that Joginder, Parkar or Help Line

played a role in the Tires Fraud.  Nor do Maersk's summary judgment papers argue that the

Remaining Defendants participated in the Tires Fraud.  To the extent Maersk implicitly suggests

that the Tires Fraud nonetheless supports its conspiracy and/or RICO claims against the

Remaining Defendants because the Remaining Defendants were connected to the defendants

who allegedly orchestrated the Tires Fraud, the suggestion is far too tenuous to provide a basis

for summary judgment.  Thus, the Court, like the parties, focuses on the Neewra and Rednihom shipments.

## B.    Neewra Fraud

The Neewra shipment was carried by Maersk from the United States to Kuwait on behalf of shipper Neewra, one of the Defaulting Defendants.  (Pls.' 56.1 Stmt. ¶ 4.)  "Neewra" spelled backwards is "Arween"—the name of the Defaulting Defendant who allegedly founded Neewra and helped orchestrate the Neewra Fraud (see AVC ¶¶ 64-71).  The bill of lading for the shipment described the cargo as "20 crates [of] electrical spare parts."  (Stmt. of Elvis Pinto, Jan. 18, 2005 ("Pinto Stmt."), ¶ 3 & Ex. 1 (original bill of lading for Neewra shipment).)[3]  The consignee named in the bill of lading was Al Tamasok, another Defaulting Defendant.  (Pls.' 56.1 Stmt. ¶ 20.)  Al Tamasok procured the release of the cargo in Kuwait by presenting Maersk with a forged bill of lading.  (Id. ¶ 21.)  The cargo disappeared, and Neewra filed multiple claims against Maersk for misdelivery, asserting that the lost crates actually contained $1.86 million worth of computer hard drives.  (See id. ¶ 4.)  One such claim, filed in Kuwaiti court, resulted in the arrest in Kuwait of a Maersk container ship.  (Id.)  To secure the vessel's release, Maersk posted security of $1.86 million with the Kuwaiti court.  The court ultimately transferred the security deposit to Remaining Defendant Parkar.  (See id.)

### 1.    Forged Bill of Lading

It is undisputed that Al Tamasok secured the release of the Neewra cargo after it arrived in Kuwait by presenting Maersk with a fraudulent bill of lading.  (Id. ¶ 21; Defs.' Rule 56.1

---

[3] Elvis Pinto was a manager in Maersk's Kuwait office during the relevant period.  (Id. ¶ 1.)  Pinto executed his Statement (attached to which are various documents relating to the frauds) in January 2005.  In 2007, Pinto made a Declaration attesting to the truth of his Statement, in anticipation of not testifying in person.  (Decl. of Elvis Pinto, Mar. 21, 2007 ("Pinto Decl."), ¶ 8.)  Pinto was, in fact, deposed, on October 29, 2008, and his testimony is consistent with his Statement.  The Court relies on certain undisputed portions of both Pinto's 2005 Statement and his 2008 deposition.

Stmt. in Opp. to Pls.' Mot. for Summ. J., Apr. 14, 2009 ("Defs.' 56.1 Cntrstmt."), ¶ 21.) Maersk asserts—and the Remaining Defendants deny, albeit without evidence to back their denial—that Joginder was heavily involved in the forgery and presentation of the fraudulent bill of lading.

Ordinarily, in order to take possession of a shipment, the consignee must present the original bill of lading. (Decl. of Soren Hansen in Opp. to Mot. to Vacate Attachment, June 6, 2006 ("Hansen Decl."), ¶ 6.)[4] Several weeks before the Neewra shipment arrived in Kuwait (which was on or about April 10, 1999 (Pinto Stmt. ¶ 4)), a man tried to obtain a blank Maersk bill of lading by offering a bribe to Pinto, a manager in Maersk's Kuwait office. Pinto was repeatedly contacted by an Indian man named Sunil Waswani ("Waswani"), who said he had a business proposal for Pinto. (Decl. of Harry H. Wise, III in Supp. of Defs.' Mot. for Summ. J, Mar. 30, 2009 ("Wise Decl."), Ex. B (Dep. of Elvis Pinto, Oct. 29, 2008 ("Pinto Dep.")), at 40:24-41:25.) Pinto finally agreed to meet with Waswani, and Waswani gave him an address, which turned out to be the office of the Blue Bird Company ("Blue Bird"). (Id. at 46:6-14; Pinto Stmt. ¶ 29.) Blue Bird was owned, operated or controlled by Remaining Defendant Joginder Singh Sahni. (Pls.' 56.1 Stmt. ¶ 15.)

A few minutes after Pinto arrived at Blue Bird's office, a man walked in and introduced himself as "Singh." (Wise Decl. Ex. B (Pinto Dep.), at 47:12-48:2.) "Singh" proceeded to offer Pinto about $60,000 for blank Maersk bills of lading. (Id. at 49:21-51:2, 51:25-52:4.) Pinto refused the offer. (Pinto Stmt. ¶ 30.)

Shortly after the self-identified "Singh" attempted to bribe Pinto, and less than two weeks before the Neewra shipment arrived in Kuwait, Defaulting Defendant Kumar contacted Maersk on behalf of Al Tamasok and asked if Maersk would release the Neewra cargo against a personal guarantee. (Id. ¶ 5.) A few days later, two Al Tamasok representatives—Kumar and a Dr. Adel

---

[4] Soren Hansen was managing director of Maersk Kuwait during the Neewra and Rednihom shipments. (Id. ¶ 1.)

11

Baron—visited Maersk's Kuwait office and inquired as to whether Maersk would release the Neewra cargo upon presentation of a copy of the bill of lading. (See id. ¶ 7.) On both occasions, Maersk informed Al Tamasok that it would not release the Neewra containers to Al Tamasok without the original bill of lading. (See id. ¶¶ 5-9.) Eventually, Al Tamasok succeeded in forging a bill of lading, presenting it to Maersk and securing the release of the Neewra shipment. (See Pls.' 56.1 Stmt. ¶ 21.)

In its Rule 56.1 Statement, Maersk cites the Pinto Statement and the Declaration of Paolo Ghirardani, the London attorney Maersk hired to investigate the Neewra Fraud (Decl. of Paolo Ghirardani in Opp. to Mot. to Vacate Attachment, June 8, 2006 ("Ghirardani Decl."), ¶¶ 1, 3, 8), as evidence that Al Tamasok's representatives accomplished this by (1) persuading a Maersk employee, Celine Mascarenhas ("Mascarenhas"), to hand over a blank bill of lading (id. at 11 n.1; Pinto Stmt. ¶ 33); (2) hiring a website designer to forge the bill of lading (Ghirardani Decl. ¶ 44(m)); and (3) presenting the fraudulent bill of lading to Maersk's finance/accounts department, when Pinto was out of the office (Pinto Stmt. ¶¶ 22-23.) However, these portions of the Pinto Statement and Ghirardani Declaration are hearsay, based on statements made to Pinto and/or Ghirardani by Mascarenhas, by the claims investigator who interviewed the website designer, or by employees in Maersk's finance/accounts department. The Court cannot consider such inadmissible evidence on a summary judgment motion. See Local Civ. R. 56.1(d).[5]

### 2.     Claim in Kuwaiti Court

After the Neewra cargo was released, it disappeared. (Hansen Decl. ¶ 17.) When Maersk employees visited Al Tamasok's listed address in Kuwait, it was deserted. (Id.) Neewra then filed successive claims for misdelivery against Maersk in New York, New Jersey and Kuwait,

---

[5] Throughout its Rule 56.1 Statement, Maersk unhelpfully cites to the entirety of various affidavits without specifying pages or paragraphs. Pursuant to Local Civil Rule 56.1(d), the Court considers only those portions containing evidence that would be admissible.

asserting that the lost crates actually contained computer hard drives worth $1.86 million.  (See Pls.' 56.1 Stmt. ¶ 4; AVC ¶¶ 100-01.)  It is undisputed that in 2004, roughly five years after Neewra's supposed loss, Remaining Defendant Parkar filed a claim in Kuwaiti court on Neewra's behalf.  (Pls. 56.1 Stmt. ¶ 17; Joint Pretrial Order, Mar. 31, 2009 ("JPTO"), at 4 ¶ 9.) Parkar's corporate sponsor in Kuwait was Blue Bird—the company owned, operated or controlled by Joginder.  (Pls.' 56.1 Stmt. ¶¶ 14-15.)

The Neewra claimants prevailed in the Kuwaiti courts.  (AVC ¶ 113; Dep. of Bimal Kanal, Nov. 13, 2008 ("Kanal Dep."), at 27:11-20.)  Although Maersk won at the trial level, the Neewra claimants succeeded in obtaining a judgment against Maersk for $1.86 million—the ostensible value of the missing cargo—in the appellate courts.  (Ghirardani Decl. ¶ 65.)  The ruling against Maersk resulted in the arrest of one of Maersk's ships, the M/V Alva Maersk. (Pls.' 56.1 Stmt. ¶ 4.)  Maersk posted security of $1.86 million with the Kuwaiti court, and the vessel was released.  (JPTO at 5 ¶ 12; Ghirardani Decl. ¶ 63.)

Ultimately, the Kuwaiti court transferred the $1.86 million to Parkar.  (Pls.' 56.1 Stmt. ¶ 4.)  In his Answer, Parkar "denie[d] that he received any of the funds recovered by Neewra and denie[d] that he profited in any manner from Neewra's suit[]."  (Docket No. 160 at 2.)  However, during discovery, Parkar produced a bank statement showing that he received roughly $1.86 million in his Kuwaiti bank account on May 9, 2005.  (Kahn Aff'n in Supp. of Pls.' Mot. for Summ. J., Mar. 31, 2009 ("Kahn Aff'n"), Ex. 1.)  The statement shows that, over the next ten days, Parkar transferred the bulk of the money (about $1.6 million) to a bank account identified only by number; that a cashier's order was issued for roughly $186,000; and that Parkar transferred the small remainder of the funds to a second bank account also identified only by number.  (See id.)  The Remaining Defendants have revised their characterization of Parkar's

involvement with the $1.86 million to read: "[Parkar] did little more than hire the attorneys for Neewra and then collect and distribute the funds, [but] did not profit in any way from the case." (Defs.' Reply Mem. in Supp. of Mot. for Summ. J., Apr. 20, 2009 ("Defs.' Reply"), at 3.) Obviously, Parkar was precluded from submitting any testimony to support that conclusory assertion, so it cannot be considered.

### 3.    April 2004 Meeting

In early 2004, Maersk retained London solicitor Paolo Ghirardani and directed him to go to Kuwait to investigate the Neewra Fraud. (Pls.' 56.1 Stmt. ¶ 23; Ghirardani Decl. ¶ 9.) On his first visit to Kuwait in April 2004, Ghirardani sought a meeting with the "decision maker" on Neewra's side, and asked Bimal Kanal, Maersk Kuwait's managing director at the time, if he could organize such a meeting. (Ghirardani Decl. ¶¶ 118-19; Dep. of Paolo Ghirardani, Apr. 26, 2006 ("Ghirardani Dep."), at 44:15-21, 47:16-48:5.) Kanal could not, but he took Ghirardani to see Maersk's local partner, Adel Behbehani ("Behbehani"), because Behbehani had an employee, Vijay Kapoor ("Kapoor"), who was close to the Singh Sahni family. (Decl. of Bimal Kanal, June 7, 2006 ("Kanal Decl."), ¶¶ 11-12.) Ghirardani explained to Kapoor that he wanted to meet the "decision maker" on the claimant's side. (Ghirardani Decl. ¶ 123; Kanal Decl. ¶¶ 12-13.) Later that day, Kapoor informed Ghirardani and Kanal that he had arranged a meeting (the "April 2004 Meeting") with a man identified as "Joginder Singh Sahni" or "Mr. Joginder." (JPTO at 4-5 ¶ 11; Pls.' 56.1 Stmt. ¶ 24; Kanal Decl. ¶ 14.)

The April 2004 Meeting took place at a coffee shop in the lobby of the JW Marriott Hotel in Kuwait. (JPTO at 4-5 ¶ 11.) Present at the April 2004 Meeting were: (1) Ghirardani; (2) Kanal; (3) Kapoor; and (4) the man who was introduced as "Joginder Singh Sahni" or "Mr. Joginder." (Id.) At the Meeting, which lasted about twenty to thirty minutes, the details of the

14

Neewra claim were discussed. (Pls.' 56.1 Stmt. ¶¶ 26-28.) The man identified as "Mr. Joginder" had knowledge of the dispute and knew the parties involved. (Id. ¶ 28.) Ghirardani encouraged "Mr. Joginder" to drop the lawsuit because Maersk had strong evidence that the claim was fraudulent. (JPTO at 5 ¶ 13.) "Mr. Joginder" refused to drop the suit and instead offered to settle the matter if Maersk paid the full $1.86 million (he offered to waive interest "as a commercial gesture"). (Id.; Pls.' 56.1 Stmt. ¶ 27.) Needless to say, those terms were unacceptable to Maersk, and the parties did not settle the dispute. (JPTO at 5 ¶ 14.)

Remaining Defendant Joginder has always claimed that it was indeed he who attended the April 2004 Meeting. (Decl. of Joginder Singh Sahni, June 11, 2006 ("Joginder Decl."); Defs.' Mem. at 9.) At that Meeting, the man identified as "Joginder Singh Sahni" never claimed to be anyone else. (AVC ¶ 109; Joginder Ans., Apr. 11, 2008 (Docket No. 158) ("Joginder Ans."), at 3.) However, after Ghirardani witnessed the deposition of Mohinder—Joginder's brother—in Kuwait in December 2005, Ghirardani had "absolutely no doubt" that it was Mohinder, not Joginder, who had attended the April 2004 Meeting. (Ghirardani Decl. ¶¶ 143-46.) And, in the AVC, Maersk alleges that the "person who attended the [April 2004] meeting was not [Joginder] but instead was [Mohinder]." (AVC ¶ 112.)

Maersk asserts that, at the end of the April 2004 Meeting, "Mr. Joginder" handed Ghirardani a Help Line business card. (Pls.' 56.1 Stmt. ¶ 12.) In his Answer, Joginder admitted the allegations in paragraph 111 of the AVC, which avers: "At the close of the [April 2004] meeting, the person identified as ["Mr. Joginder"] gave to Mr. Ghirardani a business card for [Help Line] which was almost entirely in Arabic. Mr. Ghirardani asked for and noted the individual's mobile (cell) phone number on the reverse of the business card." (Joginder Ans. at 3.) The Remaining Defendants now dispute Maersk's assertion, pointing to a discrepancy in

15

Maersk's evidence. (Defs.' 56.1 Cntrstmt. ¶ 12.) A copy of the card that Maersk claims "Mr. Joginder" gave Ghirardani at the close of the April 2004 Meeting is attached to the Ghirardani Declaration. (Ghirardani Decl. ¶ 131.) The word "Mobile" and the number "9292834" are handwritten on the back of the card; all of the words on the front of the card are in Arabic, except for "Help Line Collection Co. W.L.L." (Id. Ex. 64.) What appears to be the exact same card is also attached to the Pinto Statement. (Pinto Stmt. Ex. 44.) However, Pinto states that the card was given to Maersk more than four years before the April 2004 Meeting by an Egyptian lawyer visiting Maersk's Kuwait office in connection with the Rednihom shipment. (Id. ¶ 68.) Ghirardani, who assisted in the preparation of Pinto's Statement, testified that this is simply a mistake—that the wrong card was attached to the Pinto Statement, and that Ghirardani did, in fact, receive the Help Line business card at the April 2004 Meeting. (Ghirardani Dep. at 55:7-56:6.)

### C.     Rednihom Fraud

The Rednihom Fraud involved another shipment to Kuwait. (Pls. 56.1 Stmt. ¶ 6.) The shipper was Rednihom—"Mohinder" spelled backwards. On August 20, 1999, just a few months after the Neewra shipment, the Rednihom shipment arrived in Kuwait, also from New Jersey. (Pinto Stmt. ¶ 35.) The bill of lading described the cargo as twenty crates of "PC Parts." (Id. Ex. 19 (bill of lading for Rednihom shipment).) The named consignee for the shipment was "Arab Gulf Trading." (Id.)

For more than three months after its arrival, no one came forward to collect the cargo. (Id. ¶ 46.) During that time, Maersk discovered that the Kuwait address listed for Arab Gulf Trading was an empty office with no phone connection; that the freight forwarder for the Rednihom shipment was the same as for the Neewra shipment; that the registered addresses for

16

Neewra and Rednihom on the bills of lading were within a couple blocks of each other in Queens, New York; and that Neewra and Rednihom shared the same fax number. (Id. ¶¶ 37-38, 44.) Suspicious, Maersk alerted Kuwaiti Customs, which unsealed the crates and found that they contained miscellaneous junk, including spare auto parts, but no PC parts. (Id. ¶¶ 45, 48.)

At this point, Help Line—a Kuwaiti entity in the business of debt collection, not freight forwarding—attempted to divert the fraudulent Rednihom shipment to Dubai. (Pls.' 56.1 Stmt. ¶¶ 10, 19.) This was an attempt, Maersk alleges, to find a way to assert another false claim against Maersk. (AVC ¶ 123.)

On January 12, 2000, Maersk Kuwait received a copy of a letter from Rednihom to Help Line, authorizing Help Line to act on Rednihom's behalf in arranging for reshipment of the cargo to Dubai. (Pinto Stmt. ¶ 51 & Ex. 32.) The next day, two Help Line representatives visited Maersk Kuwait for purposes of setting up the redirection. (Id. ¶ 51.) Pinto and Hansen informed them that the cargo could not be released to Help Line (and that the reshipment to Dubai could not occur) without payment of all outstanding charges, presentation of the original bill of lading, and completion of all formalities required by Kuwaiti Customs and port authorities, which were by then in possession of the abandoned cargo. (Id. ¶ 52.)

Shortly thereafter, another Help Line representative visited Maersk Kuwait and offered to pay the outstanding charges. Maersk informed Help Line that it would not release the cargo without confirmation that the original bill of lading had been surrendered. (Id. ¶ 56.) The next day, Mohinder faxed a letter to Maersk asking it to accept the payment tendered by Help Line. (Id. ¶ 58 & Ex. 40.) Help Line itself also complained that Maersk was unnecessarily delaying the release of the Rednihom containers. (Id. ¶ 59 & Ex. 41 (fax from Help Line to Maersk dated January 22, 2000).) On January 23, 2000, Pinto and Hansen again met with Help Line

17

representatives, and again informed them that the cargo could not be exported to Dubai unless Help Line produced original documents required by Kuwaiti Customs. (Id. ¶¶ 60-61.)

During this time, Mohinder continued to pressure Maersk to release the Rednihom cargo, notwithstanding that Help Line had presented neither the original bill of lading nor the documents required by the Kuwaiti authorities. (See id. ¶¶ 75, 83, 85.) Mohinder even "demand[ed]" that Maersk divert the shipment in a January 27, 2000 fax from Rednihom to Maersk. (Id. ¶ 80 & Ex. 53.) Hansen informed Mohinder that despite the frequent visits from Help Line representatives, they had failed to submit all of the documents necessary to divert the cargo. (Hansen Decl. ¶¶ 34-37; Pinto Stmt. ¶ 84.) After further wrangling over what documents needed to be produced, on March 10, 2009, Rednihom gave up, claiming it had lost its consignee in Dubai. (Pinto Stmt. ¶ 92.) The abandoned Rednihom cargo was eventually impounded by Kuwaiti Customs. (Id. ¶ 95.)

Maersk asserts, and the Remaining Defendants deny, that Remaining Defendant Parkar visited Maersk's Kuwait office in connection with the Rednihom Fraud. (See Pls.' 56.1 Stmt. ¶ 29; Defs.' 56.1 Cntrstmt. ¶ 29.) In January 2000, a "man called Parker" came to Maersk's Kuwait office claiming that he was a Help Line representative and that he was authorized by Rednihom to arrange for the diversion of the Rednihom shipment to Dubai. (Pinto Stmt. ¶ 66.) Maersk explained to "Parker"—as it had to the other Help Line representatives—that Maersk and the Kuwaiti authorities required certain documents before the cargo could be reshipped to Dubai. (Id. ¶ 67.) About four or five meetings with "Parker" took place at Maersk Kuwait. (Id.) It was on his last visit that "Parker" was accompanied by the Egyptian lawyer who—according to the Pinto Statement—gave Maersk the same Help Line business card that Ghirardani claims he received from "Mr. Joginder" at the April 2004 Meeting. (Id. ¶ 68 & Ex. 44.)

Maersk also asserts, and the Remaining Defendants deny, that Remaining Defendant

Joginder owns or operates Help Line.  (Pls.' 56.1 Stmt. ¶¶ 8, 12; Defs.' 56.1 Cntrstmt. ¶¶ 8, 12.)

Mohinder and Mandeep—Joginder's brother and nephew—have both testified that Joginder is

the owner of Help Line.  (Decl. of Mohinder Singh Sahani, May 6, 2006 ("Mohinder Decl."),

¶ 27; Decl. of Mandeep Singh Sahni, May 6, 2006 ("Mandeep Decl."), ¶ 12.)  A fax from Help

Line to Maersk, complaining that Maersk was delaying the diversion of the Rednihom shipment,

was sent from the fax number of original defendant Sardar.  (Pinto Stmt. ¶ 59.)

Maersk alleges that Joginder owns or operates Sardar.  (AVC ¶ 14.)  A Sardar business

card found in Maersk's sales file has the names "*Mr. Joginger*/Mr. Hardeep" handwritten on it.

(Pinto Stmt. ¶ 31 & Ex. 18 (emphasis added).)  "Joginger" is one of Remaining Defendant

Joginder's many alleged aliases.  (AVC ¶ 14.)  In addition, one of the two phone numbers on the

Sardar business card is a phone number also used by Blue Bird, a company Joginder admits he

controls.  (Ghirardani Decl. ¶ 158(d); Pls.' 56.1 Stmt. ¶ 15.)  Joginder also resides in Kuwait

across the street from Sardar.  (JPTO at 4 ¶ 6.)  Joginder denies that he owns or operates Sardar,

but he is barred from submitting any competent evidence (i.e., his testimony) to support that

denial.

**DISCUSSION**

**I.      Standard of Review**

A party is entitled to summary judgment when there is "no genuine issue as to any

material fact" and the undisputed facts warrant judgment for the moving party as a matter of law.

Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  On a

motion for summary judgment, the court must view the record in the light most favorable to the

nonmoving party and draw all reasonable inferences in its favor.  Matsushita Elec. Indus. Co.

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue

of material fact.  Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Once such a showing has been

made, the nonmoving party must present "specific facts showing a genuine issue for trial."  Fed.

R. Civ. P. 56(e).  The party opposing summary judgment "may not rely on conclusory

allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.

1998).  Moreover, not every disputed factual issue is material in light of the substantive law that

governs the case.  "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude summary judgment."  Anderson, 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475

U.S. at 586.  Instead, sufficient evidence must exist upon which a reasonable jury could return a

verdict for the nonmoving party.  Summary judgment is designed to flush out those cases that are

predestined to result in directed verdict.  Lightfoot v. Union Carbide Corp., 110 F. 3d 898, 907

(2d Cir. 1997).

## II.    Conspiracy to Defraud

Under New York law, there is no independent cause of action for civil conspiracy.  Filler

v. Hanvit Bank, 156 F. App'x 413, 417 (2d Cir. 2005); Alexander & Alexander v. Fritzen, 503

N.E.2d 102, 102 (1986).  However, a civil conspiracy may be alleged for the purpose of showing

that an otherwise actionable tort was committed jointly by the conspirators and that, because of

the conspirators' common purpose and interest, the acts of one may be imputed to the others.

Filler, 156 F. App'x at 417; Grove Press, Inc. v. Angleton, 649 F.2d 121, 123 (2d Cir. 1981)

20

("The allegation [of conspiracy] 'is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts.'" (quoting Rutkin v. Reinfeld, 229 F.2d 248, 252 (2d Cir. 1956)). The injury for which plaintiff may be entitled to recovery is not the conspiracy itself but the damage caused by specific overt acts. Grove Press, 649 F.2d at 123.

Thus, to establish a claim for conspiracy to defraud, a plaintiff must first demonstrate the underlying fraud, although the plaintiff need not prove that each defendant committed every element of the underlying fraud. Meisel v. Grunberg, No. 07 Civ. 11610, 2009 U.S. Dist. LEXIS 84656, at *48-49 (S.D.N.Y. Aug. 31, 2009) (citing Snyder v. Puente De Brooklyn Realty Corp., 746 N.Y.S.2d 517, 521 (App. Div. 2002)). In addition, the plaintiff must show (1) a corrupt agreement; (2) an overt act in furtherance of that agreement; and (3) membership in the conspiracy by each defendant. Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 240 (2d Cir. 1999). "As is true in criminal conspiracies, agreements in civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence." Id.

Here, the Remaining Defendants fail to show that there is any genuine issue of material fact as to whether they engaged in a conspiracy to defraud Maersk, at least in connection with the Rednihom shipment. As explained below, supra at Discussion III.B, the undisputed facts also strongly suggest that the Remaining Defendants conspired to defraud Maersk in connection with the Neewra shipment. However, the fact that a Kuwaiti court has entered judgment *against* Maersk in connection with the Neewra shipment (a fact overlooked by both sides) makes this Court unwilling to enter summary judgment for Maersk—at least until I am provided with more information about the nature and legal ramifications of the Kuwaiti proceedings.

The occurrence of the Rednihom Fraud, on the other hand, is not, and cannot, be disputed. Nor can it be disputed that any number of overt acts were taken in furtherance of the Rednihom scheme—for example, the bill of lading falsely described the goods as PC parts, and Help Line attempted to divert the fraudulent shipment to Dubai. Thus, Maersk has demonstrated the underlying tort—the Rednihom Fraud—and an overt act. The Court now turns to the evidence establishing the remaining elements of Maersk's civil conspiracy claim against Joginder and Help Line.

### A.    Joginder

The record demonstrates the absence of any material factual issue as to whether Joginder knowingly participated in the Rednihom scheme. It is undisputed that Remaining Defendant Help Line attempted to divert the shipment to Dubai without presenting the original bill of lading and other documents required by Maersk and the Kuwaiti authorities. Mohinder and Mandeep both swore that Joginder was the owner of Help Line. In addition, a January 2000 fax from Help Line to Maersk, pressuring Maersk to release the Rednihom shipment, was sent from the fax number of original defendant Sardar. Maersk asserts that Joginder owned or operated Sardar, and presents the following facts in support of its assertion: first, a Sardar business card found in Maersk's sales file has the name "Mr. Joginger" handwritten on it; second, Sardar and Blue Bird (another of Joginder's companies) shared a phone number; third, Joginder lived across the street from Sardar. The last fact is utterly unpersuasive; the first two, however, are some evidence that Joginder was an owner or operator of Sardar.

In resolving Maersk's motion for summary judgment, the Court must view the facts in the light most favorable to the Remaining Defendants and draw all *reasonable* inferences in their favor. The only reasonable inference that the Court can draw from these facts is that Joginder

owned or operated Help Line, and that he was thus involved in the attempt to reship the

Rednihom cargo to Dubai in furtherance of the Rednihom Fraud. The Remaining Defendants

have not presented any competent evidence suggesting otherwise. Thus, there is no genuine

issue of material fact about whether Joginder was a knowing party to a corrupt agreement to

defraud Maersk. He was. Because it is undisputed that the underlying tort of the Rednihom

Fraud occurred, and because it cannot be disputed that numerous overt acts were taken in

furtherance of that scheme, the Court grants summary judgment to Maersk on its civil conspiracy

claim against Joginder. Joginder's cross-motion for summary judgment on that claim is denied.

### B.     Help Line

The record also demonstrates Help Line's membership in the conspiracy to defraud

Maersk. It is undisputed that Help Line sought to have the fraudulent Rednihom shipment

diverted to Dubai on Rednihom's behalf. Maersk presents strong circumstantial evidence in

support of its assertion that Help Line was knowingly assisting Rednihom in an attempt to find a

way to assert another false claim against Maersk. The Remaining Defendants conclusorily

respond, without support, that Help Line was merely "engaging in a standard commercial

transaction." (Defs.' Mem. at 11.) Even viewing the evidence in the light most favorable to the

Remaining Defendants, there is no genuine issue for trial.

First, as discussed above, the record shows that Help Line was owned or operated by

Joginder, a member of the conspiracy. The parties waste considerable energy disputing a single,

immaterial factual issue relating to the link between Joginder and Help Line: whether, at the

close of the April 2004 Meeting, the man identified as "Mr. Joginder" gave Ghirardani a Help

Line business card. The Remaining Defendants accurately note the discrepancy between Pinto

and Ghirardani's explanation of the card's origins. See supra Facts II.B.3. In addressing

23

Maersk's summary judgment motion, the Court must resolve this ambiguity in favor of the Remaining Defendants.

The problem, however, is that neither explanation is favorable to the Remaining Defendants. If the card was given to Ghirardani at the April 2004 Meeting, that would cement the link between Help Line and either Joginder or Mohinder—depending on which one of them attended the Meeting—and between Help Line and the Neewra episode. But if the card was actually given to Maersk by an Egyptian lawyer accompanying a "man called Parker" during a visit in furtherance of Help Line's attempt to divert the Rednihom shipment, that would confirm Help Line's involvement in the Rednihom Fraud and link Help Line to Remaining Defendant Parkar. Assuming that "Mr. Joginder" did *not* give Ghirardani the Help Line business card at the April 2004 Meeting does not sever the link between Help Line and Remaining Defendant Joginder, because that link is shown by other pieces of evidence in the record.

In short, the only reasonable inference that can be drawn from *either* version of how the Help Line business card came to be in Maersk's possession is that Help Line was part of a conspiracy to defraud Maersk. Thus, the factual dispute over whether "Mr. Joginder" gave Ghirardani the Help Line business card is immaterial, as its resolution would not affect the outcome of Maersk's conspiracy claim against Help Line. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The second piece of evidence tending to prove Help Line's membership in the conspiracy is the undisputed fact that Help Line was acting on behalf of Rednihom and Mohinder. (See, e.g., Pinto Stmt. ¶ 51 & Ex. 32 (fax from Rednihom authorizing Help Line to act on its behalf in arranging reshipment of cargo to Dubai); id. ¶ 58 & Ex. 40 (fax from Mohinder to Maersk asking it to accept payment tendered by Help Line).) In other words, Help Line was acting on behalf of

24

an entity that had just fraudulently shipped worthless spare auto parts while claiming they were valuable PC parts, and whose principal was none other than Joginder's brother.

Third, the Rednihom Fraud was strikingly similar to—and occurred on the heels of—the Neewra scheme. Help Line repeatedly attempted to persuade Maersk to release the Rednihom cargo without the original bill of lading, just as Al Tamasok had attempted to persuade Maersk to release the Neewra containers without the original bill of lading several months earlier. The second time around, Maersk, once-duped, warily avoided releasing another shipment without the presentation of original documents.

This evidence satisfies Maersk's initial burden of demonstrating the absence of any disputed issue of material fact as to whether Help Line was party to a corrupt agreement to defraud Maersk in connection with the Rednihom shipment. The Remaining Defendants have not presented any competent evidence to controvert Maersk's showing. They identify the discrepancy concerning the Help Line business card, but that is immaterial.

To be sure, there is some "metaphysical doubt" about whether Help Line was a knowing player, or merely an unwitting pawn, in Rednihom's game. But that is not enough to prevent summary judgment. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Court is required to draw all *reasonable* inferences in favor of Help Line; it is not required to perform mental gymnastics in an effort to mold the facts into an entirely improbable narrative in which Help Line was not a knowing co-conspirator. Simply put, based on the undisputed facts before the Court, it would not be reasonable to infer that Help Line was merely "engaging in a standard commercial transaction." Help Line is a debt collection company, not a freight forwarder; it is owned or operated by Joginder; it was aggressively seeking to divert a demonstrably fraudulent shipment without presenting an original bill of lading; it acted on behalf

of named defendants Rednihom and Mohinder; and all of this occurred shortly after the Neewra episode. The Court concludes that there is no genuine dispute for trial as to whether Help Line was, like Joginder, a member of the conspiracy to defraud Maersk.

Accordingly, the Court grants summary judgment to Maersk on its claim against Help Line for conspiracy to defraud. Help Line's motion for summary judgment on that claim is denied.

### III.    Fraud

Under New York law, the elements of a fraud claim are: (1) a material misrepresentation or omission of fact (2) made by the defendant with knowledge of its falsity and (3) the intent to defraud ("scienter"); (4) reasonable reliance by the plaintiff; and (5) resulting injury to the plaintiff. Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006). "In fraud cases, scienter may be proven by circumstantial evidence." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 241 (2d Cir. 1999).

Where, as here, a plaintiff has demonstrated a conspiracy to defraud, a misrepresentation made in furtherance of the conspiracy may be imputed to each of the co-conspirators. See id. at 239-40; Kashi v. Gratsos, 790 F.2d 1050, 1054-55 (2d Cir. 1986) ("Proof of a civil conspiracy under New York law connects a defendant with the transaction and . . . charges him with the acts and declarations of his coconspirators . . . .") (internal quotations omitted). In Cofacredit, multiple groups of defendants had participated in a scheme to obtain financing from the plaintiff based on fraudulent invoices. 187 F.3d at 233. One group of defendants (the "Windsor Defendants") argued that they could not be liable for fraud because they—unlike their co-defendants—had not actually made any of the actionable misrepresentations. Id. at 239-40. The Second Circuit held that, because the Windsor Defendants had engaged in the conspiracy to

26

defraud, the district court had "properly imputed to the Windsor Defendants all of the misrepresentations [their co-defendants] made within the scope of the conspiracy."  Id.

## A.   Rednihom Fraud Claims Against Joginder and Help Line

Maersk asserts fraud claims based on the Rednihom shipment against Joginder and Help Line.  (AVC ¶¶ 118-26.)  It is undisputed that the Rednihom Fraud occurred.  Numerous material misrepresentations necessarily were made in furtherance of the Rednihom scheme.  For example, the bill of lading falsely described the cargo as PC parts and named a consignee that either did not exist or never had any intention of claiming the cargo on arrival.  As established above, both Joginder and Help Line were members of a conspiracy to defraud Maersk in connection with the Rednihom shipment.  Therefore, all such misrepresentations made in furtherance of the conspiracy are imputed to Joginder and Help Line.  See Cofacredit, 187 F.3d at 239-40.  The Remaining Defendants do not dispute that Maersk reasonably relied on the misrepresentations in the bill of lading in agreeing to carry the containers to Kuwait.  Nor do they dispute that Maersk suffered damages (unpaid charges for the fraudulent shipment) as a result.

Instead, the Remaining Defendants' summary judgment papers are fairly read as contesting liability only on the ground that the Remaining Defendants did not knowingly participate in the frauds.  In other words, the Remaining Defendants challenge Maersk's proof of scienter.  However, the same evidence that demonstrates that the Remaining Defendants were knowing parties to the conspiracy to defraud Maersk also proves that they were acting with the requisite intent to defraud.  Just as the corrupt agreement in a civil conspiracy may be proven by circumstantial evidence, a defendant's scienter may be proven with circumstantial evidence.  See Cofacredit, 187 F.3d at 240-41.

27

The circumstantial evidence of Joginder and Help Line's knowing participation in the Rednihom scheme is strong, and the Remaining Defendants have not presented any competent evidence to controvert Maersk's showing. Thus, for the same reasons set forth above, the Court concludes that there is no genuine dispute as to their scienter. No reasonable trier of fact could infer anything other than knowing intent to defraud.

Accordingly, the Court grants summary judgment to Maersk on its claims against Joginder and Help Line for the Rednihom Fraud. Joginder and Help Line's cross-motion for summary judgment on those claims is denied.

### B.    Neewra Fraud Claims Against Joginder and Parkar

Maersk asserts fraud claims based on the Neewra shipment against Joginder and Parkar (AVC ¶¶ 63-114.) The evidence before the Court strongly supports the conclusion that Joginder and Parkar (among others) defrauded Maersk in connection with the Neewra shipment. However, summary judgment is inappropriate—at least for the moment—in light of the Kuwaiti judgment against Maersk.

### 1.    Evidence Against Joginder

The undisputed facts of the April 2004 Meeting weigh heavily in favor of finding that Remaining Defendant Joginder conspired to defraud Maersk in connection with the Neewra shipment. Joginder admitted that he attended the April 2004 Meeting in his Answer, swore to it in his Declaration, and now asserts it in his summary judgment papers. (Joginder Ans. at 3; Joginder Decl.; Defs.' Mem. at 9.) In other words, Joginder does not dispute that he was the man introduced to Ghirardani and Kanal at that Meeting as "Joginder Singh Sahni" or "Mr. Joginder."

When Ghirardani arrived in Kuwait to investigate the Neewra Fraud, he sought a meeting with the "decision maker" behind the fraudulent claim. The Remaining Defendants attempt to

28

conjure a factual issue by parsing Ghirardani's Declaration and deposition testimony to suggest

that he "requested a meeting with the 'decision maker' of the *Singh Sahni family*, quite a

different thing." (Defs.' 56.1 Cntrstmt. ¶ 23 (emphasis added); see Defs.' Mem. at 9.) Even if

there were competent evidence to support this assertion, it creates neither a genuine nor a

material dispute. Irrespective of Ghirardani's (or Behbehani's) word choice, the record makes

clear that there is no genuine issue as to the following material facts: Ghirardani, in keeping with

his investigative practices, sought a meeting with the decision maker for the opposition—that is,

the Neewra claimants—and was introduced to "Joginder Singh Sahni," or "Mr. Joginder."

It is undisputed that at that Meeting, "Mr. Joginder" knew the facts of the case, knew the

parties involved, and discussed settlement. These undisputed facts tend to prove that "Mr.

Joginder" was a member (possibly even a principal) of a conspiracy to defraud Maersk in

connection with the Neewra shipment. In light of what seems to be the self-evident nature of the

Neewra Fraud, "Mr. Joginder's" knowledge of the claim, and his apparent authority to settle it,

suggest he was acting with fraudulent intent.

Of course, the Court cannot turn a blind eye to the possibility that it was Mohinder, not

Joginder, who attended the April 2004 Meeting. Ghirardani and Kanal have both testified that

the man they met in April 2004 at the Marriott coffee shop was Mohinder, not Joginder, and

Maersk has consistently alleged as much. (Ghirardani Dep. 60:18-61:3; Kanal Dep. 61:21-25;

AVC ¶ 112.) Thus, there is undeniably a genuine factual issue as to whether the man identified

as "Mr. Joginder" at the April 2004 Meeting was Remaining Defendant Joginder, or his brother,

Mohinder.

But that dispute is not material for purposes of Maersk's Neewra-based fraud claim

against Joginder. If it was, in fact, Joginder, then he was clearly at the very center of any

Neewra Fraud, as established above. If it was Mohinder, then Joginder repeatedly and unabashedly lied to this Court—in his Answer, his Declaration and now his summary judgment papers—in an apparent effort to shield his brother from liability. This renders Joginder a co-conspirator in the scheme. In other words, the question of whether it was Joginder or Mohinder at the April 2004 Meeting may be relevant to the scope of their roles in the alleged fraud, but either way, the Meeting shows that Remaining Defendant Joginder was party to any conspiracy.

Of course, the April 2004 Meeting is not the only evidence tending to prove Joginder's involvement in a scheme to defraud Maersk in connection with the Neewra shipment. Several weeks before the cargo arrived in Kuwait, a man who introduced himself as "Singh" attempted to bribe Maersk's Pinto for a blank bill of lading. The attempted bribery took place at the small office of a company—Blue Bird—that Joginder owned, operated or controlled. Shortly after "Singh" failed to obtain a blank Maersk bill of lading from Pinto, Al Tamasok representatives attempted, and failed, to persuade Maersk to release the Neewra cargo without the original bill lading. In the end, Al Tamasok succeeded in obtaining a blank bill of lading from another source, forged the bill for the Neewra shipment, and presented it to Maersk, thereby securing the release of the Neewra cargo.

The only reasonable inference that the Court can draw from these undisputed facts is that Joginder played a role in the forging and presenting of the fraudulent bill of lading. The Remaining Defendants have not presented any competent evidence suggesting otherwise. Instead, they merely point out that "Singh" is a common family name, and claim that Pinto was unable to identify Joginder in photos shown to Pinto during his deposition (which took place more than nine years after Pinto saw the man who attempted to bribe him at Blue Bird's office). (See Wise Decl. Ex. C (Pinto Dep.), at 62:14-21; Defs.' Mem. at 8.) This is far from enough to

raise a genuine issue for trial, especially given the undisputed fact that Joginder controlled Blue Bird. The Remaining Defendants may have tried to manufacture some "metaphysical doubt" about whether Joginder was involved with the fraudulent bill of lading, but they fail to raise a genuine issue of fact.

### 2. Evidence Against Parkar

The evidence tending to prove Parker's participation in a Neewra-based fraud revolves around his role in advancing the Neewra claim in Kuwaiti court. It is undisputed that Parkar filed the Kuwaiti claim on behalf of Neewra. It is also undisputed that Parkar's corporate sponsor is Blue Bird, a company that Joginder owns, operates or controls. In his Answer, Parkar denied receiving any of the $1.86 million that Maersk posted to secure the release of the ship that had been arrested as a result of the Neewra suit. Now, having produced a bank statement that shows he did receive the $1.86 million and then transferred it to various bank accounts belonging to unidentified owners, Parkar admits that he "collect[ed] and distribute[ed]" the money recovered by the Neewra claimants (Defs.' Reply at 3).

In addition, the undisputed facts give rise to the reasonable inference that Parkar also participated in the Rednihom Fraud. Four or five times in January 2000, "a man called Parker," claiming to be a Help Line representative, visited Maersk's Kuwait office and attempted to arrange the diversion of the fraudulent Rednihom shipment without proper documentation. The Remaining Defendants have not presented any competent evidence supporting an inference that this man was anyone other than Parkar.[6]

In light of the evidence cited above, it would not be *reasonable* to infer that Parkar—the man who filed and pursued the Neewra claim, collected and distributed the judgment, and has

---

[6] As with Joginder, the Remaining Defendants assert that Pinto was unable to identify Parkar in a photo shown to him at his deposition. (Defs.' Mem. at 11.) That is not enough to create a genuine issue of material fact necessitating trial.

31

ties to Joginder—was merely an unwitting pawn in the game. Instead, the undisputed facts tend

to prove his knowing participation in the fraudulent conduct. The Remaining Defendants have

not come forward with any evidence that controverts Maersk's showing.

### 3. Summary Judgment Is Inappropriate in Light of the Kuwaiti Decision

The undisputed facts cited in the two preceding sections satisfy Maersk's initial burden of

demonstrating the absence of any genuine issue about whether Joginder and Parkar were

members of a conspiracy to defraud Maersk in connection with the Neewra shipment.[7] The

Remaining Defendants fail to present any competent evidence to controvert Maersk's showing.

Numerous material misrepresentations necessarily were made in furtherance of any such

conspiracy. For example, it is undisputed that Al Tamasok presented a forged bill of lading to

Maersk to obtain the release of the Neewra cargo. If Joginder and Parkar did, in fact, engage in

the conspiracy to defraud Maersk in connection with the Neewra shipment, these

misrepresentations would be imputed to them. See Cofacredit, 187 F.3d at 239-40.

Further, the Remaining Defendants do not dispute that Maersk reasonably relied on the

forged bill of lading in consenting to release the Neewra cargo. Nor do they contest that Maersk

was damaged as a result of its reliance on the fake bill in releasing the goods. Finally, as with

the Rednihom Fraud claims against Joginder and Help Line, the scienter element of the Neewra

Fraud claims against Joginder and Parkar appear to be satisfied by the same evidence that

establishes their knowing participation in the fraudulent scheme. In sum, the undisputed facts

---

[7] Maersk did not actually name Parkar in its claim for civil conspiracy. (AVC ¶ 142.) This omission was likely an oversight, as Maersk elsewhere alleges that Parkar played a significant role in both the Neewra and Rednihom Frauds and, in the RICO Count, that he "conspired to defraud Maersk" (AVC ¶ 128). Maersk's summary judgment papers make clear that its position is that all of the Remaining Defendants, including Parkar, were members of a conspiracy to defraud Maersk. (See, e.g., Pls.' Opp. to Defs.' Mot. for Summ. J., Apr. 15, 2009, at 10.) The Court does not suggest that a claim for conspiracy to defraud has, in fact, been asserted against Parkar—it is not the Court's job to amend Maersk's pleadings. Instead, the Court simply notes that the undisputed facts support a finding that Parkar was a co-conspirator, such that misrepresentations made in furtherance of any Neewra Fraud would be imputed to him.

support granting summary judgment to Maersk on its claims against Joginder and Parkar for the alleged Neewra Fraud.

However, the judgment in the Kuwaiti courts against Maersk on the Neewra claim precludes the Court from doing so, at least for now. The Court is well aware that a judgment was entered in favor of Neewra in Kuwaiti court, holding Maersk responsible for the value of the "lost" shipment. Indeed, Mohinder moved to dismiss this case on the ground of res judicata. See Maersk, 554 F. Supp. 2d at 465-66. The Court noted at that time that much more information would be needed before I could seriously consider the res judicata or collateral estoppel effects of the Kuwaiti judgment. Id.

Yet neither Maersk nor the Remaining Defendants addresses the potential res judicata effect of the Kuwaiti judgment on the pending motions. Indeed, no one even bothers to tell the Court who the parties were in the Kuwaiti action, much less provide any insight as to the nature of the proceedings, the evidence presented, or the decision itself. The record before the Court establishes only the following: a claim was asserted by or on behalf of Neewra in Kuwaiti court; Maersk defended against that claim (presumably by arguing that the claim was fraudulent for the same reasons it asserts here); and the Neewra claimants, whoever they were, *won*. Maersk does not present any evidence that the Kuwaiti judgment was procured by fraud. Surely, then, the Kuwaiti judgment is at least some evidence that the Neewra Fraud did *not* occur. In fact, it raises the possibility that the *Remaining Defendants* are entitled to summary judgment on any claim that relates solely to the Neewra Fraud. Even if the Remaining Defendants were not parties in the Kuwaiti action, they may be able to invoke collateral estoppel if the issues before this Court were litigated in Kuwait. To date, the parties have not provided the Court with any information regarding what issues were litigated and to what extent in the Kuwaiti courts.

Accordingly, the Court denies Maersk's motion for summary judgment on its Neewra-based fraud claims against Joginder and Parkar. However, I do so without prejudice. The Court invites Maersk to renew its motion on those two claims alone if it can show that the Kuwaiti judgment should have no impact on this Court's decision. The Court likewise denies the Remaining Defendants' motion for summary judgment on the Neewra-based fraud claims. But, like Maersk, the Remaining Defendants may renew their motion on those two claims on res judicata grounds—and *only* on those grounds, as there is no other basis for awarding summary judgment to the Remaining Defendants. The undisputed facts—which the Remaining Defendants cannot reargue—plainly support the conclusion that the Neewra Fraud occurred, and that Joginder and Parkar participated in it.

## IV.     Breach of Contract Claim Against Joginder

Maersk asserts a breach of contract claim against Joginder arising out of the Neewra shipment. (AVC ¶¶ 115-17.) The AVC alleges that the contract—Maersk's bill of lading—entitles Maersk to recover roughly \$2,500 in unpaid freight and \$450,000 in legal expenses jointly and severally from Neewra, Arween, Mohinder, Kumar, Al Tamasok, Sardar and Joginder. (Id.) For the reasons stated below, the Court concludes that there are genuine issues of material fact as to whether Joginder is bound by the bill of lading, making summary judgment inappropriate.[8]

The parties do not dispute that Maersk's bill of lading is a valid contract of carriage governing the transport of the Neewra cargo from the United States to Kuwait. Clause 14(4) of the bill of lading provides, in pertinent part:

---

[8] The Court notes at the outset that the parties' briefs do not even address the breach of contract claim, much less engage in any argument as to its merits. This is perhaps because Maersk's case against Joginder is quintessentially one of *fraud*, not contract. Indeed, the contract claim in the AVC spans all of three paragraphs and half a page. Maersk appears to assume—incorrectly, as the Court explains below—that if Joginder participated in the frauds, contract liability necessarily follows.

> The Shipper, consignee, holder hereof, and owner of the goods,
> *and their principals*, shall be jointly and severally liable to Carrier
> for the payment of freight, demurrage, General Average and other
> charges due hereunder, without discount, together with any Court
> costs, expenses and reasonable attorney fees incurred in collecting
> any sums due carrier. . . . *Merchant to remain liable for all
> charges hereunder* notwithstanding any extension of credit . . . by
> Carrier.

(Pls.' 56.1 Stmt. ¶ 7; Pinto Stmt. Ex. 1 (emphasis added).)  The bill of lading defines "Merchant"

to "include[] the Consignor, Shipper, Holder, Consignee, the receiver of the Goods, any person

including any Corporation, Company or other legal entity owning or entitled to the possession of

the Goods or this Bill of Lading *and anyone acting on behalf of such persons*."  (Pinto Stmt. Ex.

1 (emphasis added).)

The bill of lading also contains a choice-of-law provision: "Whenever the Carriage of

Goods by Sea Act 1936 (COGSA) of the United States of America applies, . . . this contract is to

be governed by United States law . . . ."  (Id.)  COGSA applies to the Neewra bill of lading, a

contract for the carriage of goods from a United States port to Kuwait.  See 46 U.S.C. § 30701

notes.  Thus, federal law applies to the bill of lading for the Neewra shipment.

Even aside from the bill of lading's choice-of-law provision, it is well-established that

"When a contract is a maritime one, and the dispute is not inherently local, federal law controls

the contract interpretation."  Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 22-23

(2004).  The bill of lading for the Neewra shipment "require[d] substantial carriage of goods by

sea" and, as this case is anything but "inherently local," it is a maritime contract governed by

federal common law.  See id. at 27; see also Fed. Ins. Co. v. Great White Fleet (US) Ltd., No. 07

Civ. 2415, 2008 U.S. Dist. LEXIS 58461, at *13 (S.D.N.Y. Aug. 1, 2008).

Turning to federal common law, as a general rule, "contracts for carriage of goods by sea

must be construed like any other contracts: by their terms and consistent with the intent of the

parties." Kirby, 543 U.S. at 31.  However, "Bills of lading should be 'carefully if not

restrictively construed.'"  Cont'l Ins. Co. v. Polish Steamship Co., 346 F.3d 281, 283 (2d Cir.

2008) (quoting Import Export Steel Corp. v. Miss. Valley Barge Line Co., 351 F.2d 503, 506 (2d

Cir. 1965).  In particular, "bills of lading are contracts of adhesion and, as such, are strictly

construed against the carrier."  Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd

Brasileiro, 775 F.2d 476, 482 (2d Cir. 1985); see Monica Textile Corp. v. S.S. Tana, 952 F.2d

636, 643 (2d Cir. 1991); Great White Fleet, 2008 U.S. Dist. 58461, at *15.

　　　　Here, the bill of lading does not name Joginder as a party to the contract.  (Pinto Stmt.

Ex. 1.)  There are two possible grounds on which the Court could find that Joginder is

nevertheless bound by its terms: if he was either (1) a "principal" of the shipper, consignee,

holder of the bill, or owner of the goods; or (2) a "Merchant," as that term is defined.  As Neewra

was the shipper and held the original bill of lading, Al Tamasok was the consignee, and no

evidence suggests that a third party owned or received the goods, the bill of lading could bind

Joginder only if he was either a principal of Neewra or Al Tamasok, or was acting on behalf of

Neewra or Al Tamasok as a "Merchant."

## A.　　"Principal" Theory of Contractual Liability

　　　　Pursuant to clause 14(4), Joginder would be bound by the bill of lading if he was a

"principal" of Neewra (the "Shipper") or Al Tamasok (the "consignee").  Courts in this District

have consistently upheld the provision in clause 14(4) of Maersk's bill of lading that extends

joint and several liability to principals.  In all of those cases, the principals to whom liability was

extended were officers, directors or shareholders of the shipper.  Maersk, Inc. v. Royal Brands

Int'l, No. 98 Civ. 8396, 2001 U.S. Dist. LEXIS 5308, at *7-8 (S.D.N.Y. May 1, 2001) (majority

shareholders of shippers liable for freight charges); Maersk Inc. v. Atcom Indus., 73 F. Supp. 2d

387, 390-91 (S.D.N.Y. 1999) (sole officer, director and shareholder of shipper qualified as

principal for purposes of clause 14(4)); Maersk Inc. v. Am. Midwest Commodities Export Cos.,

No. 94 Civ. 0475, 1998 U.S. Dist. LEXIS 12219, at *12-13 (S.D.N.Y. Aug. 10, 1998) (president

of shipper liable for freight charges); Maersk Inc. v. Alan Mktg., No. 97 Civ. 3495, 1998 U.S.

Dist. LEXIS 4816, at *4 (S.D.N.Y. Apr. 10, 1998) (same).

In specifying the contours of federal maritime common law agency principles, courts of

this Circuit have looked to the Restatement (Second) of Agency (1958). See, e.g., Dow Chem.

Pac. Ltd. v. Rascator Mar. S.A., 782 F.2d 329, 339-40 (2d Cir. 1986); In re M/V Rickmers

Genoa Litig., 622 F. Supp. 2d 56, 73 (S.D.N.Y. 2009). A basic principle of agency law is that an

agency relationship exists only if the agent is acting on behalf of and subject to the control of the

principal. Restatement (Second) of Agency §§ 14-15.

In this case, there is a genuine issue of material fact as to whether Neewra or Al Tamasok

was acting on behalf of Joginder and was subject to his control. Maersk does not claim that

Joginder was an officer, director or shareholder of the shipper, Neewra. Thus, this case is

different from those in which courts of this District have upheld the validity of clause 14(4). But

even if clause 14(4) can extend more broadly, based on agency principles (as its plain language

suggests), to principals not officially affiliated with the shipper, there is a genuine issue as to

whether Joginder was a principal of Neewra. Joginder is the father of Arween, Neewra's alleged

founder, and, as discussed above, he was *involved* in the Neewra scheme—and, by necessary

implication, with Neewra, Inc. itself. However, viewed in the light most favorable to Joginder,

the evidence establishes only that he was a co-conspirator in the plot, *not* that he actually

controlled the entity Neewra, or that Neewra was acting on his behalf.

With respect to the consignee, Al Tamasok, Maersk asserts, based on the evidence that both Joginder and Al Tamasok were involved with the forged bill of lading, that Joginder was Al Tamasok's owner, officer or director. (Pls.' 56.1 Stmt. ¶ 8.) Although it is undisputed that Al Tamasok presented a forged bill of lading to Maersk, the Remaining Defendants dispute that "[Joginder] ever directed Al Tamasok to do anything." (Defs.' 56.1 Cntrstmt. ¶ 21.) Of course, the Remaining Defendants cannot offer evidence to support their contention, and on the evidence before it, the Court finds it at least plausible that the Al Tamasok operatives who forged and delivered the fraudulent bill were intermediaries acting on Joginder's behalf. However, it is not unreasonable to infer that Al Tamasok could have received its marching orders from someone else (for example, Mohinder). Thus, the Court concludes that there is a genuine issue of material fact as to the nature of any relationship between Joginder and Al Tamasok.

### B.    "Merchant" Theory of Contractual Liability

The other possible ground for finding Joginder liable under the bill of lading is if he was "acting on behalf of" Neewra or Al Tamasok, and was therefore a "Merchant." Unlike the provision in clause 14(4) extending liability to principals, there is no settled law in this Circuit concerning the meaning of a "Merchant" clause like that in Maersk's bill of lading. See In re M/V Rickmers, 622 F. Supp. 2d at 71-72 (noting, in a case involving a substantially identical definition of "Merchant," that courts have differed in their interpretations of such "Merchant" clauses, and that the "Court of Appeals has not addressed the binding effect of Merchant Clauses in bills of lading").

The Court need not pass on the binding effect of the "Merchant" clause in Maersk's bill of lading, because there is a genuine factual issue as to whether Joginder was "acting on behalf of" Neewra or Al Tamasok. Simply put, the record before the Court is sufficiently ambiguous

about the nature of the link between Joginder and Neewra and/or Al Tamasok, such that the Court cannot find at the summary judgment stage that Joginder was specifically acting on behalf of either or both of those entities.

In its summary judgment papers, Maersk appears to assume that if it can prove Joginder participated in the frauds, liability on the maritime contract necessarily follows. That is incorrect. Maersk's bill of lading should be "carefully" if not "restrictively" interpreted, and should be "strictly construed against the carrier." See Polish Steamship, 346 F.3d at 283 (internal quotations omitted); Allied Chem., 775 F.2d at 482. It would not comport with the Second Circuit's rules of construction for bills of lading to conclude that, simply because a defendant participated in a fraudulent scheme *relating to* a cargo shipment governed by a bill of lading, he is automatically bound by and in violation of its terms. Maersk asserted contract claims against several other defendants—for example, the shipper, Neewra; its alleged founder, Arween; and the consignee, Al Tamasok—who are clearly bound by the terms of the contract of carriage. Whether Joginder is similarly bound is an open question.

In sum, there is a genuine issue of material fact as to whether Joginder was a principal and/or "Merchant" for purposes of Maersk's bill of lading, and therefore bound by its terms. Accordingly, the Court holds that Maersk is not entitled to summary judgment on its breach of contract claim against Joginder. The parties' cross-motions for summary judgment on the contract claim are therefore denied.

## V.   RICO

Count VI of the AVC asserts a claim against all of the named defendants seeking civil relief pursuant to 18 U.S.C. § 1964 for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO").  (AVC ¶¶ 127-35.)  A civil RICO plaintiff

must show that the defendant violated the substantive RICO statute, 18 U.S.C. § 1962(a)-(c),

causing injury to plaintiff's business or property.  18 U.S.C. § 1964(c); Spool v. World Child

Int'l Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008).  Such a showing entitles the plaintiff

to treble damages plus costs, including attorney's fees.  18 U.S.C. § 1964(c).

Maersk does not specify under which of the three subsections of § 1962 it claims injury.

(See AVC ¶ 135; Pls.' 56.1 Stmt. ¶ 33.)  To establish a violation of § 1962(a), a plaintiff must

prove an "investment injury"—an injury caused by the defendant's investment of racketeering

income.  Quaknine v. MacFarlane, 897 F.2d 75, 82-83 (2d Cir. 1990).  Here, Maersk does not

allege an investment injury, and the record does not suggest that it suffered one, so § 1962(a)

cannot provide the basis for Maersk's RICO claim.

A violation of § 1962(b) also requires a specific type of injury: an "acquisition" or

"maintenance" injury, which must be distinct from the injury caused by the racketeering activity

itself.  Discon, Inc. v. NYNEX Corp., No. 95 Civ. 7673, 1996 U.S. App. LEXIS 28747, at *22-

23 (2d Cir. Aug. 26, 1996).  Maersk does not allege an acquisition or maintenance injury, and the

record does not suggest that it suffered such an injury; thus, § 1962(b) is likewise inapplicable.

Section 1962(c) provides that it "shall be unlawful for any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity . . . ."  Section 1962(c) is the only possible basis

for Maersk's RICO claim.

To establish a violation of § 1962(c), a plaintiff must prove that it was injured by the

defendant's (1) "conduct" (2) of an "enterprise" (3) through a "pattern" of (4) "racketeering

40

activity." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); City of N.Y. v. Smokes-Spirits.com, Inc., 541 F.3d 425, 439 (2d Cir. 2008).

Maersk also asserts that the Remaining Defendants are liable under § 1962(d) for conspiracy to commit a substantive RICO violation. (See AVC ¶ 134; Pls.' 56.1 Stmt. ¶ 32.) Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of [§ 1962(a)-(c)]." To establish a RICO conspiracy, a plaintiff must prove that each defendant agreed to commit at least two predicate acts of racketeering in furtherance of an endeavor which, if completed, would satisfy all the elements of a substantive RICO violation. See Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244-45 (2d Cir. 1999). Thus, if a plaintiff fails to prove a substantive RICO violation, the RICO conspiracy claim necessarily fails as well. Discon, 1996 U.S. App. LEXIS 28747, at *28; Edmonds v. Seavey, No. 08 Civ. 5646, 2009 U.S. Dist. LEXIS 84397, at *26-28 (S.D.N.Y. Sept. 15, 2009).

The Remaining Defendants are in no position to assert that they are entitled to summary judgment on Maersk's RICO claim. The evidence cited above establishing their membership in a civil conspiracy to defraud Maersk certainly supports Maersk's allegation that it was victimized by a criminal racketeering enterprise. Nor do the Remaining Defendants present any specific facts refuting the existence of such an enterprise (or their participation therein). That said, establishing a RICO violation requires more than proof of common-law fraud or conspiracy to defraud. See Cofacredit, 187 F.3d at 242 (noting that "[m]ere common-law fraud does not constitute racketeering activity for RICO purposes"); Gross v. Waywell, 628 F. Supp. 2d 475, 488 (S.D.N.Y. 2009) (stating that "only widespread frauds or other major criminal offenses," not "garden-variety state common-law causes of action," "are subject to [RICO's] severe penalties"); Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998) (characterizing a civil RICO

suit as "the litigation equivalent of a thermonuclear device," such that "a court's focus must be to ensure that RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate the acts of racketeering") (internal quotations omitted).

Here, certain aspects of the record are not sufficiently developed to allow Maersk to establish the elements of its RICO claim. This may very well be attributable to the Remaining Defendants' refusal to participate meaningfully in discovery—it would seem difficult, for example, to determine with any certainty whether the Remaining Defendants participated in the operation or management of a criminal enterprise when they have refused to be deposed. The Court also notes that the parties' briefs do nothing more than make conclusory assertions and allegations in connection with Maersk's RICO claim. Not one of the six briefs submitted in support of or opposition to the summary judgment cross-motions even sets forth the elements of a civil RICO claim, much less engages in any discussion of whether they have been established. In any event, having examined the record before it, the Court concludes that there are genuine issues of material fact as to whether Joginder, Parkar and/or Help Line violated RICO. The Court identifies the principal factual issues below.

## A.      Pattern of Racketeering Activity

Section 1961(1) defines "racketeering activity" as any of a series of specifically enumerated criminal offenses. A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). To prove a pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related" and that they "amount to or pose a threat of continued criminal activity." H. J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). Relatedness exists when the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are

interrelated by distinguishing characteristics and are not isolated events." Id. at 240 (internal quotations omitted).  Continuity can be either "open-ended" or "closed-ended."  First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 180 (2d Cir. 2004).  Open-ended continuity requires the "threat of continuing criminal activity beyond the period during which the predicate acts were performed."  Cofacredit, 187 F.3d at 242.  Closed-ended continuity requires "predicate acts extending over a substantial period of time," with two years generally considered the minimum duration necessary.  First Capital, 385 F.3d at 181 (internal quotations omitted).

Maersk alleges predicate acts of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  (AVC ¶¶ 128, 130-33; Pls.' 56. 1 Stmt. ¶ 30; RICO Case Stmt., July 30, 2007 ("RICO Stmt."), at 8-9, 11.)  The elements of mail and wire fraud are (1) the use of interstate mail or wires in furtherance of (2) a scheme to defraud (3) with money or property as the object.  United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000).  To prove that the use of the mail or wires was "in furtherance of" the fraudulent scheme, a plaintiff must show that (1) the defendant "caused" the mailing or use of the wires—that is, "acted 'with knowledge that use of the mails [or wires] will follow in the ordinary course of business, or . . . can reasonably be foreseen, even though not actually intended'"—and (2) the mailing or use of the wires "was for the purpose of executing the scheme or, in other words, 'incident to an essential part of the scheme.'"  United States v. Bortnovsky, 879 F.2d 30, 36 (2d Cir. 1989) (quoting Pereira v. United States, 347 U.S. 1, 8-9 (1954)); In re Sumitomo Copper Litig., 995 F. Supp. 451, 455 (S.D.N.Y. 1998).

Maersk does not specifically identify the individual acts of mail and/or wire fraud allegedly committed by Joginder, Parkar and/or Help Line.  However, interstate (or international) mail and wires appear to have been used on numerous occasions to carry out the fraudulent schemes.  For example, the record indicates that Neewra/Arween used the mail and wires in

43

connection with the alleged Neewra Fraud (see, e.g., Ghirardani Decl. Ex. 23 (fax from New York-based Neewra to Maersk's New Jersey office regarding fraudulent bill of lading Maersk had received from Al Tamasok), and that Rednihom/Mohinder sent Maersk Kuwait several faxes from New York in connection with the Rednihom Fraud in late 1999 and early 2000 (see, e.g., Pinto Stmt. Ex. 40 (fax from Mohinder to Maersk asking it to accept payment tendered by Help Line)). There are genuine issues as to whether Maersk can establish each element of mail and/or wire fraud with respect to these and other transmissions—in particular, that they were "caused" by Joginder, Parkar and/or Help Line, and were made "for the purpose of executing the scheme." Further, there are genuine factual issues as to whether the predicate acts of wire and/or mail fraud (if any) were sufficiently related and continuous for RICO purposes.

Maersk also alleges witness intimidation as a predicate act for the RICO claim against Joginder. (RICO Stmt. at 9; Pls.' 56.1 Stmt. ¶ 31.) The Remaining Defendants vigorously deny that allegation. (Defs.' 56.1 Cntrstmt. ¶ 31.) Elvis Pinto avers that, following the execution of his Statement, his wife was attacked while vacationing in India. (Pinto Decl. ¶ 6.) Pinto believes that the attack was connected to his investigation of the Neewra and Rednihom Frauds, and expressed fear for his safety. (Id. ¶¶ 6-7.) In December 2005, when Ghirardani and a Maersk attorney traveled to Kuwait for Mohinder's deposition, the attorney's belongings were apparently searched while he was out of his hotel room. (Ghirardani Decl. ¶ 151.) Witness intimidation is a serious charge; but, given the nature of the frauds perpetrated against Maersk, the Court does not find it implausible. However, Pinto's allegation is entirely speculative, and Maersk does not even attempt to tie Joginder to the ransacking in Kuwait. Thus, the alleged witness intimidation, absent further *factual* development, cannot serve as a predicate for Maersk's RICO claim.

## B.    Enterprise

Section 1961(4) defines "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). Courts in this Circuit look to the "hierarchy, organization and activities" of an "association-in-fact" to determine whether "its members functioned as a unit." See United States v. Coonan, 938 F.2d 1553, 1560-61 (2d Cir. 1991); Rothberg v. Chloe Foods Corp., No. 06 Civ. 5712, 2007 U.S. Dist. LEXIS 53914, at *50-51 (E.D.N.Y. July 25, 2007).

However, the enterprise must exist "separate and apart from the pattern of activity in which it engages," Turkette, 452 U.S. at 583, and it must be an organization distinct from the conduct of the culpable defendants comprising it, see Riverwoods Chappaqua Corp. v. Marine Midland Bank, 30 F.3d 339, 344 (2d Cir. 1994). In other words, the association among a group of defendants that necessarily results from a pattern of racketeering does not, without more, constitute a RICO enterprise; the enterprise must have "an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering." Schmidt, 16 F. Supp. 2d at 349.

The evidence establishing that the Remaining Defendants engaged in a common-law conspiracy to defraud Maersk provides support for Maersk's claim that Joginder, Parkar and Help Line were part of a RICO enterprise. For example, Joginder, who was involved in the alleged Neewra Fraud, was the father of Arween; Joginder owned, operated or controlled Blue

45

Bird, the corporate sponsor of Parkar, who filed the Neewra claim in Kuwaiti court; the Rednihom Fraud mirrored and occurred just a few months after the Neewra episode; Help Line sought to divert the fraudulent shipment on behalf of Mohinder, who is Joginder's brother—and on, and on. However, that the Remaining Defendants were members of a common-law conspiracy to commit fraud does *not* necessarily mean they were members of a RICO *enterprise*. See id. at 350 (association-in-fact must have "continuity or distinct structure beyond the alleged conspiracy" to defraud to constitute RICO enterprise) (internal quotations omitted). In other words, proof that the Remaining Defendants conspired to defraud Maersk—that is, evidence of a corrupt agreement, an overt act, and commission of the underlying fraud—does not prove the existence of an enterprise that functioned as a unit with an ascertainable structure separate and apart from any pattern of activity in which it engaged.

On the other hand, this is not a case where Maersk is making "a creative effort to stretch common law fraud into a RICO claim." See Baisch v. Gallina, 346 F.3d 366, 371 (2d Cir. 2003) (internal quotations omitted); Schmidt, 16 F. Supp. 2d at 346 ("[C]ourts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.") (internal quotations omitted). The undisputed facts easily permit the inference that Joginder, Parkar and Help Line were members of a mafia-like RICO enterprise run by the Singh Sahni family that victimized Maersk in a series of elaborate frauds. However, when the record is viewed in the light most favorable to the Remaining Defendants, it also permits a reasonable inference that, although Joginder, Parkar, Help Line and others conspired to defraud Maersk, there was no "enterprise" functioning as a unit with a structure distinct from the fraudulent activity.

Maersk argues that the "findings" in the default judgments entered against the five Defaulting Defendants establish the existence of a RICO enterprise as the "law of the case." (Pls.' Mem. at 4-6.) Maersk's reliance on the law of the case doctrine is misplaced: the law of the case doctrine only applies to "issues that have actually been decided." 18 Moore's Federal Practice § 134.20; see United States v. Hatter, 532 U.S. 557, 566 (2001) ("The law of the case doctrine presumes a hearing on the merits."); DeWeerth v. Baldinger, 38 F.3d 1266, 1271 (2d Cir. 1994). Here, the default judgments were entered against the Defaulting Defendants for failure to respond, and in no way constitute decisions on the merits of Maersk's claims. And, while Magistrate Eaton properly "accept[ed] as true all of the facts alleged in the [AVC]" in his April 9, 2008 Report and Recommendation, he did so merely for purposes of determining damages. (Docket No. 157 at 2.) Thus, while entry of the default judgments may have presumptively established the sufficiency of Maersk's *pleadings*, see Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Restaurant Employees Int'l Union, No. 00 Civ. 3613, 2004 U.S. Dist. LEXIS 17093, at *54-55 (S.D.N.Y. Aug. 27, 2004), it does not provide a basis for awarding Maersk summary judgment.[9]

## C.    Participation in the Conduct of the Enterprise's Affairs

Section 1962(c) also requires that each defendant "conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs." This means that the defendant must have had "some part in directing [the enterprise's] affairs." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993). In Reves, the Supreme Court adopted the "operation or management" test, which requires a plaintiff to show that the defendant "participated in the operation or management of the enterprise." Id. at 179, 183; see First Capital, 385 F.3d at 176. However, "RICO liability is

---

[9] Maersk also asserts that the default judgments establish the occurrence of the underlying frauds as the law of the case. (Pls.' Mem. at 5.) That argument fails for the same reasons just stated. It is also unnecessary at least with respect to the Rednihom and Tires Frauds, as the undisputed facts demonstrate that they occurred.

47

not limited to those with primary responsibility for the enterprise's affairs." Reves, 507 U.S. at

179. A defendant may be "liable under RICO if he or she has 'discretionary authority in carrying

out the instructions of the [conspiracy's] principals.'" Baisch, 346 F.3d at 376 (quoting United

States v. Diaz, 176 F.3d 52, 93 (2d Cir. 1999)). On the other hand, "the simple taking of

directions and performance of tasks that are 'necessary or helpful' to the enterprise, without

more, is insufficient to bring a defendant within the scope of § 1962(c)." United States v. Viola,

35 F.3d 37, 41 (2d Cir. 1994).

Although the "operation or management" test is a low hurdle to clear at the *pleading*

stage, Smokes-Spirits.com, 541 F.3d at 449, it is ultimately a "difficult test to satisfy," Schmidt,

16 F. Supp. 2d at 346 (quoting LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F.

Supp. 1071, 1090 (S.D.N.Y. 1996)). As the Second Circuit stated in Allen, 155 F.3d at 42:

> Unless a civil RICO defendant is indisputably directing the affairs
> of the enterprise, his commission of crimes that advance its
> objectives must be assessed by a fact-finder to determine whether
> or not his criminal activity, assessed in the context of all the
> relevant circumstances, constitutes participation in the operation or
> management of the enterprise's affairs.

Here, the undisputed facts once again permit competing reasonable inferences as to

whether Joginder, Parkar and/or Help Line participated in the operation or management of a

RICO enterprise. Joginder may have been the principal of any such enterprise; or he may have

simply attempted to bribe Pinto at Mohinder's behest, and then lied to protect Mohinder after the

April 2004 Meeting. Parkar may have had broad discretionary authority in filing the allegedly

fraudulent Neewra claim and later distributing the $1.86 million; or he may have merely been a

lackey following instructions from those above. And Help Line, like Parkar, may have exercised

considerable discretionary authority in its attempt to divert the fraudulent Rednihom shipment; or

it may have merely been performing a task necessary and helpful to the fraud. The record

certainly does not make it clear that Joginder, Parkar and/or Help Line was "indisputably directing the affairs of the enterprise." Allen, 155 F.3d at 42.

In sum, there are genuine issues of material fact regarding this and several other elements of Maersk's substantive RICO claim, making summary judgment inappropriate for either Maersk or the Remaining Defendants.

### D.    RICO Conspiracy

As stated above, a RICO conspiracy claim under § 1962(d) requires proof of each element of a substantive RICO violation. See Cofacredit, 187 F.3d at 244-45.[10] Thus, if Maersk cannot prove its substantive RICO claim, its RICO conspiracy claim would necessarily fail as well. See Discon, 1996 U.S. App. LEXIS 28747, at *28; Edmonds, 2009 U.S. Dist. LEXIS 84397, at *26-28. The genuine factual issues concerning the elements of the substantive RICO claim (and, in particular, the issue of whether a RICO enterprise existed) make summary judgment similarly inappropriate on the RICO conspiracy claim.

Accordingly, the Court denies the parties' cross-motions for summary judgment on Maersk's substantive RICO claim and its RICO conspiracy claim; thus, summary judgment is denied as to Count VI of the AVC.

### VI.    Personal Jurisdiction

In its March 27, 2008 Opinion, the Court denied the Remaining Defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), holding that Maersk had satisfied its "pre-discovery" burden of making a prima facie showing of the Court's personal jurisdiction. Maersk, 554 F. Supp. 2d at 446-50. The Court suggested that the Remaining Defendants could

---

[10] The Court notes that the "operation or management" test does not apply to a claim for RICO conspiracy. United States v. Pizzonia, 577 F.3d 455, 462 n.4 (2d Cir. 2009). A defendant whose role in the enterprise does not involve operation or management may be liable under § 1962(d) "where he 'know[s] the general nature of the conspiracy and that the conspiracy extends beyond [his] individual role.'" Id. (quoting United States v. Zichettello, 208 F.3d 72, 99 (2d Cir. 2000)).

49

renew their Rule 12(b)(2) motions after merits discovery that "should reveal more precisely [their] role (or lack of one) in the frauds." See id. at 448. Now, after barely participating in any merits discovery—and, in particular, after refusing to appear for their depositions—the Remaining Defendants reprise their Rule 12(b)(2) arguments, asserting that the Court should apply the stricter, "post-discovery" standard and dismiss the AVC for lack of personal jurisdiction (Defs.' Mem. at 12-15). The Remaining Defendants' Rule 12(b)(2) motion is once again denied.

A plaintiff "bears the burden of establishing that the court has jurisdiction over the defendant when served with a Rule 12(b)(2) motion to dismiss." Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001). As stated more fully in the March 27, 2008 Opinion, when a court rules on a Rule 12(b)(2) motion based on pleadings and affidavits, the plaintiff need only make a prima facie showing of personal jurisdiction. DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001); Whitaker, 261 F.3d at 208. This is what the Court referred to as the "pre-discovery" standard. Maersk, 554 F. Supp. 2d at 440. When the court is presented with evidence—for example, exhibits and deposition testimony—in support of and opposition to a Rule 12(b)(2) motion, the plaintiff must establish jurisdiction by a preponderance of the evidence. This is what the Court refered to as the "post-discovery" standard. See id.

In the March 27, 2008 Opinion, the Court held that the pre-discovery standard applied to the Remaining Defendants' Rule 12(b)(2) motions, partly because Maersk had not had an opportunity to depose Joginder, Parkar or Help Line. See id. By contrast, Maersk *had* deposed Mohinder, and submitted voluminous exhibits in opposition to his Rule 12(b)(2) motion; the Court thus applied the post-discovery standard to Mohinder's motion. Id. The Remaining Defendants have denied Maersk the opportunity to depose them, and have generally prevented

Maersk from being in an appreciably better position to prove jurisdiction today than it was in March 2008. The Remaining Defendants nonetheless assert that the Court should apply the heightened, post-discovery standard to their renewed Rule 12(b)(2) motion.

But the Court will not reward the Remaining Defendants' wrongful refusal to participate in discovery. The Court holds that the pre-discovery standard still applies to the Remaining Defendants' Rule 12(b)(2) motion and, for the same reasons set forth in the March 27, 2008 Opinion, that Maersk has made the requisite showing.

However, even if the *post*-discovery standard now applies, Maersk satisfies its burden of establishing personal jurisdiction by a preponderance of the evidence. The affidavits and testimony of Maersk's witnesses support the Court's pre-discovery finding that it has jurisdiction over Joginder, Parkar and Help Line. In addition, the JPTO and the parties' Rule 56.1 statements have established that the following facts, among others, are undisputed: the Rednihom Fraud occurred, with events taking place in New York and Kuwait; in Kuwait, Help Line attempted to divert the fraudulent Rednihom shipment on behalf of New York-based Rednihom; Joginder was an owner or operator of Help Line; and Parker acted on behalf of Help Line in seeking the diversion. In light of these and the other facts developed to date, the Court has little trouble concluding that Maersk has established personal jurisdiction over the Remaining Defendants by a preponderance of the evidence. In other words, it is more likely than not that Joginder, Parkar and Help Line were co-conspirators with the New York-based defendants in the commission of the alleged frauds, and are thus subject to jurisdiction pursuant to New York's long-arm statute, N.Y. C.P.L.R. § 302.

Accordingly, the Court denies the Remaining Defendants' renewed Rule 12(b)(2) motion to dismiss the AVC for lack of personal jurisdiction.

## VII.   Discovery Sanctions

The Remaining Defendants wrap into their motion for summary judgment an objection to the discovery sanctions imposed by Magistrate Eaton, which is neither timely nor meritorious.

Under Federal Rule of Civil Procedure 72(a), when a magistrate judge issues an order deciding a nondispositive pretrial matter, a party must file any objection to the order within *fourteen days* of being served with a copy. "The district judge in the case must consider *timely* objections and modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a) (emphasis added).

Here, the Kuwait-based Remaining Defendants argue first that Magistrate Eaton erred in requiring them to travel to New York for their depositions. (Defs.' Mem. at 16.) Magistrate Eaton issued that decision in an order dated September 17, 2008, which was served via ECF on counsel for the Remaining Defendants that day. (Docket No. 175.) Second, the Remaining Defendants contend that Magistrate Eaton's sanctions were unwarranted. (Defs.' Mem. at 16-17.) Magistrate Eaton imposed those sanctions in an order dated March 6, 2009, which was served via ECF on counsel for the Remaining Defendants that day. (Docket No. 178.) The Remaining Defendants filed their summary judgment motion on March 31, 2009, which was more than fourteen days after Magistrate Eaton's September 17, 2008 and March 6, 2009 orders. The Remaining Defendants' objections are therefore denied as untimely pursuant to Rule 72(a).

Although it is unnecessary to the Court's conclusion, the Court adds that the Remaining Defendants' objections to Magistrate Eaton's sanctions are also meritless. Magistrate Eaton's sanctions, while severe, are reasonable and carefully considered. Joginder, Parkar and Help Line displayed a startling disregard for the authority of this Court, and Magistrate Eaton sanctioned them accordingly. They have no cause to complain.

## VIII.  Maersk's Motion to Strike the Remaining Defendants' Jury Demand

In a third motion, separate from the parties' cross-motions for summary judgment,

Maersk moves to strike the Remaining Defendants' demand for a jury trial.  Maersk contends

that this is an "admiralty or maritime matter," such that "there is no right to a trial by jury."

(Mem. in Supp. of Mot. to Strike Jury, Apr. 7, 2009 ("Pls.' Jury Strike Mem."), at 1.)  For the

reasons stated below, Maersk's motion is denied.  All of the remaining claims on which the

Court has not granted summary judgment—fraud against Joginder and Parkar, breach of contract

against Joginder, and RICO against all three Remaining Defendants—should be tried before a

jury.

### A.    Applicable Constitutional and Statutory Provisions

The Seventh Amendment to the United States Constitution provides: "In Suits at common

law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be

preserved . . . ."  The Seventh Amendment protects the fundamental right to a jury trial for

actions at law, not those in equity.  Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 41 (1989).  A

two-step inquiry is required to determine when the jury right attaches: first, the court must

consider whether the action would have been deemed legal or equitable in 18th-century England

before the merger of courts of law and equity; second, the court must "examine the remedy

sought and determine whether it is legal or equitable in nature."  Id. at 42 (quoting Tull v. United

States, 481 U.S. 412, 417-18 (1987)); Pereira v. Farace, 413 F.3d 330, 337 (2d Cir. 2005).  The

second part of this test (the nature of the remedy) is more important than the first.

Granfinanciera, 492 U.S. at 42.

The Seventh Amendment right to a jury does not extend to claims brought within a

federal court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, which gives

district courts exclusive jurisdiction of "Any civil case of admiralty or maritime jurisdiction,

saving to suitors in all cases all other remedies to which they are otherwise entitled." Under

Federal Rule of Civil Procedure 9(h), "If a claim for relief is within the admiralty or maritime

jurisdiction and also within the court's subject-matter jurisdiction on some other ground, the

pleading may designate the claim as an admiralty or maritime claim for purposes of Rules 14(c),

38(e), and 82 . . . . A claim cognizable only in the admiralty or maritime jurisdiction is an

admiralty or maritime claim for those purposes, whether or not so designated." Rule 38(e)

expressly provides that the Federal Rules of Civil Procedure "do not create a right to a jury trial

on issues in a claim that is an admiralty or maritime claim under Rule 9(h)."

Here, the first paragraph of both the original verified complaint and the AVC make the

following allegation as to this Court's subject-matter jurisdiction:

> This is an admiralty and maritime matter within the meaning of
> Rule 9(h) of the Federal Rules of Civil Procedure in that it involves
> claims related to the transportation of goods by sea in connection
> with ocean bills of lading. The case also falls within the Court's
> admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.
> Jurisdiction is also proper under 18 U.S.C. § 1961 and is therefore
> within the Court's federal question jurisdiction pursuant to 28
> U.S.C. § 1331.[11]

## B.     There Is No Right to a Jury on the Maritime Contract Claim

Maersk's breach of contract claim against Joginder lies within the Court's admiralty

jurisdiction. "The admiralty jurisdiction of federal courts embraces two principal subjects—

maritime contracts and maritime torts." Berwind-White Coal Mining Co. v. New York, 135 F.2d

443, 446 (2d Cir. 1943). As established above, supra at Discussion IV, the bill of lading for the

Neewra shipment is plainly a "maritime contract" pursuant to the rule recently articulated by the

Supreme Court in Kirby. See Norfolk S. Ry. Co. v. James N. Kirby, Pty. Ltd., 543 U.S. 14, 22-

---

[11] Neither Maersk nor the Remaining Defendants assert that this case is before the Court on diversity grounds. (Pls.'
Jury Strike Mem. at 3 n.1; Defs.' Mem. in Opp. to Pls.' Jury Strike Mot., Apr. 23, 2009, at 3.)

23, 27 (2004). Maersk's claim to enforce that contract of carriage therefore falls squarely within the Court's admiralty jurisdiction. See id.; A.P. Moller-Maersk A/S v. Ocean Express Miami, 550 F. Supp. 2d 454, 461 (S.D.N.Y. 2008). The Court construes the first paragraph of the AVC (which is incorporated by reference in each of the seven Counts) as identifying the breach of contract claim as a maritime claim for purposes of Rule 9(h). Thus, regardless of whether Maersk's maritime contract claim is also within the Court's subject-matter jurisdiction on any other ground, Joginder has no right to a jury trial on the breach of maritime contract claim. The same is not true of the fraud and RICO claims.

## B.     The Jury Right Attaches to the Civil RICO Claim

The Court's admiralty jurisdiction does *not* extend to Maersk's civil RICO claim. RICO is a federal criminal statute that also provides civil remedies; it is wholly unrelated to a district court's admiralty jurisdiction over maritime torts and contracts. The civil RICO claim lies within the Court's federal question jurisdiction, not its admiralty jurisdiction. Maersk effectively acknowledges as much in its AVC by taking care to allege federal question jurisdiction pursuant to RICO and 28 U.S.C. § 1331, in addition to admiralty jurisdiction under § 1333.[12]

Maersk does not go so far as to expressly argue that the Court's admiralty jurisdiction embraces the RICO claim. Instead, Maersk repeats the generalized assertion that because this action "involves claims related to the transportation of goods by sea in connection with ocean bills of lading," *all* of its claims "fall[] within the Court's admiralty and maritime jurisdiction." (See AVC ¶ 1; Pls.' Jury Strike Mem. at 1; Reply Mem. in Further Supp. of Mot. to Strike Jury, Apr. 29, 2009 ("Pls.' Jury Strike Reply"), at 2-3.)

---

[12] Maersk's contention in its brief that admiralty jurisdiction is "the sole basis for subject matter jurisdiction" (Pls.' Jury Strike Mem. at 2) is not only incorrect, but flatly contradicts the plainly stated jurisdictional allegations in the opening paragraph of its AVC.

In support of this assertion, Maersk points to Judge Sweet's recent decision in Ocean Express Miami. In that case, the defendant argued that Maersk's claims were common-law tort claims outside of the court's admiralty jurisdiction. Ocean Express Miami, 550 F. Supp. 2d at 461. However, Judge Sweet concluded that because "the central allegation of the [complaint] is that . . . [defendant] violated the parties' contract of carriage—specifically, the terms of the Maersk Bill of Lading," and because all of Maersk's claims arose directly from and relied on the alleged breach, the claims fell within the court's admiralty jurisdiction. See id.

Here, the "central allegation" of the AVC is assuredly *not* that the defendants breached the bill of lading for the Neewra shipment—Maersk's breach of contract claim spans three paragraphs and less than a single page in its lengthy pleading. Instead, the central allegation is that the defendants engaged in a complex, multi-faceted, international conspiracy to defraud (which necessarily involved the use of fraudulent bills of lading). In any event, Ocean Express Miami in no way suggests that a court's admiralty jurisdiction could extend to a civil RICO action. The RICO claim does not "arise under" or "rely" on the terms of the Maersk bill of lading; it is a statutory claim against the Remaining Defendants for participating in an enterprise engaged in a pattern of racketeering activity—proof of which might very well include only indirect reference to the breach of the Neewra bill of lading.

Further, Maersk's argument loses sight of the fact that the applicability of Rule 9(h) is determined *claim by claim*, not case by case. Rule 9(h) allows a pleading to designate any "*claim* for relief" that is within the court's admiralty or maritime jurisdiction. Fed. R. Civ. P. 9(h)(1) (emphasis added); see Red Star Towing & Transp. Co. v. The Cargo Ship "Ming Giant", 552 F. Supp. 367, 375 n.6 (S.D.N.Y. 1982) ("It is not the whole action but the *claim* that may be designated as being within the admiralty jurisdiction of the court."). Thus, Rule 9(h) does not

apply to *all* of the different causes of action in Maersk's multi-claim AVC merely because this is, as a general matter, a "case" that "involves" maritime-related activity. (AVC ¶ 1.) Nor can Maersk identify the RICO claim as an admiralty claim for purposes of Rule 9(h) (and Rule 38(e)), since the RICO claim is not within the Court's admiralty jurisdiction in the first place. In short, Rules 9(h) and 38(e) do not apply to Maersk's civil RICO claim, which is before the Court on the independent jurisdictional ground of federal question. Having established that the RICO claim is not subject to Rule 38(e), the Court turns to the question of whether the Seventh Amendment provides the right to a trial by jury on that claim.

The Remaining Defendants do have a Seventh Amendment right to a jury trial on Maersk's civil RICO claim seeking damages pursuant to § 1964(c). See NSC Int'l Corp. v. Ryan, 531 F. Supp. 362 (N.D. Ill. 1981). In Ryan, one of the very few cases to explicitly address this question, the plaintiff, like Maersk here, brought an action for treble damages pursuant to § 1964(c). Id. at 362. In conducting the traditional two-step inquiry to determine whether the jury right attaches to such a claim, the Ryan court first concluded that a civil RICO claim closely resembles an action sounding in tort that would have been recognized as legal in 18th-century England. See id. at 363. More importantly, the court determined that the relief authorized by § 1964(c) is distinctly legal, not equitable, in nature. Id. at 363-64. Thus, civil RICO actions under § 1964(c) are legal, and the jury right attaches. Id.; see Molloy v. Primus Auto. Fin. Servs., 247 B.R. 804, 809 (C.D.C. 2000) ("It is undisputed that [defendant] has the right to a trial by jury on plaintiff's RICO . . . claims."). In sum, there can be no dispute that the Remaining Defendants have a Seventh Amendment right to a jury trial on Maersk's civil RICO claim.

## C.    The Jury Right Attaches to the Fraud Claims

The Court's admiralty jurisdiction also does not extend to Maersk's remaining fraud

claims against Joginder and Parkar. The Supreme Court has enunciated a two-part test for

determining whether a tort claim falls within a federal court's admiralty jurisdiction. Jerome B.

Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995). First, the alleged

tort must have occurred on "navigable water" (the "location" or "situs" requirement). Id.

Second, the activity giving rise to the incident must have had a substantial relationship to

traditional maritime activity, such that the incident had a potentially disruptive influence on

maritime commerce (the "connection" or "status" requirement). Id.; Vasquez v. GMD Shipyard

Corp., 582 F.3d 293, 298 (2d Cir. 2009).

To determine if the situs requirement is satisfied, a court must "determine whether the

tort occurred on navigable water or whether injury suffered on land was caused by a vessel on

navigable water." Grubart, 513 U.S. at 534. A fraud claim, like any other tort claim, does not

fall within a court's admiralty jurisdiction if the situs requirement is not met. E.g., Smith v.

Mitlof, 198 F. Supp. 2d 492, 500 & n.11 (S.D.N.Y. 2002) (finding that admiralty jurisdiction did

not extend to fraud claim arising out of misrepresentations that were made on land, and rejecting

plaintiffs' contention that a fraud claim need only satisfy the status requirement to fall within a

court's admiralty jurisdiction).

Here, Maersk's fraud claims against Joginder and Parkar fail to satisfy the situs

requirement. The alleged Neewra Fraud did not take place on navigable waters (nor does this

case involve an injury suffered on land but caused by a vessel). Numerous misrepresentations

allegedly occurred *before* the Neewra cargo left New Jersey and *after* it arrived in Kuwait, but

the only activity that occurred on the high seas was the uneventful transport of twenty wooden crates.

Accordingly, the Court finds that the Neewra Fraud claims are common-law fraud claims that fall outside the Court's admiralty tort jurisdiction. It goes without saying that the Seventh Amendment right to a jury trial attaches to common-law fraud claims. Thus, Joginder and Parkar have the right to a jury on the Neewra-based fraud claims.

## D.   The Remaining Claims Will Be Tried Before a Jury

The Court is thus presented with the question of how to resolve Maersk's motion given the conflict between Maersk's non-jury/admiralty claim and its jury claims. For the reasons stated below, the Court concludes that all of the remaining claims should be tried to a jury.

Critical to the Court's conclusion is the Supreme Court's reminder that while "the Seventh Amendment does not require jury trials in admiralty cases, neither that Amendment nor any other provision of the Constitution forbids them. Nor does any statute of Congress or Rule of Procedure, Civil or Admiralty, forbid jury trials in maritime cases." Fitzgerald v. U.S. Lines Co., 374 U.S. 16, 20 (1963). In Fitzgerald, the plaintiff, who alleged he had been injured in an accident aboard the defendant's ship, asserted a negligence claim under the Jones Act, which expressly provides for a jury trial as of right, along with claims for unseaworthiness and for maintenance and cure, both traditional admiralty causes of action for which a jury trial is *not* required. Id. at 17. The plaintiff demanded a jury on all three claims. Id. The Court, noting that the claims were "based on one unitary set of circumstances" and "depend[ed] in large part upon the same evidence," concluded that splitting the case between judge and jury would "unduly complicate[] and confuse[] a trial," such that only "one trier of fact should be used." Id. at 18-

19, 21. Because the Jones Act claim required a jury trial, the Court determined that the claims should all be tried before a jury—"a time-honored institution in our jurisprudence." Id. at 21.

Fitzgerald has come to stand for the following general rule: when admiralty claims are joined in an action with legal claims that normally carry the right to a jury trial, the court may properly submit *all* claims to a jury. See In re Korean Air Lines Disaster of Sept. 1, 1983, 798 F. Supp. 755, 761 (E.D.N.Y. 1992) ("KAL"); Red Star Towing, 552 F. Supp. at 371; see also 8 Moore's Federal Practice § 38.10 ("Joinder of admiralty claims with legal claims may result in the jury trial of all claims under appropriate circumstances."). In other words, "parties have no right to a non-jury trial on all of the issues in an admiralty case if considerations require otherwise." In re Great Lakes Dredge & Dock Co., 895 F. Supp. 604, 611 (S.D.N.Y. 1995) (citing Fitzgerald, 374 U.S. at 20); Red Star Towing, 552 F. Supp. at 371 ("[Fitzgerald] established that a litigant in admiralty is not entitled as a matter of right to a non-jury trial . . . .")

Furthermore, when non-jury admiralty claims are joined with legal claims carrying a jury right, the constitutional right to a jury *should* prevail. See Mayer v. Cornell Univ., 909 F. Supp. 81, 85 (N.D.N.Y. 1995) (stating "general rule" that "when admiralty claims are joined with claims which carry the right to a jury, the right to a jury prevails"); In re Complaint of Berkley Curtis Bay Co., 569 F. Supp. 1491, 1494 (S.D.N.Y. 1983) ("[W]here the nonjury admiralty tradition and a plaintiff's jury right conflict, the jury right must prevail."); Parsell v. Shell Oil Co., 421 F. Supp. 1275, 1276-77 (D. Conn. 1976) (holding, in action involving single claim, that if claim sounded only in admiralty, there would be no right to a jury trial, but if federal question was present as "a separate and independent basis for federal jurisdiction," then "the jury demand must be honored"); see also 8 Moore's Federal Practice § 38.32 ([W]hen nonadmiralty and admiralty claims are so intertwined as to require trial by a single fact finder, the constitutionally

protected jury trial right in civil claims outweighs the tradition of non-jury trials in admiralty actions, and a jury trial of all claims should be ordered.")

Red Star Towing and KAL are especially instructive. In Red Star Towing, the defendants moved to strike the plaintiff's jury demand, arguing that because her claims were litigated as part of a maritime limitation proceeding, she did not have the right to a jury, even if she might have had a jury right on her wrongful death claims had they been litigated outside the limitation proceeding. 552 F. Supp. at 371. Then-district court Judge Leval, relying on Fitzgerald, rejected that argument, concluding that "the proper exercise of discretion favors jury trial." Id. Judge Leval reached the conclusion that the jury demand should be "give[n] precedence" partly because the "weight and importance" of the claims that might have otherwise been tried before a jury was greater than that of the non-jury claims at issue in the limitation proceeding. See id.

Judge Leval also considered one defendant's argument that because plaintiff had pled her death claims against it under the Death on the High Seas Act ("DOHSA"), which does not require a jury trial, both her DOHSA and her Jones Act claim—which does carry a jury right— must be tried without a jury. Id. at 372. Judge Leval disagreed, holding that both claims could be tried together before a jury and stating that the "Supreme Court's Fitzgerald decision seems fairly to imply that the general law of admiralty holds no obstacle and indeed encourages such a procedure." Id. at 374.

Similarly, in KAL, plaintiffs asserted legal claims under the Warsaw Convention together with admiralty claims under DOHSA. See 798 F. Supp. at 756. Defendant KAL moved to strike plaintiffs' jury demand on the ground that that there is no jury right under DOHSA, and that plaintiffs therefore were not entitled to a jury trial notwithstanding the existence of another cause of action that would otherwise support a jury demand. See id. at 759-60. The court, recognizing

"the rule that when claims carrying a right to jury trial are joined with admiralty claims and arise out of the same transaction or occurrence, all claims may be tried to a jury," denied KAL's motion. Id. at 757 (internal quotations omitted). Chief Judge Platt held that "plaintiffs have claims cognisable under the Warsaw Convention that sound in law and to the extent plaintiffs have claims sounding in admiralty, all of plaintiffs' claims may be tried before a jury." Id. at 761-62.

The Court finds additional support for its decision to try Maersk's remaining claims before a jury from cases that have found it appropriate to consolidate an action at law with an admiralty action in a single *jury* trial. See, e.g., Parsons Mills, Inc. v. Companhia Portuguese de Transportes Maritima, 82 F.R.D. 331 (S.D.N.Y. 1978); Blake v. Farrell Lines, Inc., 417 F.2d 264 (3d Cir. 1969). The Parsons Mills court, relying on the principle of Fitzgerald, found that an action at law and an admiralty suit arising out of the same events and involving common factual issues, should be consolidated in a jury trial for the sake of efficiency. See 82 F.R.D. at 333. In Blake, the Third Circuit similarly concluded that it was proper to consolidate in a single jury trial a longshoreman's negligence diversity suit for damages with the shipowner's subsequent and separate action in admiralty for indemnity. 417 F.2d at 266-67.[13]

In this case, four important considerations make it particularly appropriate to submit both the legal claims and the admiralty claim to a jury. The first is the "weight and importance" of the RICO and fraud claims—the *jury* claims—as compared to the three-paragraph maritime contract claim, which Maersk's summary judgment papers do not even mention. Cf. Red Star Towing,

---

[13] All of these cases make clear that the introduction of Rules 9(h) and 38(e) in 1966 in no way undermined the core teaching of Fitzgerald (decided in 1963) that no statute or rule *forbids* a jury trial on an admiralty claim. The Third Circuit explicitly dispelled any such concern in Haskins v. Point Towing Co., stating that "the new merged rules do not . . . prevent us from allowing a jury trial on the admiralty claims," but merely provide that no such right is *created* by the rules. 395 F.2d 737, 743 (1968) ("Although the unified rules were adopted and became effective after Fitzgerald was decided, they make no attempt to deal with the Fitzgerald decision . . . .").

552 F. Supp. at 371. The RICO claim is especially important not only because it would entitle Maersk to treble damages, but because it represents the central allegation of this case: that the named defendants participated in a family-run racketeering enterprise that defrauded Maersk.

Second, this is not a "quintessential admiralty proceeding." In re Great Lakes, 895 F. Supp. at 614. In In re Great Lakes, Judge Conner split the proceeding, holding that the non-jury issues in plaintiffs' limitation actions would be tried to the court, after which the remaining issues would be submitted to a jury, largely because a "limitation action is a quintessential admiralty proceeding, customarily conducted without a jury." Id. at 614-15. That factor is not present here. Nothing about the posture of this proceeding—an action for damages alleging breach of contract, fraud and civil RICO—is quintessentially maritime in nature.

Third, a single jury trial is particularly appropriate here because the contract, fraud and RICO claims all seek money damages. Cf. Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 153 (4th Cir. 1995) ("While trials to different factfinders may be required in actions having law and equity components because of the jury's inability to fashion equitable remedies, that result is not compelled when claims at law and in admiralty, arising out of a single accident, are combined in a single complaint for damages."). Although Vodusek involved a single accident, not multiple frauds allegedly perpetrated by a racketeering enterprise, the Fourth Circuit's reasoning applies with almost equal force in this case: where, as here, the facts and circumstances giving rise to a plaintiff's law and admiralty damage claims are the same, "the considerations underlying the pragmatic rule of Fitzgerald dictate its application, even when the plaintiff has named different defendants in those claims." Id. at 154.

Fourth, the maritime contract claim and the fraud and RICO claims do, in fact, arise from the same set of underlying circumstances—a consideration that courts typically identify as

relevant in determining whether it would be appropriate to submit law and admiralty claims to a

jury. See, e.g., Red Star Towing, 552 F. Supp. at 371. The alleged breach of the bill of lading

for the Neewra shipment is an important component of the Neewra Fraud, and part of the broader

allegation of a RICO enterprise. Although proof of that enterprise would not depend on proof of

Joginder's breach, the two claims are inextricably linked. This is particularly true now, as the

disputed factual issue for trial on the contract claim is whether Joginder was a "principal" or

"Merchant" of Neewra and/or Al Tamasok, a question that also may be relevant for purposes of

ascertaining the structure of any RICO enterprise that existed among the named defendants.

In sum, based on Fitzgerald and its progeny, and in light of the considerations set forth

above, the Court concludes that Maersk's maritime contract, common-law fraud and RICO

claims should be tried before a jury.

The cases cited by Maersk do not counsel otherwise. Maersk relies heavily on a line of

cases supporting the unhelpful proposition that a jury trial should not be allowed in a case where

every claim (or the only claim) is within the court's admiralty jurisdiction, but at least one of the

claims (or the single claim) also sounds in diversity, and where the plaintiff has invoked the

court's admiralty jurisdiction. (See Pls.' Jury Strike Mem. at 2 (citing Hamilton v. Unicoolship,

Ltd., No. 99 Civ. 8791, 2002 U.S. Dist. LEXIS 346 (S.D.N.Y. Jan. 11, 2002) (citing T.N.T.

Marine Serv. v. Weaver Shipyards, 702 F.2d 585 (5th Cir. 1983); Durden v. Exxon Corp., 803

F.2d 845 (5th Cir. 1986); Island Queen Steamboat Co. v. Shearson Lehman Bros., Inc., No. 87

Civ. 6629, 1988 U.S. Dist. LEXIS 19487 (S.D.N.Y. Aug. 29, 1988)). The fact that Hamilton and

Island Queen have followed the Fifth Circuit in concluding that a jury trial is not appropriate in

such a situation in no way suggests that the Court should not allow a jury trial here, where two of

the remaining causes of action are *not within the Court's admiralty jurisdiction.*

For example, in Hamilton, the plaintiffs brought *in rem* admiralty claims against a vessel as well as *in personam* claims against the vessel's owners, the latter of which sounded both in maritime tort and diversity. 2002 U.S. Dist. LEXIS 346, at *2, 4. The plaintiffs had already taken advantage of the benefits of admiralty jurisdiction by obtaining a Letter of Undertaking, but asserted that they were entitled to proceed "at law" on their *in personam* claims, which the complaint had not specifically designated as admiralty claims. See id. at *2-3, 6. Judge McKenna granted defendants' motion to strike plaintiffs' jury demand, concluding that the plaintiffs had "invoked the admiralty jurisdiction" of the court by using the distinctive maritime procedure of demanding a Letter of Undertaking, and had thus effectively designated their *in personam* claims as admiralty claims. See id. at *10.

Island Queen is particularly revealing, as it actually underscores the reasons why the line of cases cited by Maersk does not apply here. In Island Queen, the plaintiff brought a single claim for the alleged breach of a charter party agreement, and its complaint invoked both the court's admiralty and diversity jurisdiction. 1988 U.S. Dist. LEXIS 19487, at *1. In holding that the plaintiff was not entitled to a jury trial, then-district court Judge Walker was, like Judge McKenna in Hamilton, "guided" by the Fifth Circuit's holding in the cases cited above, which Judge Walker summarized as follows: "where a plaintiff pleads a *single cause of action and elects to proceed in admiralty*, the fact that plaintiff's claim also satisfies the criteria for invoking a court's diversity jurisdiction does not entitle plaintiff to a jury trial of its claim." Id. at *4 (emphasis added). That holding does not bear on the question before this Court of how to resolve the jury/non-jury conflict between *multiple* causes of action, two of which are not within the Court's admiralty jurisdiction.

Indeed, Judge Walker went on to expressly distinguish Fitzgerald from the facts of Island Queen. First, "Unlike the plaintiff in Fitzgerald," and unlike Maersk here, "[the Island Queen plaintiff] assert[ed] only a single claim," sounding both in admiralty and diversity. Id. at *7. In other words, the Island Queen plaintiff's admiralty claim was not joined with legal claims carrying the right to a jury trial. Thus, the efficiency and fairness considerations that explain the Supreme Court's decision in Fitzgerald were not present in Island Queen, and Judge Walker held that the plaintiff was not entitled to a jury trial of its single claim. Id. at *7-9.

Maersk also points to cases from this District addressing the even less probative question of whether, when a plaintiff asserts an admiralty claim, and identifies it as such, the defendant is entitled to a jury trial on *counterclaims* over which the court has jurisdiction on non-admiralty grounds. (See Pls.' Jury Strike Mem. at 3-4 (citing Fed. Ins. Co. v. PGG Realty, LLC, No. 06 Civ. 2455, 2007 U.S. Dist. LEXIS 29483, at *25-26 (S.D.N.Y. Apr. 17, 2007) (finding that plaintiff, by electing to proceed under Rule 9(h) rather than diversity, had precluded defendant from invoking the right to a jury trial on its counterclaims); Royal Ins. Co. of Am. v. Deep Sea Int'l, No. 02 Civ. 3175, 2004 U.S. Dist. LEXIS 5948, at *32-33 (S.D.N.Y. Mar. 15, 2004) (adopting magistrate judge's recommendation that plaintiff's Rule 9(h) election to bring its single claim in admiralty should not be disturbed by defendant's counterclaims). The Remaining Defendants, of course, have not asserted any counterclaims; thus, neither PGG Realty nor Royal Insurance bears on the Court's conclusion.

Finally, Maersk contends that because it has taken advantage of a maritime attachment pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Rule B"), a jury trial would be inappropriate. (See Pls.' Jury Strike Mem. at 3.) Maersk quotes the Seventh Circuit's decision

in Brotherhood Shipping Co., Ltd. v. St. Paul Fire & Marine Ins. Co., 985 F.2d 323, 326 (1993), in which Judge Posner wrote: "The plaintiff's decision to plead its case as an admiralty case cannot be dismissed as a formality, when already the plaintiff has used the distinctive procedures of admiralty to take this interlocutory appeal." Not surprisingly, Brotherhood involved a claim sounding both in admiralty and diversity, and which the plaintiff had designated as an admiralty claim for purposes of Rule 9(h). Id. Moreover, the question of whether that claim should be tried to judge or jury was not even before the court in Brotherhood; instead, the Seventh Circuit merely implied that, if it were presented with that question, it would follow the approach of Hamilton, Island Queen and the Fifth Circuit. Thus, Brotherhood is similarly inapplicable to the case at bar.

Regardless, the fact that Maersk took advantage of the distinctive admiralty procedure of a Rule B attachment in no way mandates a bench trial of its fraud and civil RICO claims. There is no bar to jointly litigating legal claims and an admiralty claim in a single action where maritime procedures—such as a Rule B attachment—are used in connection with the admiralty claim. Cf. Haskins, 395 F.2d at 742 ("The unification of the civil and admiralty rules of procedure . . . specifically authorizes a hybrid proceeding in which claims in admiralty and claims at law are tried together, yet distinctive maritime remedies and procedures are preserved on claims identified as being brought within the admiralty jurisdiction under Rule 9(h).").

Nor is the Court's conclusion at all inconsistent with either Judge Casey's August 1, 2006 decision, or this Court's March 27, 2008 Opinion, the "two prior rulings" in this case (Pls.' Jury Strike Reply at 1). In the former, Judge Casey decided only that Maersk had pled a "maritime contract claim" against Mohinder, which was sufficient to sustain the court's maritime jurisdiction and the validity of the Rule B attachment of Mohinder's funds. See Maersk, Inc. v.

Neewra, Inc., 443 F. Supp. 2d 519, 531-32 (S.D.N.Y. 2006).  In the March 27, 2008 Opinion, this Court merely noted that the maritime contract was the basis for the Rule B attachment. Maersk, 554 F. Supp. 2d at 441.  Neither Judge Casey's nor this Court's ruling in any way suggested that, as a result of the Rule B attachment (or for any other reason), the Court's admiralty jurisdiction embraced the civil RICO and common-law fraud claims, such that the Remaining Defendants would not be entitled to a jury trial.  In the end, the use of a Rule B attachment in a hybrid action involving a maritime contract claim as well as legal fraud and RICO claims simply cannot extinguish a defendant's Seventh Amendment right to a jury trial on the fraud and RICO claims.

Thus, the Court concludes that all of the remaining claims—breach of a maritime contract against Joginder, common-law fraud against Joginder and Parkar, and civil RICO against all three Remaining Defendants—should be tried before a jury.  Accordingly, Maersk's motion to strike the Remaining Defendants' jury demand is denied.

## CONCLUSION

For the reasons set forth above, the Court awards summary judgment to Maersk on its claims for common-law conspiracy to commit fraud against Joginder and Help Line.  The Court also grants Maersk's motion for summary judgment on its Rednihom-based fraud claims against Joginder and Help Line, but denies Maersk's summary judgment motion as to its Neewra-based fraud claims against Joginder and Parkar.  The Court denies Maersk's summary judgment motion as to its breach of contract claim against Joginder and its civil RICO claim against all three Remaining Defendants.  The Remaining Defendants' cross-motion for summary judgment is denied in its entirety.  Finally, the Court denies Maersk's motion to strike the Remaining

Defendants' demand for a jury trial.  The Docket Clerk is directed to remove Docket Nos. 190, 194 and 198 from the Court's list of pending motions.

Dated: December 17, 2009

_____

U.S.D.J.

BY ECF TO ALL COUNSEL